**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** | **CASE NO.:** 3:19-CR-239 |
| Plaintiff, | |
| v. | **JUDGE:** Hon. Robert C. Chambers |
| **RICKY L. HOUDERSHELDT, D.O.,** | |
| Defendant. | |

---

**MEMORANDUM IN SUPPORT OF DEFENDANT'S RENEWED MOTION
FOR JUDGMENT OF ACQUITTAL OR DISMISSAL OR, IN THE ALTERNATIVE,
A NEW TRIAL**

**(EVIDENTIARY HEARING REQUESTED)**

---

Paul M. Flannery (OH 91480) (*Pro Hac Vice*)
Colin J. Callahan (PA 328003) (*Pro Hac Vice*)
David A. Brown (NC 48997) (*Pro Hac Vice*)
**FLANNERY | GEORGALIS LLC**
1375 E. 9th St., 30th Floor
Cleveland, OH 44114

Tel/Fax: (216) 367-2094 (Paul)
       (412) 254-8602 (Colin)
       (704) 949-2251 (David)

paul@flannerygeorgalis.com
callahan@flannerygeorgalis.com
dbrown@flannerygeorgalis.com

Mark McMillian (WV 0009912)
**Mark McMillian – Attorney at Law, L.C.**
Boulevard Tower, Suite 900
1018 Kanawha Blvd., East
Charleston, WV 25301
Tel: (304) 720-9099
Fax: (304) 720-0290
mark@markmcmillian.com

Jerri Jeaneen Legato (WV 0006978)
**Legato Law PLLC**
1018 Kanawha Blvd., East, Suite 1200
Charleston, WV 25301Tel:
Tel: (304) 340-9910
Fax: (304) 344-2869
jeaneenlegato@gmail.com

*Counsel for Defendant*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS .................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................ iv

FACTS ........................................................................................................................... 1

    A.    Dr. Houdersheldt ........................................................................................ 1

    B.    Encounter at Hurricane City Park ............................................................. 4

    C.    Debra Leslie .............................................................................................. 5

    D.    Dr. Timothy Munzing ............................................................................. 11

    E.    The Defense Case .................................................................................... 12

          1.  Brian Williams ............................................................................. 12

          2.  Ronnie Wilson ............................................................................. 13

          3.  Dr. Lewis Whaley ....................................................................... 14

LEGAL STANDARD .................................................................................................. 15

ARGUMENT ............................................................................................................... 17

I.    DR. HOUDERSHELDT IS ENTITLED TO A JUDGMENT OF ACQUITTAL
    BECAUSE THE GOVERNMENT FAILED TO PRESENT SUFFICIENT EVIDENCE
    TO SHOW HE INTENTIONALLY DISTRIBUTED A CONTROLLED SUBSTANCE
    BEYOND THE BOUNDS OF MEDICAL PRACTICE ............................... 17

    A.    The Government Showed No Benefit to Dr. Houdersheldt from His Purported
        Misdeeds ................................................................................................. 20

    B.    Dr. Munzing's Testimony Does Not Show Dr. Houdersheldt Acted Outside the
        Bounds of Legitimate Medical Practice ................................................. 23

    C.    Additional, Uncontradicted Evidence More Than Creates Reasonable Doubt as to
        Whether Dr. Houdersheldt Continued to Act as a Physician ................... 27

    D.    The Government Failed to Show Dr. Houdersheldt Intended to Act as a Drug
        Pusher ...................................................................................................... 28

II.    ALTERNATIVELY, DR. HOUDERSHELDT IS ENTITLED TO A NEW TRIAL
    BECAUSE HIS CONVICTION WAS AGAINST THE GREAT WEIGHT OF THE
    EVIDENCE ................................................................................................ 29

    A.    Ms. Leslie's Testimony Was Not Credible ............................................ 29

    B.    Dr. Munzing's Testimony Was Not Credible ........................................ 41

III.    THE COURT ERRED BY ADMITTING UNRELIABLE, UNCONSTITUTIONALLY
    OBTAINED, AND UNDULY PREJUDICIAL EVIDENCE AT TRIAL ...... 41

i

A.     Evidence of Dr. Houdersheldt's Other Acts Should Have Been Excluded Pursuant to Evidence Rules 403 and 404(b) ......................................................................... 42

B.     Dr. Houdersheldt's Statements to Investigators Were Inadmissable under *LaSalle National Bank* and *Garrity*.................................................................................. 51

C.     Dr. Munzing's "Expert" Opinion Was Inadmissible Under Daubert .................. 54

D.     Evidence from Dr. Houdersheldt's Medical Practice Was Obtained via a Fatally Flawed Warrant Affidavit and Should Have Been Excluded ............................... 63

IV.    THE JURY WAS PREVENTED FROM HEARING KEY EVIDENCE AS A RESULT OF THE GOVERNMENT'S *BRADY* AND *GIGLIO* VIOLATIONS AND THE COURT'S ERRONEOUS EVIDENTIARY RULINGS ..................................................68

A.     The Government Violated *Giglio* By Failing To Turn Over Critical Impeachment Evidence That Would Have Discredited Its Key Witness ....................................68

B.     The Government Wrongly Withheld Evidence Showing Dr. Houdersheldt Did Not, In Fact, Attempt To Interfere With A Police Investigation ......................... 83

C.     The Government Wrongly Withheld Evidence Of The Massive Financial Benefits Dr. Munzing Reaps As A Government Expert Witness ...................................... 84

D.     The Government's Conduct In Another Case In This District Proves These Failures Were Intentional............................................................................... 85

E.     The Court Erred By Precluding The Defense Expert From Testifying Based On His Interview With Dr. Houdersheldt ................................................................ 88

V.     THE GOVERNMENT'S MISCONDUCT DEPRIVED DR. HOUDERSHELDT OF A FAIR TRIAL..........................................................................................................89

A.     The Government Lied to Defense Counsel Just Before Trial to Induce a Plea Bargain ..........................................................................................................93

B.     Government Counsel Solicited Perjury from Sergeant Crane When It Allowed Him to Testify That Leslie Had Not Been Pressured or Threatened to Force Her Cooperation with the Government...................................................................... 95

C.     The Government Sought to Mislead the Jury at Trial to Prevent It From Learning of Its Own Past Misconduct................................................................................ 97

D.     Government Counsel Intentionally Asked Inflammatory Questions of Ms. Leslie to Mislead the Jury Into Believing that Dr. Houdersheldt Had Traded Drugs for Sex............................................................................................................... 103

E.     The Government Prejudiced the Jury Immediately Prior to Deliberations by Misstating the Evidence During Closing Argument........................................... 106

1.     The Government Lied to the Jury, Telling Them that Dr. Whaley Prescribed Drugs Illegally and Falsely Asserting that He Agreed with Dr. Munzing's Testimony .................................................................................................. 107

2.   The Government Lied to the Jury By Arguing That Dr. Houdersheldt Was Providing Drugs to Ms. Leslie to Groom Her for Sex ................................. 108

VI.   THE COURT FAILED TO PROPERLY INSTRUCT THE JURY ..............................111

A.   The Court Failed to Instruct the Jury Regarding the Specific Intent Component of "Beyond the Bounds of Medical Practice." ........................................................111

B.   The Court Failed to Instruct the Jury on How to Consider the Testimony of an Unindicted Co-conspirator like Ms. Leslie ......................................................... 115

VI.   EVEN IF NO SINGLE ERROR OR INSTANCE OF MISCONDUCT ENUMERATED IN THIS BRIEF IS INDEPENDENTLY SUFFICIENT TO WARRANT DISMISSAL OR A NEW TRIAL, THE CUMMULATIVE IMPACT OF THESE MYRIAD MISSTEPS MAKES DISMISSAL OR A NEW TRIAL AN ABSOLUTE NECESSITY ................................................................................................................117

CONCLUSION....................................................................................................................120

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Aiken*, 965 F.2d 1306 (4th Cir. 1992)........................................................ 25

*Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001)..................................................... 31

*Ashcroft v. Tennessee*, 322 U.S. 143 (1944) ............................................................. 48

*Aversa v. United States*, 99 F.3d 1200 (1st Cir. 1996)............................................... 101

*Barbe v. McBride*, 521 F.3d 443 (4th Cir. 2008) ...................................................... 114

*Berger v. United States*, 295 U.S. 78 (1935) ............................................................ 129

*Bruton v. United States*, 391 U.S. 123 (1968) ........................................................... 49

*Buckley v. Fitzimmons*, 20 F.3d 789 (7th Cir. 1994) ................................................... 48

*Campbell v. Reed*, 594 F.2d 4 (4th Cir. 1979) .......................................................... 106

*Chesapeake & Ohio Ry. Co. v. Martin*, 283 U.S. 209 (1931)......................................... 30

*Commonwealth v. Stirlacci*, 137 N.E. 3d 375 (Mass. 2001)......................................... 124

*Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 198 (4th Cir. 2001) ..................... 66, 67

*Crawford v. United States*, 212 U.S. 183 (1909)........................................................ 49

*Cruz-Vargas v. R.J. Reynolds Tobacco Co.*, 348 F.3d 271 (1st Cir. 2003) ................... 31

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)....................... 63, 64, 67, 72

*Eghnayem v. Boston Scientific Corp.*, 57 F. Supp. 3d 658 (S.D. W. Va. 2014).......... 71

Franks v. Delaware, 438 U.S. 154 (1978)................................................................. 72

*Gabor v. Barnhart*, 221 F. App'x 548 (9th Cir. 2007) ................................................ 67

*Garrity v. New Jersey* 385 U.S. 493 (1967)............................................................. 62

*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997)...................................................... 70

*Giglio v. United States*, 405 U.S. 150 (1972) .......................................................... 77

*Gilliam v. Sealey*, 932 F.3d 216 (4th Cir. 2019)...................................................... 48

*Gonzales v. Oregon*, 546 U.S. 243 (2006)............................................... 26, 27, 28, 29

iv

*Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245 (11th Cir. 2010)............................................. 66

*Hamric v. Bailey*, 386 F.2d 390 (4th Cir. 1967) ................................................................. 106, 114

*Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329 (11th Cir. 2003)........................................ 70

*In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices and Prod. Liab. Litig.*, 145 F. Supp. 3d 573 (D.S.C. 2019)................................................................................................. 67

*Kinsella v. U.S. ex rel. Singleton*, 361 U.S. 234 (1960)......................................................... 101

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)................................................... 64, 66

*Kyles v. Whitley*, 514 U.S. 419 (1995) ......................................................................... 78, 85, 91

*LaFrance v. Bohlinger*, 499 F.2d 29 (1st Cir. 1974) ................................................................. 48

*Lefkowitz v. Cunningham*, 431 U.S. 801 (1977) ...................................................................... 63

*Lefkowitz v. Turley*, 414 U.S. 70 (1973) ................................................................................. 63

*Love v. Johnson*, 57 F.3d 1305 (4th Cir. 1995) .................................................................. 93, 94

*March v. W.R. Grace & Co.*, 80 F. App'x. 883 (4th Cir. 2003) .................................................. 69

*Michelson v. United States*, 335 U.S. 469 (1948)................................................................. 56, 77

*Miller v. Pate*, 386 U.S. 1 (1967)......................................................................................... 106

*Moody v. Michigan Gaming Control Board*, 871 F.3d 420 (6th Cir. 2017)................................ 63

*Napue v. Illinois*, 360 U.S. 264 (1959) ........................................................................... 105, 106

*New York v. Burger*, 482 U.S. 691 (1987)............................................................................. 61

*Patterson v. New York*, 432 U.S. 197 (1977)......................................................................... 35

*Philpot v. LM. Commc'ns II of S.C., Inc.*, 343 F. Supp. 3d 694 (E.D. Ky. 2018) ....................... 54

*Sarkes Tarzian, Inc. v. U.S. Tr. Co. of Fla. Savings Bank*, 397 F.3d 577 (7th Cir. 2005)........... 31

*Sheppard v. Maxwell*, 384 U.S. 333 (1966)......................................................................... 101

*Spevack v. Klein*, 385 U.S. 511 (1967) ................................................................................. 63

*Strickler v. Greene*, 527 U.S. 263 (1999) ............................................................................. 78

*United States v. Abdallah*, 911 F.3d 201 (4th Cir. 2018).......................................................... 115

*United States v. Arrington*, 757 F.2d 1484 (4th Cir. 1985) ................................................. 25, 38

*United States v. Auten*, 632 F.2d 478 (5th Cir. Unit A 1980) ........................................ 85

*United States v. Basham*, 561 F.3d 302 (4th Cir. 2009) .................................... 116, 128

*United States v. Belyea*, 159 F. App'x 525 (4th Cir. 2005) ............................................ 25

*United States v. Birbragher*, 603 F.3d 478 (8th Cir. 2010) ........................................ 123

*United States v. Bowen*, 799 F.3d 336 (5th Cir. 2015) ............................................. 101

*United States v. Brice*, 2017 WL 3710800 (W.D. NC Aug. 28, 2017)........................ 47

*United States v. Brizuela*, 962 F.3d 784 (4th Cir. 2020)............................................. 58

*United States v. Brooks*, 928 F.2d 1043 (4th Cir. 1990).......................................... 125

*United States v. Burns*, 2016 WL 3910273 (W.D. Va. July 14, 2016)........................ 90

*United States v. Chapman*, 209 F. App'x 253 (4th Cir. 2006) .................................. 126

*United States v. Chong Lam*, 677 F.3d 190 (4th Cir. 2012) ..................................... 115

*United States v. Chube II*, 538 F. 3d 693 (7th Cir. 2008) ........................................ 124

*United States v. Davis*, 960 F.2d 820 (9th Cir. 1992)................................................ 39

*United States v. Dillingham*, No. 1:17-cr-184, (E.D. Va. August 22, 2018) ............... 64

*United States v. Ellis*, 121 F.3d 908 (4th Cir. 1997)......................................... 104, 106

*United States v. Feingold*, 454 F.3d 1001 (9th Cir. 2006).................................... passim

*United States v. Gentry*, No. 7:07-cr-294, 2011 WL 13172167
   (D.S.C. March 10, 2011)...................................................... 106, 111, 114

*United States v. Griley*, 814 F.2d 967 (4th Cir. 1987).............................................. 104

*United States v. Hall*, 858 F.3d 254 (4th Cir. 2017)..................................... 52, 53, 54, 56

*United States v. Harrison* 716 F.2d 1050 (4th Cir. 1983)........................................ 119

*United States v. Harvey*, 159 F. App'x. 451 (4th Cir. 2005) ................................... 125

*United States v. Hernandez*, 975 F.2d 1035 (4th Cir. 1992)...................................... 54

*United States v. Higgs*, 663 F.3d 726 (4th Cir. 2011).............................................. 77

*United States v. Johnson*, 587 F.3d 625 (4th Cir. 2009)............................................ 97

*United States v. Johnson*, 617 F.3d 286 (2010) ............................................... 54, 56

*United States v. Kohli*, 847 F.3d 843 (7th Cir. 2017) .......................................................... 37, 123

*United States v. LaSalle Nat. Bank*, 437 U.S. 298 (1978) ......................................................... 61

*United States v. Lawson*, 502 F. Supp. 158 (D. MD. 1980) ......................................................... 62

*United States v. Leonard*, 494 F.2d 955 (D.C. Cir. 1974) ......................................................... 49

*United States v. Lewis*, 10 F.3d 1086 (4th Cir. 1993) ......................................................... 118

*United States v. Lighty*, 616 F.3d 321 (4th Cir. 2010) ......................................................... 115

*United States v. Llamas*, 599 F.3d 381 (4th Cir. 2010) ......................................................... 25

*United States v. Martin*, 657 F. App'x 193 (4th Cir. 2016) ......................................................... 25

*United States v. Martinez*, 277 F.3d 517 (4th Cir. 2002) ......................................................... 26

*United States v. McBride*, 676 F.3d 385 (4th Cir. 2012) ......................................................... 54

*United States v. Mciver*, 470 F.2d 550 (4th Cir. 2006) ......................................................... 53

*United States v. Milam*, 443 F.3d 382 (4th Cir. 2006) ......................................................... 35

*United States v. Millender*, ___ F.3d ___, 2020 WL 4745571 (4th Cir. 2020) ...................... 24, 25

*United States v. Mitchell*, 1 F.3d 235 (4th Cir. 1993) ......................................................... 128

*United States v. N-Jie*, 276 F. App'x. 325 (4th Cir. 2008) ......................................................... 115

*United States v. Omni Intern. Corp.* 634 F. Supp. 1414 (D. Md. 1986) ............................ 126, 127

*United States v. Osborne*, 935 F.2d 35 (4th Cir. 1991) ......................................................... 25

*United States v. Palacios*, 677 F.3d 234 (4th Cir. 2012) ......................................................... 97

*United States v. Queen*, 132 F.3d 991 (4th Cir. 1997) .......................................................... 51, 52, 59

*United States v. Riley*, 920 F.3d 200 (4th Cir. 2019) ......................................................... 47

*United States v. Rosenberg*, 515 F.2d 190 (9th Cir. 1975) ......................................................... 123

*United States v. Russell*, 411 U.S. 423 (1973) ......................................................... 101

*United States v. Russell*, 971 F.2d 1098 (4th Cir. 1992) ......................................................... 87

*United States v. Sabean*, 885 F.3d 27 (1st Cir. 2017) ......................................................... 123

*United States v. Silver*, 103 F. Supp. 3d 370 (S.D.N.Y. 2015) ......................................................... 101

*United States v. Smith,* 459 F.2d 12 (4th Cir. 1972) ................................................ 125

*United States v. Sterling*, 724 F.3d 482 (4th Cir. 2013)........................................ 87, 88

*United States v. Sutton*, 542 F.2d 1239 (4th Cir. 1976)............................................... 80

*United States v. Teffera*, 985 F.2d 1082 (D.C. Cir. 1993) ......................................... 24

*United States v. Tran Trong Cuong*, 18 F.3d 1132 (4th Cir. 1994)....................... passim

*United States v. Varoudakis*, 233 F.3d 113 (1st Cir. 2000) ........................................ 52

*United States v. Veal*, 23 F.3d 985 (6th Cir. 1994).......................................... 38, 123

*United States v. Washington*, 184 F.3d 653 (7th Cir. 1999) ....................................... 38

*United States v. Williams*, 81 F.3d 1321 (4th Cir. 1996) ............................................ 58

*United States v. Wilson* 135 F.2d 291 (4th Cir. 1999) ............................................... 115

*United States v. Wilson*, 262 F.3d 305 (4th Cir. 2001) ............................................... 25

*White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992).................................................... 26

**Statutes**

21 U.S.C. § 841(b)(1)(C) ............................................................................................ 61

21 U.S.C. § 841(b)(1)(E) ............................................................................................ 61

21 U.S.C. § 842(a)(6) .................................................................................................. 60

21 U.S.C. § 844........................................................................................................... 49

28 U.S.C. § 530B(a)................................................................................................... 100

**Other Authorities**

21 C.F.R. § 1306.04 .................................................................................................. 121

**Rules**

Fed. R. Crim. P. 29 .................................................................................................... 24

Fed. R. Evid. 401 ................................................................................................... 58, 59

Fed. R. Evid. 403 ........................................................................................................ 59

Fed. R. Evid. 404(b)(1) .............................................................................................. 51

Fed. R. Evid. 408 ................................................................................................ 54

Fed. R. Evid. 703 ................................................................................................ 97

W.V. Rules of Prof. Conduct 3.4 ...................................................................... 103

W.V. Rules of Prof. Conduct 3.6 ...................................................................... 100

W.V. Rules of Prof. Conduct 3.8 ...................................................................... 100

W.V. Rules of Prof. Conduct 4.1 ...................................................................... 103

**Publications**

Centers for Disease Control and Prevention, Morbidity and Mortality Weekly Report, *CDC Guideline for Prescribing Opioids for Chronic Pain* 16, 30, 31–32 (2016) ............................ 71

Christine J. Saverda, Note, *Accomplices in Federal Court: A Case for Increased Evidentiary Standards* 100 Yale L. J. 785, 786 (1990) .............................. 50

Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 6–8(B)(2)(c) (4th ed. 2000) ................................................................................... 114

Jeffrey A. Gudin, MD, et al., *Risks, Management, and Monitoring of Combination Opioid, Benzodiazepines, and/or Alcohol Use*, National Institutes of Health (July 2013) .................... 32

Michael H. Graham, *Handbook of Federal Evidence* § 607:2 (6th ed. 2006) ............................ 114

Richard A. Leo, *False Confessions: Causes, Consequences, and Implications*, 37 J. Am. Acad. Psychiatry & Law 332, 335 (2009) ......................................................... 47

Sir Walter Scott, *Marmion: A Tale of Flodden Field* (1808) ...................................... 88

To err is human, not criminal. Contrary to the government's theory at trial, the Controlled Substances Act does not make felons of doctors who make mistakes or keep sloppy records. Instead, to be found guilty of violating the Act, a doctor must wholly depart from his medical role and engage in drug trafficking as traditionally understood.

In this case, the government failed to present sufficient evidence that Dr. Ricky L. Houdersheldt knowingly distributed controlled substances outside the ordinary course of medical practice. At the very least, his convictions on 17 counts were against the great weight of the evidence.

The government obtained those convictions only through: (1) flagrant government misconduct on the part of a prosecution team with a history of abandoning norms of professional behavior to pursue victory at all costs; (2) the admission of improper and highly prejudicial evidence; and (3) the withholding and exclusion of favorable evidence. Dr. Houdersheldt therefore asks this Court to enter a judgment of acquittal or dismiss the indictment. In the alternative, he asks the Court to grant him a new trial.

## FACTS[1]

Dr. Ricky L. Houdersheldt was indicted on September 18, 2019, on six counts of distribution of controlled substances "not for legitimate medical purposes in the usual course of professional medical practice and beyond the bounds of medical practice," in violation of the Controlled Substances Act ("CSA"), 21 U.S.C. § 841. ECF No. 1 at 2. The government twice superseded this original indictment, culminating in a second superseding indictment filed May

---

[1]      This section presents a broad overview of the facts of the case. Additional facts are presented later in the specific subsections of argument to which they are most relevant.

1

12, 2020, and alleging 23 counts of § 841 violations—*i.e.*, a total of only 23 times that Dr. Houdersheldt had supposedly written an illegitimate prescription. ECF No. 24; ECF No. 74.

From the beginning, the government's case was built on an erroneous theory of "drugs for sex," which was premised on the very thinnest of evidentiary reeds. That may not be all that uncommon at the start of an investigation. But what *was* uncommon was the fact that, as the investigation progressed, it failed to yield additional (really, any) evidence of Dr. Houdersheldt's guilt. To the contrary, virtually everywhere the government turned, it bumped into facts that contradicted its wild theory of the case. Not to be deterred, however, the government pressed on, "correcting" star witness testimony, threatening charges, suppressing evidence, quieting unhelpful voices, and the like—tactics it has recently begun to deploy again in another case in this District.

In the end, the government's case at trial rested exclusively on a single fact witness—whose government-coerced story did not even support a finding of criminal behavior—and a single, purported, expert witness—who the government has paid over $1.8 million in the last 2 years to testify in its favor. With these two witnesses in tow, and the use of false testimony and patently improper argument, the government was able to eke out convictions with respect to 17 of the 23 purportedly illegal prescriptions Dr. Houdersheldt was charged with writing.

A.     **Dr. Houdersheldt**

Dr. Houdersheldt has practiced medicine in Hurricane, West Virginia for nearly forty years. He turned down lucrative opportunities with large hospitals in Philadelphia, Baltimore, and Cleveland—where he completed his residency and several clinical rotations. Instead, he chose to return home to serve the people in the community where he was born and raised.

Dr. Houdersheldt built up a practice that served over 3,000 patients in Hurricane and greater Putnam County, including numerous elderly patients who suffered from life-threatening and painful illnesses, including incurable cancers.

Dr. Houdersheldt has impeccable academic credentials and has given back to his profession by serving as a professor and faculty member at several medical schools. Across the nearly 40-year span of his practice, he has had only two malpractice or similar complaints lodged against him. Likewise, prior to this case, he had never been sanctioned or reprimanded by the Board of Medicine.

Indeed, this record of good conduct threw a wrench into the government's efforts to manufacture this case. When the government first set its sights on Dr. Houdersheldt and determined that he would be a necessary casualty in their effort to burnish their anti-opioid credentials, it was interested in 52 of Dr. Houdersheldt's 3,000 patients as potential addicts for whom Dr. Houdersheldt served as their supposed "dealer." *See* Ex. A (Affidavit in Support of Application for Search Warrant) at 9, 12–14.

Review of those 52 files showed that even that canvass—roughly 1.9% of Dr. Houdersheldt's patient rolls—was overbroad by an order of magnitude. The government decided that, of the 52, only nine even merited review by the government's expert. *See generally* Ex. B (Report of Dr. Timothy Munzing). That expert, though incentivized to find wrongdoing by the more than $1.8 million in expert fees he garnered from the government since 2019, in turn winnowed the pool of potential patients whose prescriptions supposedly violated the CSA to precisely *three*—or about 0.1% of Dr. Houdersheldt's practice. Of those three, two testified *in Dr. Houdersheldt's favor* at trial, resulting in an acquittal in 6 of the 23 charges. And the sole patient who testified for the

3

government swore that Dr. Houdersheldt gained no illicit financial or other benefit from providing her with the duly authorized prescriptions. But perhaps it is best to start at the beginning.

### B.   Encounter at Hurricane City Park

The case against Dr. Houdersheldt began with an encounter between Dr. Houdersheldt, his patient Debra Leslie, and Officer Timothy Duran—a local Hurricane policeman who, interestingly, was elevated in May 2020 to the position of Deputy U.S. Marshall.[2] At trial, Duran testified that he was on patrol when he drove into Hurricane City Park (Trial Tr. at 38:2–10, 39:7–24, 40:5–24) where he saw two vehicles parked under a streetlight: a black Escalade and a dark-colored Jeep with North Carolina plates. *Id.* at 41:12–25, 71:16–72:5. Duran conducted what he termed a "welfare check," *id.* at 42:7–12, though the basis for that "check" is not clear from his testimony. As he approached the vehicles, Ms. Leslie exited the passenger side of the Escalade. *Id.* at 43:2–15.

According to Duran's trial testimony,[3] on exiting the vehicle, Ms. Leslie stated that she was "just leaving" and had been there to "pick up a prescription." *Id.* at 44:9–10. Duran requested Ms. Leslie's driver's license and the prescription (i*d.* at 44:18–45:7) and he talked to Dr. Houdersheldt, the driver of the Escalade. *Id.* at 45:14–46:5. Dr. Houdersheldt confirmed Ms. Leslie's explanation that he was a doctor and was just dropping off a prescription for his patient. *Id.* at 46:1–2.

---

[2]     If the Court orders a hearing on the motion for new trial, as Dr. Houdersheldt has requested, the defense intends to explore what support the government attorneys provided for Duran as he sought a position with the U.S. Marshal's Service. If such support was provided and not disclosed to the defense, that would be yet another *Giglio* violation. *See*, *infra*, Sections IV.A, IV.B, and IV.C.

[3]     As discussed in greater detail below, it is here that Duran's testimony departs markedly from the account provided in his incident report used to justify a search warrant.

According to Duran, he then allowed Dr. Houdersheldt to leave to tend to a medical emergency (*id.* at 58:8–9, 59:2–3) but, thereafter, continued to detain and interrogate Ms. Leslie in the cold for an additional 10–20 minutes before searching her car, *id.* at 59:6–10; Trial Tr. at 570:21–25. Finding nothing, Duran ultimately allowed Ms. Leslie to leave after an hour of unwarranted detention. *See id.* at 59:15–19, 574:14–16.

### C.    Debra Leslie

Ms. Leslie was the government's star fact witness. But that was not because of the strength of her testimony or the clarity of her memory. Rather, it was because she was the only one of Dr. Houdersheldt's 3,000 patients willing to testify against him. That said, "against" is a strong word.

On September 10, 2019—nearly a year after Duran had interrogated Ms. Leslie in Hurricane City Park—Duran, West Virginia State Police Sergeant Jason Crane, and two additional agents questioned Ms. Leslie for more than two hours at DEA's Charleston facilities. *Id.* at 178:5-10, 13–22, 216:11-20. Events surrounding that interrogation are discussed in more detail in later sections of this brief, but even a brief introduction is enough to give a flavor of the illegal and coercive interrogation.

According to Ms. Leslie's uncontradicted testimony, Crane and Duran came to her just-deceased mother's home where Ms. Leslie was meeting with family. *Id.* at 648:5. They seized her and transported her to the Charleston DEA office without telling her where they were going or why. *Id.* at 649:10–13; 681:19–682:4. Understandably she was "very nervous" and "scared." *Id.* at 648:25; 681:23-682:4. In fact, she admitted that some of the information she gave the officers was inaccurate—especially the dates she met Dr. Houdersheldt outside the office. *Id.* at 650:14–24.

During the two-hour-plus interrogation Ms. Leslie was told that "the government needed her assistance," and assured her that she was not, at least at that point, the target of the investigation. *Id.* at 195:11–18; 197:24–198:12. But the agents pressed her again and again to admit that she had a sexual relationship with Dr. Houdersheldt. *Id.* at 652:1–654:3; 682:13–685:20. A recording of the interview shows that, even after she was asked <u>more than 30 times</u>, Ms. Leslie steadfastly denied it. *See generally* Ex. C (Tr. of Sept. 10 Interrogation of Ms. Leslie), *passim*.

The officers repeatedly told her, despite her denials, that they thought she was lying. Trial Tr. at 216:21–217:3; 686:8–12. They also threatened her with criminal charges. Ex. C at 59:21–60:13 ("You have a lot of options, and if we continue down this road, doors are going to close for you. . . . [I]f you keep going down this path . . . you're going to get caught up in something."). In response to this pressure, Ms. Leslie had a revelation about halfway through the interview:  She suddenly recalled an alleged sexual proposition Dr. Houdersheldt made to her on September 20, 2018. Trial Tr. at 654:4–9. Even then, she asserted only that Dr. Houdersheldt purportedly made a romantic advance, on a single occasion, which she rejected. Ex. C at 88:5–6. More importantly, Ms. Leslie firmly denied that her prescription or any other benefit was conditioned on her response to the alleged personal request. *See*, *infra*, Section II.A.2.

In the same interview, Ms. Leslie told the agents that she had only met with Dr. Houdersheldt on two occasions outside his office. Ex. C at 16:10, 61:9. But here too her memory suddenly "sharpened" as the interrogation progressed. *See*, *infra*, Section II.A.2. By the time the interrogation was concluded, she had raised the number of out-of-office meetings and prescriptions to six. *Id.*

Unsurprisingly, the government could not corroborate these "facts," and so, Crane, Duran, and another officer interrogated Ms. Leslie a second time—again for two hours—on September

14, 2019, this time in her recently deceased mother's home. *Id.* at 179:5–21 (purpose of second interview was "[t]o follow up on information that was uncertain from the previous interview"). During that interview, the agents confronted Ms. Leslie with prescriptions and her Board of Pharmacy ("BOP") record and persuaded her that she had met with Dr. Houdersheldt at specific locations and on specific dates in 2018 that matched what they believed could be corroborated by their investigation, including cell phone records, rather than the dates and locations Leslie had previously provided to the government. Ex. D (Tr. of Sept. 14 Interrogation of Ms. Leslie) at 57:2–68:16.)[4] Having secured this "confirmation," the government went forward with the first indictment, which alleged that Ms. Leslie had met with Dr. Houdersheldt on six occasions outside his office.

Following that indictment, the government executed a search warrant on Dr. Houdersheldt's office. Based on the seized medical records, the government learned that the prescription issued to Ms. Leslie on one of the six supposed occasions—June 8, 2018—was actually written during an office visit, and not in the parking lot of a Dollar General as the agents persuaded Ms. Leslie to "recall." Doc. No. 74, p.2. The government subsequently learned that *another* of the prescriptions—the one from July 10, 2018—was also written pursuant to an office visit and not, as the agents had persuaded Ms. Leslie to say—in the parking lot of a Speedway. The government was forced to supersede the indictment to correct these "errors." *Id*.

---

[4]   At trial, she testified that the officers essentially told her where and when she met Dr. Houdersheldt outside of his office so her story would match their records. Trial Tr. at 688:21–689:4. And as discussed below, Dr. Houdersheldt's medical records belied the information Leslie was told was where she received those prescriptions.

And still the government could not get its facts straight.[5] At trial, the government's own evidence showed that the prescription written on September 20, 2018—the date of the infamous proposition from Dr. Houdersheldt—was also provided during an office visit. Gov. Ex. 401 (Medical Records of Ms. Leslie) (excerpt attached as Ex. E). Accordingly, the government's basic facts were wrong on three of the six prescriptions at issue.

But because the in-office evidence with respect to this third prescription completely debunked Ms. Leslie's story about an alleged sexual advance—the one she had conjured up at the repeated urgings and threats of her interrogators—this time the government did not correct the error. Instead, the government went so far as to suggest at a bench conference (though it had no good-faith basis for doing so) that Dr. Houdersheldt could have fabricated the records after the fact. *Id.* at 715:2–4.[6] The Court dismissed this theory as "pure speculation." *Id.* at 715:5. Thus stymied from infecting the jury with baseless slander, the government simply left the discrepancy unexplained and hoped the jury would not notice.

With the government thus running interference, Ms. Leslie was able to testify at trial concerning the six prescriptions and the sexual-advance story she had "remembered" at the behest of the government. According to her uncorroborated testimony, on September 20, 2018, after visiting a farm that she was interested in buying from Dr. Houdersheldt, she was asked whether she was interested in "fooling around." Tr. at 623:12-13. Ms. Leslie said she wasn't interested (*id.* at 624:1-7), and she later received her prescription with no strings attached, *id.* at 627:4-20. Ms.

---

[5]    In addition to the September 10 and September 14, 2018 interrogations, the government met with Ms. Leslie at least two or more times to try and get their ducks in a row. Trial Tr. at 218:5–220:14.

[6]    Government counsel made this assertion even though the government had previously seized all of Dr. Houdersheldt's medical records.

Leslie was very clear that Dr. Houdersheldt never suggested trading sex for drugs.[7] *Id.* at 652:6–653:8. Nor did he accept "any form of financial compensation" for the prescription. *Id.* at 628:9–12. And he never again made any romantic overtures to her. *Id*. at 683:12.

Besides the romantic-advance story and a rote account of obtaining the other five out-of-office prescriptions, Ms. Leslie testified about her experience as Dr. Houdersheldt's patient for approximately twelve years. Trial Tr. at 552:13–553:7. The balance of her testimony was not helpful to the government.

Ms. Leslie testified that she experienced chronic pain (*id.* at 696:15–25); she averred that over time she had "extensive consultation with [Dr. Houdersheldt]" about her conditions, that he ordered a variety of imaging tests, and that he ordered her evaluation by other medical experts (*id*. at 698:12–19; she explained that she "discussed with him various treatment alternatives and options about the whole picture of [her] life, [her] lifestyle, and everything else considered." (*id*. at 698:20–24); and she even said that she thought he gave her proper care and that, over the course of her treatment, the quantum of opioids she was taking actually *decreased*. *Id.* at 699:16–20; 701:14–21. Part of her testimony is worth quoting in full:

> Q.    This wasn't something where you popped up after having not seen the doctor for an extended time and said, hey Doc remember me?
>
> A.    Yes.
>
> Q.    I need some pills, can you help me out? It wasn't anything like that, was it?
>
> A.    No.

---

[7]    Though that fact did not prevent government counsel from repeatedly arguing to the contrary during closing. Trial Tr. at 3:6-7; 5:14-23; 9:16-24; 10:13-27; 11:3-15; 1036:10-1037:1; 1042:17-21; 1075:14-23.

> Q.      He was seeing you the whole time very regularly, weekly, in fact, right, at times?
>
> A.      Yes.
>
> Q.      He knew your condition; did he not?
>
> A.      Yes.
>
> Q.      He knew it very well. He listened to you every time you said there was a change in your condition, and when necessary or appropriate, he would even verify that with imaging, et cetera, right?
>
> A.      Yes.

*Id.* at 703:24–704:15.

She did testify that she became concerned that she might be having adverse effects from her continued use of opioids. *Id.* at 578:21–579:20. But according to Ms. Leslie, Dr. Houdersheldt was responsive to those concerns, began prescribing a Suboxone treatment (*id.* at 580:25–581:7) and he explicitly advised her to "take it as prescribed." *Id.* at 581:5–7. Ms. Leslie then cycled between opioids and Suboxone several times but eventually asked to switch back to hydrocodone because Suboxone was too expensive and because she continued to require pain medication because of her underlying conditions. *See id.* at 589:25–590:1. Dr. Houdersheldt worked with her to transition from Tylenol-4. *Id.* at 555:5–11. None of this, of course, establishes criminal liability on Dr. Houdersheldt's part.

In short, what Ms. Leslie had to say was equivocal and not terribly useful for the government. And even the meager gruel they were able to wring from her trial testimony was not reflective of Ms. Leslie's actual memory but rather was the product of coercive government interrogations, government "supplementation" of Ms. Leslie's memories, threats of prosecution, and other manipulations. But it was all they had.

### D.      Dr. Timothy Munzing

Although Ms. Leslie was the government's star fact witness, the government also alleged that Dr. Houdersheldt illegally prescribed medication to two more of his roughly 3,000 patients—Messrs. Brian Williams and Ronnie Wilson. Neither Mr. Wilson nor Mr. Williams was willing to testify for the government at trial.

With only one patient willing to say anything, even equivocally, bad about Dr. Houdersheldt, the government was in desperate need of another witness to testify against Dr. Houdersheldt. To fill that role, the government hired Dr. Timothy Munzing to testify as an "expert" regarding each of the at-issue prescriptions to Ms. Leslie, Mr. Williams, and Mr. Wilson. *E.g.*, Trial Tr. at 376:9–11.

Despite his so-called expert opinion, Dr. Munzing admitted that he based his determination entirely on *government-provided* copies of Dr. Houdersheldt's patient files. And despite testifying that an in-person examination—including obtaining a complete medical history—is a critical part of determining whether a course of opioid treatment is appropriate (*id.* at 403:13–404:6, 408:2–413:1, 414:15–24, 435:12–13), Dr. Munzing admitted that he did not personally examine any of the at-issue patients, *id.* at 385:17–22. He also did not request any additional information beyond Dr. Houdersheldt's records, which he claimed were inadequate. *Id.* at 501:18–502:15. Apparently believing that a doctor should not be permitted to make house calls or otherwise accommodate a patient's busy schedule, Dr. Munzing also testified that it necessarily is "unprofessional" to meet with a patient outside the office. *See* Trial Tr. at 424:13–25.[8]

---

[8]      This testimony is indicative of Dr. Munzing's overarching lack of familiarity with how medicine is practiced in smaller towns across West Virginia and the United States more generally, which unsurprisingly differs from his own practice in Orange County, California.

Dr. Munzing admitted that he only ever testifies as a witness for the government. *Id.* at 386:25–387:3. Further, he admitted that he was paid $16,800 to prepare his report in this case and also guessed that his final compensation for the case would be in the "ballpark of" $30,000. *Id.* at 497:20–498:2. The government had never disclosed how much Dr. Munzing was being paid, or even if he was being paid at all. Which is understandable, if not acceptable, considering Dr. Munzing's receipt of more than $1.8 million for serving as a government witness since 2019. U.S. Treasury Department, Bureau of the Fiscal Service, *USAspending.gov* (last accessed Oct. 1, 2020), available at https://www.usaspending.gov/search/99b4dcac35ce06d1e5448fb1ac5f 4a39.

## E.    The Defense Case

Dr. Houdersheldt presented the testimony of several witnesses, including two of the three patients who received prescriptions that the government alleged were medically unnecessary: Ronnie Wilson and Brian Williams. Their testimony refutes all the legitimate evidence the government introduced at trial.

### 1.    Brian Williams

Brian Williams, whose prescriptions were the basis for 11 of the 23 counts against Dr. Houdersheldt (and 11 of the 17 counts of conviction), testified on the doctor's behalf. Trial Tr. at 808. Mr. Williams was in a car accident that resulted in severe injury to his back and a botched surgery that left him in "a great deal of pain." *Id.* at 782:12–783:15, 809:18–810:7. He testified that each appointment with Dr. Houdersheldt lasted at least 20 minutes, during which Dr. Houdersheldt would perform a physical examination and range-of-motion tests, take other evaluative steps as necessary, and discuss Mr. Williams's course of treatment. *Id.* at 812:15–20.

Mr. Williams testified that, when he was Dr. Houdersheldt's patient, his pain was under control, his quality of life was greatly improved, and he was able to take care of his farm. *Id.* at 815:14–23. But now that he is being treated by a new physician (a physician who undoubtedly is aware of the government's overzealous prosecution of Dr. Houdersheldt and consequently gun shy) who prescribes inadequate pain medication, his chronic pain means that he struggles to get off the couch, is unable to keep up with his farm, and in fact may soon be forced to sell the farm. *Id.* at 814:8–13, 21–24, 815:9–816:3.

Williams's wife, a registered nurse, also testified. Trial Tr. at 781. Mrs. Williams explained that her husband began seeing Dr. Houdersheldt in 2008, at which point Dr. Houdersheldt *reduced* the dosage on Mr. Williams's previously prescribed pain medication. *Id.* at 785:24–786:2, *see also* 811:19–21. She confirmed that, at each appointment, Dr. Houdersheldt would spend around twenty minutes examining her husband, discussing his treatment, and giving counsel on potential side effects. *Id.* at 786:3–787:1. She further explained that, prior to being prescribed opioids, her husband had tried other treatment methods—including physical therapy—without success. *Id.* at 790:22–791:11. Finally, she corroborated Mr. Williams's testimony that his new physician's unwillingness to prescribe needed pain medication has severely degraded Mr. Williams's quality of life. *Id.* at 787:6–788:13. "When he was under Dr. Houdersheldt's care, he had good days and he had bad days. . . . Now he doesn't have good days." *Id.* at 788:7–13.

### 2. Ronnie Wilson

Dr. Houdersheldt's third patient whose prescriptions were at issue in the case—Ronnie Wilson—also testified on his behalf. Trial Tr. at 750. Mr. Wilson suffers from an autoimmune disease that causes him to experience severe pain throughout his body. Trial Tr. at 724:3–20. Notwithstanding that condition, he works about 60 hours a week (including 10-12 hours a day on

his feet) as a hairstylist. *Id.* at 726:8, 728:9, 751:4–12. Mr. Wilson saw Dr. Houdersheldt for eight years. *Id.* at 734:10–12. His pain is such that he has had to train himself to hold his shears in a special way in order to perform his job. *Id.* at 752:8–12. Mr. Wilson testified that Dr. Houdersheldt performed a physical exam at every appointment. *Id.* at 773:4–7. He also explained that he had unsuccessfully tried physical therapy in the past. *See id.* at 770:21–25.

Scott McSweeney, Mr. Wilson's husband, also testified, explaining that he attended all of Mr. Wilson's physician appointments, both with Dr. Houdersheldt and other doctors (such as the Cleveland Clinic rheumatologist to whom Dr. Houdersheldt referred Mr. Wilson). *Id.* at 725:8–17. He testified that Mr. Wilson began seeing the Cleveland specialist because Dr. Houdersheldt did not "think there was sufficient experience in the area," and Cleveland Clinic was the best place to go. *Id.* at 727:10–15.

Mr. McSweeney confirmed the severe and debilitating nature of Mr. Wilson's pain and said that Mr. Wilson would have been unable to work without Dr. Houdersheldt's treatment. *Id.* at 728:15–729:13. He further testified that Dr. Houdersheldt extensively discussed the side effects of Wilson's medication with them both, reviewed reports from specialists, and took other medically appropriate steps. *Id.* at 729:24–731:24; 738:20–739:3.

The jury acquitted Dr. Houdersheldt of all charges related to Mr. Wilson's prescriptions.

### 3.    Dr. Lewis Whaley

Finally, Dr. Lewis Whaley testified that, in his expert opinion, Dr. Houdersheldt's treatment of Ms. Leslie, Mr. Williams, and Mr. Wilson was within the bounds of medical practice. His conclusion was that Dr. Houdersheldt "could have been more diligent in his recordkeeping, but that doesn't mean he did something wrong." *Id.* at 865:18–20, 867:22–24. He testified that Dr. Houdersheldt performed appropriate BOP checks on each of the three patients at issue. *Id.* at

922:11–17. In addition to reviewing patient records, Dr. Whaley also interviewed both Mr. Williams and Mr. Wilson, as well as their spouses. *Id.* at 861:18–863:20. He was not able to meet with Ms. Leslie. *Id.* at 863:23–24.

In stark contrast to the government's expert, Dr. Whaley provided his opinions free of charge. *Id.* at 957:15–21. He explained that there are times when it is medically appropriate to prescribe both opioids and benzodiazepines. *Id.* at 905:3–22. In his opinion, prescribing both simultaneously was appropriate for Messrs. Williams and Wilson. *Id.* at 906:18–23. He also explained that, although Mr. Williams's morphine milligram equivalents ("MME")[9] levels were high, such levels are appropriate for certain patients with severe pain and that Mr. Williams's medical records supported the conclusion that he was such patient. *Id.* at 886:17–887:17.

## **LEGAL STANDARD**

Criminal Rule 29 requires that the Court grant a motion for judgment of acquittal as to "any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). When adjudicating such a motion, the Court considers the evidence in the light most favorable to the government. *See United States v. Millender*, ___ F.3d ___, 2020 WL 4745571, *3 (4th Cir. 2020).

While this standard is favorable to the government, it is far from "toothless." *United States v. Teffera*, 985 F.2d 1082, 1085 (D.C. Cir. 1993). That is, in ruling on a motion for judgment of acquittal, the Court must do more than offer a "rote incantation of the [standard of review] followed by summary affirmance." *Id*. And while a jury is entitled to make reasonable inferences from the

---

[9]     Morphine milligram equivalents are a method of comparing one controlled substance to another. Trial Tr. 399:18-19.

evidence, it may not base its verdict on speculation. *Id.* at 1085. Thus, a district court has substantial discretion to enter a judgment of acquittal.

When it comes to a motion for a new trial, a district court's discretion is even broader, as Criminal Rule 33(a) permits a trial court to grant such a motion *any time* "the interest of justice so requires." Indeed, the Fourth Circuit has gone so far as to assert that while a district court, in ruling on a motion for judgment of acquittal, "may not draw inferences . . . unfavorable to the Government . . . from the evidence," "[i]n determining the necessity of a new trial, such inferences are allowed." *Millender*, 2020 WL 4745571, at *6 (internal quotation marks omitted). The Court thus has no obligation to view the evidence in the light most favorable to the government, and it is free to independently evaluate—and render an independent judgment concerning—witness credibility. *United States v. Arrington*, 757 F.2d 1484, 1485–86 (4th Cir. 1985).

In short, a district court should grant a new trial whenever the evidence shows that it would be "unjust to enter judgment" against the defendant, such as where the defendant's conviction is against the great weight of the evidence or he has been prejudiced by legal error or government misconduct. *Millender*, 2020 WL 4745571, at *6; *United States v. Arrington*, 757 F.3d 1484,1485 (4th Cir. 1985) ("Rule 33 allows a district court to grant a new trial in the interest of justice."). Under that standard, new trial motions have been granted based on: errors in the admission or exclusion of evidence,[10] the government's failure to comply with its *Brady* and *Giglio* obligations,[11] prosecutorial misconduct,[12] improper statements during closing arguments,[13]

---

[10]   *United States v. Martin*, 657 F. App'x 193, 199 (4th Cir. 2016); *United States v. Belyea*, 159 F. App'x 525, 533 (4th Cir. 2005).

[11]   *United States v. Llamas*, 599 F.3d 381, 391 (4th Cir. 2010).

[12]   *United States v. Wilson*, 262 F.3d 305, 314 (4th Cir. 2001); *United States v. Osborne*, 935 F.2d 35, 37 (4th Cir. 1991).

[13]   *Adams v. Aiken*, 965 F.2d 1306, 1318 (4th Cir. 1992).

16

sufficiency of the evidence,[14] and the cumulative effect of independently insufficient errors which, when taken together, amount to a deprivation due process.[15]

As discussed below, *each* of those bases are present in this case. Accordingly, Dr. Houdersheldt is entitled, at a minimum, to a new trial.

## ARGUMENT

In this case, the government has failed to show that Dr. Houdersheldt is anything more than a fallible physician. He is thus entitled to a judgment of acquittal. In the alternative, the lack of evidence against him, government misconduct, and numerous legal errors—either in isolation or together—entitle him to a new trial.

**I.      DR. HOUDERSHELDT IS ENTITLED TO A JUDGMENT OF ACQUITTAL BECAUSE THE GOVERNMENT FAILED TO PRESENT SUFFICIENT EVIDENCE TO SHOW HE INTENTIONALLY DISTRIBUTED A CONTROLLED SUBSTANCE BEYOND THE BOUNDS OF MEDICAL PRACTICE.**

The Controlled Substances Act (CSA) gives the Department of Justice "limited powers to be exercised in specific ways." *Gonzales v. Oregon*, 546 U.S. 243, 259 (2006). It grants DOJ neither "authority to make quintessentially medical judgments" nor permission "to make a rule declaring illegitimate a medical standard for care and treatment of patients that is specifically authorized under state law." *Id.* at 258, 267. In other words, the CSA does not transform DOJ into a super-medical board, empowered to use the criminal law to discipline physicians who it believes have departed from its idealized standard of care. *Id.* at 262. Instead, the power to define the bounds of acceptable medical practice and to discipline wayward physicians rests primarily with the States. *See id.* at 270.

---

[14]     *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992).

[15]     *United States v. Martinez*, 277 F.3d 517, 532 (4th Cir. 2002)

The federal government's authority is circumscribed to prosecuting doctors who use "their prescription-writing powers as a means to engage in illicit drug dealing and trafficking as conventionally understood." *Gonzales*, 546 U.S. at 270. That is, prosecutions are only warranted for the doctor who acts "as a drug pusher instead of a physician"—who, for example, sells drugs "not for legitimate purposes, but primarily for the profits to be derived from them." *Id.* at 269 (internal quotation marks omitted). "Beyond this, however, the statute manifests no intent to regulate the practice of medicine more generally." *Id.* at 270.

Thus, to prove that a medical practitioner was violating the CSA, "the government must prove beyond a reasonable doubt that (1) defendant knowingly or intentionally distributed the controlled substance alleged in the indictment, and (2) at the time of such distribution the defendant knew that the substance distributed was a controlled substance under the law." *United States v. Tran Trong Cuong*, 18 F.3d 1132, 1137 (4th Cir. 1994). And there is "a third essential element" in cases like this one:  The physician must have, with specific intent, provided the controlled substance "outside the bounds of professional medical practice" and for other than a "legitimate medical purpose." *Id.* at 1138, 1141, 1144.

As to the nature and scope of that third element, the Fourth Circuit has approved of the following instruction:

> The final element the government must prove beyond a reasonable doubt is that the defendant prescribed the drug other than for legitimate medical purpose and not in the usual course of medical practice.
>
> In making a medical judgment concerning the right to treatment for an individual patient[,] physicians have discretion to choose among the wide range of available options. Therefore, in determining whether defendant acted without a legitimate medical purpose, you should examine all the defendant's actions and the circumstances surrounding them.

* * *

> [Where] [a] doctor dispenses a drug in good faith in medically treating a patient,
> then the doctor has dispensed the drug for a legitimate medical purpose in the usual
> course of medical practice. That is, he has dispensed the drug lawfully. Good faith
> in this context means **good intentions in the honest exercise of best professional
> judgment** as to a patient's need. It means **the doctor acted in accordance with
> what he believed to be proper medical practice**.

*Id*. at 1137-38 (emphasis added); *see also United States v. Feingold*, 454 F.3d 1001, 1008 (9th Cir.

2006) (explaining that, as to this third element, the government must prove "that the practitioner

acted with intent to distribute the drugs *and with intent to distribute them outside the course of

professional practice.* In other words, the jury must make a finding of intent not merely with

respect to distribution, but also with respect to the doctor's *intent to act as a pusher rather than a

medical professional*." (emphasis added)).

For these reasons, showing "a violation of the standard of care alone is insufficient to

support the criminal conviction of a licensed practitioner under" the CSA. *Feingold* at 1007;  *Tran*

at 1137 ("reasonably prudent physician" standard insufficient to show CSA violation); *Gonzales*

at 271 (explaining that CSA does not address general "standards of medical practice"). In other

words, malpractice does not establish criminal liability. *Feingold* at 1009–10 (The Supreme Court

has concluded that a CSA conviction cannot be "based . . . merely on the fact that the doctor had

committed malpractice, but rather on the fact that his actions completely betrayed any semblance

of legitimate medical treatment.").

A jury must find that the defendant "acted not as a doctor, or even as a *bad* doctor, but as

a 'pusher.'" *Id.* at 1007. As the Fourth Circuit has explicitly held, criminal prosecution of a

physician under the CSA "requires more" than breach of the "standard of care"; it requires

> proof beyond a reasonable doubt that the doctor['s] . . . authority to prescribe
> controlled substances was being used **not for treatment of a patient**, but for the
> purpose of assisting another in the maintenance of a drug habit or of dispensing
> controlled substances for other than a legitimate medical purpose, i.e. **the personal
> profit of the physician**."

*Tran* at 1136 (emphasis added).

In this case, it was therefore not enough for the government to show that Dr. Houdersheldt was an imperfect doctor, a negligent doctor, or even a bad doctor. Rather, the government was required to prove that in prescribing the medications at issue he completely—and intentionally—*ceased to be a doctor at all* and took on the exclusive role of drug pusher. *E.g.*, *Feingold* at 1011 ("A practitioner becomes a criminal not when he is a *bad* or *negligent* physician, but when he ceases to be a physician *at all*."); *Tran* at 1144 (the CSA "requires . . . specific intent"). The government failed to meet that burden in this case so completely that—even after the jury heard improper evidence and was prejudiced by flagrant misrepresentations of the evidence during argument—it still acquitted Dr. Houdersheldt of 6 of the 23 counts against him.

### A.     The Government Showed No Benefit to Dr. Houdersheldt from His Purported Misdeeds.

As *Gonzales* recognized, drug dealers are not typically altruists: There is always something in the deal for them. 546 U.S. at 269–70; *see also Tran* at 1136 (illicit dispensing of drugs for "the personal profit of the physician" is a tell-tale component of a physician violation of the CSA). But in this case there was *no* evidence that Dr. Houdersheldt profited—financially or in any other way—from writing the at-issue prescriptions. Indeed, it is uncontested there was no illicit monetary gain to Dr. Houdersheldt from prescribing these medications. And the government was unable to show that Dr. Houdersheldt obtained any other benefit.

To be sure, the government thought it might be able to cobble together a motive based on Ms. Leslie's testimony that Dr. Houdersheldt sought an intimate relationship with her on September 20, 2019. But Ms. Leslie's entire account of that encounter is debunked by contemporaneous documentation in her own medical file showing that the visit actually took place

in Dr. Houdersheldt's office. Ex. E (Gov. Ex. 401). And her story only materialized after she was subjected to repeated, threatening, and dishonest allegations that the government knew she had traded sex for drugs.

Moreover, even if Ms. Leslie's story had been true, it emphatically does not show a trade of sex for drugs. Quite the opposite. Dr. Houdersheldt treated Ms. Leslie for nearly 12 years. Trial Tr. at 552:13–553:7. Yet she testified that this was the *only* time he had ever made a romantic advance, that she declined it, and that thereafter he continued to provide her with her prescriptions without strings. *See id.* at 624:1-7, 625:20-626:3; 627:4-20.

Ms. Leslie in fact testified that Dr. Houdersheldt never conditioned her prescriptions (*any* of them) on a sexual relationship. Trial Tr. at 626:10-16; 652:6–653:8. Going further, she testified she never felt Dr. Houdersheldt "wielded power over her in a controlling way." *Id.* at 705:19–21. In fact, any connection between the prescription and the proposition was so tenuous that Ms. Leslie forgot to mention the prescription when she told the jury about the trip to the farm. The government had to remind her about it after she finished telling her story. *See id.* at 626:10-14.

So, notwithstanding the government's repeated—and improper—references in its opening and closing arguments to a supposed sex-for-drugs *quid pro quo*, Ms. Leslie herself testified that no *quid* was ever provided and, at any rate, it had *no* link to any *quo*.

That denial—the assertion of *the government's* star witness—was the only evidence ever offered on this topic. Where, as here, a witness offers uncontradicted factual testimony constituting the sole evidence with respect to an issue, the case law is legion that a jury may not disregard it, much less use that testimony to find *precisely the opposite* of what the witness said. *See, e.g.*, *Chesapeake & Ohio Ry. Co. v. Martin*, 283 U.S. 209, 216, 220–21 (1931) ("We recognize the general rule, of course, . . . that the question of the credibility of witnesses is one of the jury alone;

but this does not mean that the jury is at liberty, under the guise of passing upon the credibility of a witness, to disregard his testimony, when from no reasonable point of view is it open to doubt. . . . It is not proper to submit uncontradicted testimony to a jury for the sole purpose of giving the jury an opportunity to nullify it by discrediting the witness . . . ."); *Cruz-Vargas v. R.J. Reynolds Tobacco Co.*, 348 F.3d 271, 278 (1st Cir. 2003) (a jury may not reject "substantive, uncontradicted and unimpeached evidence"); *Anderson v. Russell*, 247 F.3d 125, 130 (4th Cir. 2001) ("No evidence was introduced that refuted [an officer's] testimony regarding the citizen's report or his perception of the bulge."); *Sarkes Tarzian, Inc. v. U.S. Tr. Co. of Fla. Savings Bank*, 397 F.3d 577, 585 (7th Cir. 2005) (explaining that the jury does not have "the right arbitrarily to ignore or discredit the testimony of unimpeached witnesses so far as they testify to facts"). And if this proposition is true regarding witness testimony generally, it plainly must apply when the government's own witness provides the only testimony on the topic and that testimony unequivocally exonerates the defendant. Here, the government failed to show *any* link between the prescriptions and the alleged separate request for intimacy.

With respect to Mr. Williams, the government's failure to show Dr. Houdersheldt benefitted from the supposed illicit provision of drugs was, if possible, even more glaring. Indeed, the government offered no evidence—and made *no attempt even to argue*—that Dr. Houdersheldt received a financial or other benefit that motivated him to provide drugs in violation of the CSA.

There was absolutely no evidence of illicit benefit to Dr. Houdersheldt presented in this case. And thus, as a matter of law, there was insufficient evidence to establish Dr. Houdersheldt acted as a drug "dealer" or "pusher"—*i.e.*, an agent acting entirely outside the bounds of the practice of medicine. Absent a showing that Dr. Houdersheldt prescribed controlled substances for

some purpose other than medical treatment, the only logical inference is that he was prescribing it

for medical treatment—or at least sincerely believed he was. *See Tran* at 1137.

### B.   Dr. Munzing's Testimony Does Not Show Dr. Houdersheldt Acted Outside the Bounds of Legitimate Medical Practice.

Just as Ms. Leslie's testimony fails to show that Dr. Houdersheldt took off his lab coat and

donned a drug trafficker's garb by seeking or obtaining personal benefits in exchange for illicitly

prescribing medications, so too did the government's other star witness, Dr. Munzing, fail to

provide testimony sufficient to show Dr. Houdersheldt acted outside the bounds of medical

practice. And as already shown, without proof beyond a reasonable doubt on this issue, Dr.

Houdersheldt's convictions cannot stand. *Tran* at 1137.

Dr. Munzing's conclusion that the at-issue prescriptions were provided outside the scope

of medical practice was based entirely on a series of "red flags" he identified. Though varying in

form, in the end almost all of the "red flags" boiled down to the same general complaint:  In Dr.

Munzing's opinion, Dr. Houdersheldt did not keep sufficiently detailed medical records.[16] *E.g.*,

Trial Tr. at 460:5–19, 461:2–5, 475:14–476:3, 479:4–22. But Dr. Munzing himself admitted that

---

[16]      The only "red flags" that did not fit into this overarching complaint were Dr. Munzing's observations that Dr. Houdersheld (1) prescribed Ms. Leslie and Mr. Williams both opioids and benzodiazepines, which Dr. Munzing asserted was never medically appropriate, Trial Tr. at 402:3–403:7, 439:7–8, 471:15–23; and (2) continued to prescribe opioids to Ms. Leslie and Mr. Williams even though, in Dr. Munzing's opinion, they showed signs of opioid addiction, *id.* at 427:14–18, 439:24-440:3, 477:12–478:3. But Dr. Munzing's assertion regarding the first observation is patently false. In fact, government publications show that there are occasions where these drugs can be prescribed simultaneously as part of a course of legitimate medical treatment. *E.g.*, Jeffrey A. Gudin, MD, et al., *Risks, Management, and Monitoring of Combination Opioid, Benzodiazepines, and/or Alcohol Use*, National Institutes of Health (July 2013). And regarding the second observation, even if Dr. Munzing's opinion is correct that Ms. Leslie and Mr. Williams showed signs of addiction, Dr. Munzing's own article (introduced at trial) asserts that cutting these patients off cold was not appropriate. Timothy Munzing, *Physician Guide to Appropriate Opioid Prescribing for Noncancer Pain*, The Permanente Journal 5 (2017) (attached as Ex. F) ("Patients with substance use disorder with medically legitimate pain sufficient to justify opioids must be closely monitored . . . .").

these "red flags," standing alone, did not show that Dr. Houdersheldt had acted outside the bounds of medical practice. Rather, they merely suggested that further investigation was appropriate. *See, e.g.*, Trial Tr. at 512:5–11 (Q. "The red flag, I just want the jurors to understand that those things may not be a violation, per se. It may just be something you think, hmm, I'm starting to see a couple suspicious things here, it warrants a deeper inquiry, right? A. Right"). In other words, at most, Dr. Munzing's red flags were more like yellow lights, showing possible negligence or grounds for further inquiry—but not criminal activity.[17]

Moreover, Dr. Munzing's testimony is replete with equivocations indicating that what he observed in Dr. Houdershedlt's files might very well have been medically appropriate. Indeed, Dr. Munzing admitted all the following:

- Failure to abide by the CDC guidelines on opioid use he cited throughout his testimony as support for the proposition that opioids should not be prescribed with benzodiazepines is not necessarily a breach of the standard of care (let alone a violation of criminal law). *Id.* at 511:2–512:9.

- Abnormal drug test results do not necessarily mean that prescription of opioids is inappropriate (for example, the patient who has run out of a medication may test positive because the patient borrowed medication from a family member to tide the patient over until an upcoming appointment). *Id.* at 520:7–16.

- Ms. Leslie was prescribed a lower dosage of opioids at the end of her treatment with Dr. Houdersheldt than she was taking when she first came to his practice. *Id.* at 544:23–545:5.

---

[17]     Pursuant to Dr. Munzing's own testimony, then, Dr. Houdersheldt's convictions for the prescriptions he provided to Mr. Williams are invalid for the additional reason that no "further inquiry" ever occurred.

- Even in his own practice, if he is familiar with a patient and reviews the patient's file, he will sometimes write a controlled-substance prescription without an inpatient exam to hold the patient over between appointments. *Id.* at 540:1–15.

At best, then, Dr. Munzing's testimony was a wash.

Further, on cross examination, Dr. Munzing conceded that his identification of "red flags" was based only on his review of the patients' written files, and, in light of the blinkered nature of his review, he did not know if Dr. Houdersheldt, in the actual process of practicing medicine, took steps that mitigated or alleviated the "red flag" concerns. *Id.* at 503:2–19, 507:2–3 (Q. "And you don't know what other information exists?  A. I don't know what other information exists.").

For example, Dr. Munzing flagged Ms. Leslie's and Mr. Williams's abnormal test results, *id.* at 441:12–15, 474:10–19, but he did not know whether Dr. Houdersheldt ran those abnormal results to ground before prescribing additional medication. He knew about notes in Ms. Leslie's file that she should not be prescribed additional medication, but he did not know whether a change in circumstances occurred that justified overriding those notes. *Id.* at 553:14–16. He knew Mr. Williams was on a high dosage of opioid medications, *id.* at 471:20–472:12, but did not know whether that dosage was justified or what alternative treatments Mr. Williams had undergone.

Dr. Munzing simply—and impermissibly—assumed that the absence of a specific, meticulous written record pertaining to a fact or event was proof positive that that fact or event did not exist or never occurred. *Id.* at 527:4–19. But then, contradictorily, he himself admitted that what he reviewed was not sufficient to allow him to evaluate Ms. Leslie's and Mr. Williams's courses of treatment. *See id.* at 420:3–6, 526:11–23. Whichever is true, Dr. Houdersheldt's conviction cannot stand, as a defendant may not be convicted based on the information an expert witness does *not* have.

By presenting Dr. Munzing's assumptions as evidence, the government created a haze of suspicion around Dr. Houdersheldt's practices and then claimed it was up to him to dispel it. That is not the law. The government "may not permit the blameworthiness of an act . . . . to depend on the presence or absence of an identified fact"—here that Dr. Houdersheldt's actions actually lacked any legitimate medical purpose—"without assuming the burden of proving the presence or absence of that fact." *Patterson v. New York*, 432 U.S. 197, 214 (1977). It is the government that "must prove every ingredient of an offense beyond a reasonable doubt, and . . . it may not shift the burden of proof to the defendant." *Id.* at 215; *see also United States v. Milam*, 443 F.3d 382, 387 (4th Cir. 2006) (explaining that, as to the elements of an offense, it is never permissible to "shift the burden of persuasion to the defendant. Even when the government's facts go unanswered or unobjected to, the court may not in a criminal case tried to a jury direct a verdict in favor of the government." (internal citations omitted)).

Indeed, this case is largely indistinguishable from *Tran*. There, the Fourth Circuit reversed the defendant's convictions on 80 counts, holding that the expert testimony in that case was insufficient to support them. *Id.* at 1141. The Court focused on the fact that the expert had not examined or interviewed the 20 patients in question and his admission that:  "Well, some of the [patients' records] had just a few entries, there were just three or four entries. On that basis, I have no way of judging whether they were valid . . . ." *Id.* In short, the expert could only say that the records looked suspicious and warranted further inquiry. The Fourth Circuit held that was not enough.

Like the expert in *Tran*, Dr. Munzing simply did not know whether Dr. Houdersheldt had acted outside the bounds of medical practice.[18] This is a different question entirely from whether a physician's recordkeeping practices are sloppy or in compliance with professional requirements. At most, the issues Dr. Munzing identified might create a reasonable suspicion that something was amiss with Dr. Houdersheldt's practice. But that is worlds away from proof beyond a reasonable doubt that Dr. Houdersheldt had fled the bounds of medical practice to traffic in drugs. In other words, Dr. Munzing's testimony fell far short of showing that Dr. Houdersheldt "cease[d] to be a physician *at all*." *Feingold*, 454 F.3d at 1011.

### C.    Additional, Uncontradicted Evidence More Than Creates Reasonable Doubt as to Whether Dr. Houdersheldt Continued to Act as a Physician.

It is undisputed that both Ms. Leslie and Mr. Williams were on *lower* dosages of controlled substances when they stopped being treated by Dr. Houdersheldt than they were on when they first became his patients. Trial Tr. at 544:23–545:5, 785:24–786:2. Indeed, in Mr. Williams' case, Dr. Houdersheldt reduced his opioid dosage significantly as soon as he became a patient. *Id.* at 785:24–786:2. This fact is utterly inconsistent with the idea that Dr. Houdersheldt abandoned medicine to push drugs: It is bad for business for a drug dealer to persuade his customers to use fewer narcotics.

It is also beyond doubt that Dr. Houdersheldt conducted thorough in-person exams of both Mr. Williams and Mr. Wilson during their respective office visits and that these exams included symptom checks, appropriate physical tests, and extensive discussions of drug side effects. *See, e.g.*, *id.* at 729:24–731:24, 738:20–739:3, 786:3–787:1, 812:15–20. Moreover, the government made no effort to rebut testimony—by both Mr. Williams and his wife—that Mr. William's condition had dramatically deteriorated since he left Dr. Haudersheldt's care, and his new doctor

---

[18]    And as argued further below, Dr. Munzing should never have been permitted to opine that Dr. Houdersheldt's conduct was, in his opinion, outside the bounds of medical practice and without legitimate medical purpose.

reduced his medication. *Id*. at 787:6–788:13. Nor did it contradict testimony that Mr. Wilson's new doctor put him on essentially the same regimen as Dr. Houdersheldt. *Id.* at 735:14–24.

Lengthy, in-person exams; dosages that are reduced across the board over time; a dramatic deterioration in a patient's condition due to his new physician's fear of prescribing an adequate dosage of medication:  The only logical inference that can be drawn from these facts is that Dr. Houdersheldt was acting as a physician when he treated these patients, not as a drug trafficker "outside the bounds of medical practice." Indeed, even Ms. Leslie's testimony shows this to be the case, as she admitted that she had in-person office appointments with Dr. Houdersheldt every week (*i.e.*, far more regularly than the government's own expert said was required), that he knew her medical condition very well, that he would order tests when appropriate, and that he gave her proper care. Trial Tr. at 699:16–20; 701:14–21; 703:24–704:15.

### D. The Government Failed to Show Dr. Houdersheldt Intended to Act as a Drug Pusher.

Even assuming, counterfactually, that the government had shown that Dr. Houdersheldt's actions were so beyond the pale of legitimate medicine that he ceased to be a doctor, and started to be a (very unusual, very unsuccessful) drug dealer, it failed to show that he did so intentionally. The CSA requires proof not only that Dr. Houdersheldt knew he was prescribing opioids, but also that he intended to do so outside the bounds of medical practice as previously defined. *Tran Trong Cuong*, 18 F.3d at 1144 (CSA "requires that [a physician] act with specific intent"); *see also United States v. Kohli*, 847 F.3d 483, 489–90 (7th Cir. 2017) ("In other words, the evidence must show that the physician . . . intentionally act[ed] as a pusher rather than a medical professional." (internal quotation marks omitted) (alteration in original)); *Feingold*, 454 F.3d at 1008 ("[T]he jury [must] look into [a practitioner's] mind to determine whether he prescribed the pills for what he thought was a medical purpose or whether he was passing out the pills to anyone who asked for them."

28

(second and third alterations in original)); *United States v. Veal*, 23 F.3d 985, 988 (6th Cir. 1994) ("To convict him on the drug distribution charges, therefore, the government was required to prove that (a) Mr. Veal filled prescriptions that were not issued for a legitimate medical purpose, and (b) that he did so knowing the prescriptions were invalid.").

Dr. Houdersheldt's practice of meeting with patients for extended appointments, his reduction of dosages over time, his failure to seek illicit profits or other improper gain, and all the other evidence previously discussed, are inconsistent with intentionally acting as a drug dealer. Accordingly, Dr. Houdersheldt respectfully request this Court to enter a judgment of acquittal in this case.

## II.   ALTERNATIVELY, DR. HOUDERSHELDT IS ENTITLED TO A NEW TRIAL BECAUSE HIS CONVICTION WAS AGAINST THE GREAT WEIGHT OF THE EVIDENCE.

Even if, in the Court's view, the government eked out enough evidence to meet the sufficiency requirement, still Dr. Houdersheldt is entitled to a new trial because the jury's guilty verdict was against the great weight of the evidence. Importantly, all the flaws in the government's case discussed in Section I also apply here, are incorporated by reference, and are themselves more than sufficient reasons to grant a new trial. And in addition to these shortcomings, there are also additional reasons to conclude that the verdict is contrary to the great weight of the evidence.

### A.   Ms. Leslie's Testimony Was Not Credible.

The Court may reweigh the credibility of witnesses when considering a motion for new trial. *Arrington*, 757 F.2d at 1485–86. And where, as here, a witness's uncorroborated testimony provides the only evidence of an essential part of the government's case, a defendant is entitled to a new trial if he can show that witness's testimony was incredible. *United States v. Washington*, 184 F.3d 653, 658 (7th Cir. 1999) ("[G]iven the district court's determination that [a key witness's

testimony linking the defendant to the conspiracy] was incredible and should not be considered, the jury's guilty verdict with respect to Hogan was against the manifest weight of the evidence, and the court abused its discretion in rejecting Hogan's motion for a new trial."); *United States v. Davis*, 960 F.2d 820, 825 (9th Cir. 1992) (explaining that a new trial is warranted where impeachment evidence shows a witness's uncorroborated testimony was "totally incredible"). In this case, Ms. Leslie's testimony that Dr. Houdersheldt propositioned her for sex on September 20, 2018 is simply not credible.[19]

### 1.   Ms. Leslie's Testimony Flatly Conflicts with Documentary Evidence.

Critically, Ms. Leslie's assertion that the September 20 meeting occurred at a farm owned by Dr. Houdersheldt is flatly contradicted by medical records making clear that her appointment that day took place at Dr. Houdersheldt's office. Ex. E (Gov. Ex 401). This alone is fatal to Ms. Leslie's credibility on this point.

So much so that the government could mount no rebuttal to it in front of the jury. At a bench conference, the only response it could muster was a baseless assertion that the record of the appointment might have been fabricated. Trial Tr. at 715:2–4. The Court correctly shot that theory down as "pure speculation." *Id.* at 715:6.

The government having no other explanation, Dr. Houdersheldt was severely prejudiced by the jury's exposure to this salacious and easily falsifiable allegation. This Court should grant him a new trial on that basis alone. But there is more.

---

[19]     In fact, as discussed below, Ms. Leslie's testimony on this point should never have been admitted under Rule 404(b) and this Court's prior ruling on the question.

### 2. Ms. Leslie's "Farm Story" was the Product of Government Coercion.

Before Ms. Leslie agreed to testify for the government, it was in a lurch:  no credible witnesses could confirm its pills for sex theory of the case. Another supposed patient of Dr Houdersheldt, A.M., had provided the government with a yarn about having sex with Dr. Houdersheldt in exchange for opioids. But the government could not corroborate one word of her bogus sex-for-drugs story. Quite the opposite:  evidence proved A.M. was never even a patient (Doc. No. 55, Exs. 1, 2, 4). And BOP records showed that A.M. had never received *any* prescriptions—not even one—from Dr. Houdersheldt. *Id*. at Ex. C.  And salacious tidbits regarding a third witness, G.W., were no more credible. So the government needed a star witness—or, more accurately, *any* witness—to provide a modicum of credibility to their headline-grabbing sex-for-drugs story.

Desperate, the government decided to coerce what they needed out of the only other witness available to them: Ms. Leslie. Seizing her from her mother's home—where she was grieving the recent death of her mother— agents hurried her off to Charleston without explanation or any legal justification. Trial Tr. at 681:19–682:4. Understandably, Ms. Leslie was "nervous," and not just nervous, but "scared" as well. *Id.* at 649:25. She "didn't know what . . . was going to happen and what was involved, or if [she] was in trouble." *Id.* at 649:23-24. "[A] federal officer" just "showed up at [her] mother's house and told [her they] were going for a ride to Charleston, [but] didn't say where [they] were going or what [they] were going for." *Id.* at 649:10-12.

Only after Ms. Leslie was sequestered at the DEA office and surrounded by four federal and state law enforcement officers did she finally understand the reason why she was forced to leave her home. *Id.* at 649:1-7. The government needed her help to take down Dr. Houdersheldt,

and she had a choice:  She could cooperate and provide the missing evidence the government so desperately needed, or she could go down with him.

What the government needed was testimony that Ms. Leslie had traded sex with Dr. Houdersheldt for drugs. And they were determined to get it.

The agents played nice at first, allowing Ms. Leslie to give an anodyne account of her relationship with Dr. Houdersheldt. Even so, unable to contain their excitement or frustration, they asked her seven times during her account whether she had a sexual relationship with the doctor or if he had ever done anything to make her uncomfortable. Ex. C at 34:24–35:16, 37:16–19, 58:6– 11. But Ms. Leslie adamantly denied it each time. *Id.*

So DEA Diversion Squad Group Supervisor Justin Shoeman dropped both the pretense and the hammer:  "See, here's the thing. I'm not convinced." *Id.* at 58:13. If Ms. Leslie—unlike A.M. and the mysterious G.W.—wouldn't leap at the chance to tell the investigators what they wanted to hear, they would scare it out of her.

Shoeman falsely told Ms. Leslie that there were "cameras at the park" that had caught her doing something with Dr. Houdersheldt and that the government already knew what she was saying wasn't the truth. *See id.* at 58:23–59:17. He told her she had "a lot of options" but "if we continue down this road, doors [were] going to close for [her]. *Id.* at 59:19–23. He warned her that if she didn't get on board she would "get caught up in something [she didn't] want to get caught up in." *Id.* at 60:5–6. "I think you know exactly what I'm talking about," he blustered, "[b]ecause . . . you don't come down to the Drug Enforcement Administration . . . because we just . . . think that you are some person that doesn't know anything." *Id.* at 60:17–22.

And Ms. Leslie did know exactly what he meant, because at this point her story started to morph into something more to the government's taste. First, she "remembered" more dates when

she met Dr. Houdersheldt outside the office—although those dates, too, later had to be adjusted to match the government's version of events. *Id.* at 61:9–15 ("The only thing, it was more than twice [that I met him to pick up a prescription]."). But helpful as that was, it wasn't what the agents wanted. So they took her through each meeting step-by-step, warning her obliquely that there was only one answer they wanted to hear: agreement with their sex-for-drugs theory. *See id.* at 72:1– 7("[Y]ou've got to gamble whether you trust us or not . . . because, to be honest with you, . . . some questions we know the answers . . . most of them.").

Ms. Leslie gave them an account of her first out-of-office meeting with Dr. Houdersheldt to pick up a prescription. In response, Shoeman asked her three times if Dr. Houdersheldt ever flirted with her. *Id.* at 82:12–8. She again denied any romantic connection, but the agents continued to press: suggesting it was kind of odd that they met outside the office. *Id.* at 84:21–85:24.

Anxious to give the agents something, Ms. Leslie conceded it was odd, and added that one time Dr. Houdersheldt asked her to come to look at a farm he was selling to see if he was asking enough for it. *Id.* at 86:1–87:7. But she was adamant that "nothing happened then," beyond viewing the farm. *Id.* at 86:12–24. Nonetheless, sensing that Ms. Leslie's resolve might be wavering, the agents pushed for more details. *Id.* at 87:8–19.

And so—halfway through a two-hour interview—after denying any sort of flirting or inappropriate behavior nine previous times (including while discussing the farm), Ms. Leslie suddenly "remembered" something: When they went to the farm, Dr. Houdersheldt asked if she ever wanted "to fool around with" someone. *Id.* at 88:5–6. But even then she was quick to add that she firmly rejected the proposal, such as it was, and he apologized. *Id.* at 88:14–15.

Now the agents thought they had something. "It's okay," "it's understandable" to be nervous, Shoeman cooed. *Id.* at 89:2–5. Then he opened the door: "How did you pay him for your

script?" he asked. *Id.* at 89:19. You can almost hear the agents deflate when Ms. Leslie responded: "I didn't pay him. . . . *He didn't ask me for anything*." *Id.* at 89:22, 90:2 (emphasis added). They proceeded to discuss more meetings.

By this point, the agents were getting increasingly frustrated, because Ms. Leslie continued to deny giving Dr. Houdersheldt anything in exchange for the prescriptions. Regardless of whether it was the truth, it was not the "truth" they wanted to hear.

When Ms. Leslie again denied paying anything, Shoeman scolded: "[s]o we're kind of running up against this thing again . . . [a]bout the truth and not the truths, okay?" *Id.* at 106:2–7. He admonished her that this wasn't "going to be a very easy conversation" but that he knew "through other conversations, that other things happened." *Id.* at 106:9–21. It didn't work this time. Ms. Leslie was firm: "No. Nothing ever happened between us physical. Nothing. Unh-unh. No way." *Id.* at 106:24–107:1.

But Shoeman pressed on: "Did he ever touch you in inappropriate places?"—bringing the total number of times she was asked about sexual misconduct up to 11 at this point. *Id.* at 107:7. Desperate to reach the end of the interrogation, Ms. Leslie again denied it, but offered up a slightly juicier version of the farm story: This time, after she turned Dr. Houdersheldt down, she emphasized that Dr. Houdersheldt was married and claimed he responded to her rejection by saying, "Well, it's something you could think about . . . and let me know." *Id.* at 107:8–18. She was again quick to say she rejected him and nothing came of it. *Id.*

The interrogation continued with no sign of letting up. After getting through two more supposed meetings, they were back to the farm story. *Id.* at 111:10–11. Shoeman pressed: "Did he try to kiss you?"; "Did he hold your hand?"; "Put his hand on your leg?" *Id.* at 116:15–20.

When she again denied it, Shoeman pressed on: "Did he ever try to touch you prior to that . . . put his hand on your leg . . .hold your hand?" *Id.* at 117:2–8.

All Ms. Leslie would give him was an admission that Dr. Houdersheldt routinely gives people friendly hugs when they leave the office. *Id.* at 117:9–22. "You sure he never gave you a kiss," Shoeman prompted. *Id.* at 117:23. Ms. Leslie again denied it: "Unh-unh. Nope. Unh-Unh." *Id.* at 118:2.

Infuriated, Shoeman fumed: "I'm going to go back to this, right? . . . We've got . . . other things going on. . . . [H]is truck stands out with the big Steelers thing on it . . . ." *Id.* at 118:6–13. He falsely told Ms. Leslie he had photos of her in compromising positions with the doctor. *Id.* at 118:21. "You don't have nothing of me and him doing anything," she protested. *Id.* at 118: 22–23.

Shoeman tried a different track: "Well, I've got photos . . . Would it surprise you that I have photos, maybe not of you, but of other ladies," he said, falsely trying to convince Ms. Leslie that she wouldn't be the only credible witness to come forward with an accusation. *Id.* at 118:24–119:3. It still didn't work. *Id.* at 119:4–6 ("Oh, well, *that would probably surprise me*, but, I mean, I didn't fool with the man.") (emphasis added).

Truly reaching now, Shoeman insisted that "nothing in this world is free" and that, even if Ms. Leslie didn't give him anything, Dr. Houdersheldt might have had "ulterior motives" for helping her out. *Id.* at 119:24–120:6. Thinking maybe this was her way out, Ms. Leslie leapt at the life preserver: "And he probably did have ulterior motives, and I was so dingy, you know, I didn't see it at first . . . ." *Id.* at 120:9–11. Shoeman eagerly pressed on, saying that "hindsight is 20/20 now" and getting her to admit that she did have an "aha moment" when he propositioned her. *Id.* at 120:19–121:4. But at that point Ms. Leslie unhelpfully emphasized that Dr. Houdersheldt had

apologized, and there was still no connection between the offer of sex and the drugs. *Id.* at 120:14–15.

And then it all fell apart again. Because when Shoeman prompted her to say that, after the farm proposition, she thought sex was "what he want[ed]" for the prescriptions all along, *id.* at 122:10–11, Ms. Leslie denied it:

> Q.    So think about before the three—you know, the three other times.
>
> A.    Uh-huh. He never mentioned it.
>
> Q.    No. But were there gestures?  Were there side comments?  Was it a look?
>
> A.    I don't think so.

*Id.* at 122:21–123:2. The agents had now asked some form of this question 19 times without success. Grasping for straws, Shoeman pleaded: "Did he give you a hug this time?" *Id.* at 126:8. "Nope," *id.* at 126:9; failed attempt number 20. But not completely:  Ms. Leslie said part of the reason she stopped the out-of-office visits was she thought Dr. Houdersheldt might be trying to "start[ ] something up, like an affair." *Id.* at 127:18–128:6.

Shoeman refused to relent. He again insisted that cameras had seen something untoward going on in the park. *Id.*at 136:21. Ms. Leslie again denied any sexual relationship. *Id.* at 137.

Shoeman lost it:  "Now, just come on, . . . some of this is . . . certainly unacceptable . . . [these a]nswers are unacceptable . . . [b]ecause they are not factual . . . because we know." *Id.* at 137:8–138:20. "There is more to it than just going to a guy's door and writing scripts. . . I know it, and you know it." *Id.* at 139:2–6. He told her again there were cameras, *id.* at 140:3–5, and insisted: "what I'm saying is, it happened . . . . there was physical action here, physical touching" *id.* at 143:2, 146:15–16.

Then the threats began again:  "It's very important, and ***its also very important for you***. . . . Because distribution of a controlled substance is a crime. . . . If it's not a valid script and you take that script to, you know, a pharmacy knowing it's not a good script . . . ." *Id.* at 149:9–20. Leslie didn't quite get the message:  "But he acted like it was fine, because I'd ask him about it." *Id.* at 150:11–12. "***You knew it's not fine. You know it.*** You work in a doctor's office," Shoeman thundered in response. *Id.* at 150:13–18.

Then came the offer:  "[T]his isn't about you though, right? . . . [R]ight now we're just still having a conversation. . . . You're not under arrest." *Id.* at 150:13–151:7. "I want to know what really happened . . . Because we're not looking at you," he continued, "[b]ut I do . . . think we're not quite matching up." *Id.* at 152:14–22.

The questions about sex and inappropriate touching resumed. At one point Crane jumped in, telling her that she was "not a target," but refusing to confirm that she was not "going to go to prison for anything." *Id.* at 158:21–159:4. "[T]he government needs your cooperation," he said, "[b]ut there is no sense diverting. . . [because] there is a high potential that it was you in a photograph, okay? . . . *And as embarrassing as that may be, the truth needs to hit the table right here, right now. . . . This is your opportunity.*" *Id.* at 159:23–160:14 (emphasis added). Ms. Leslie then added some additional details to the farm story but continued to deny any inappropriate relationship.

In all, the agents asked Ms. Leslie at least 30 times whether she had a sexual relationship with Dr. Houdersheldt—not counting threats, statements, encouragements, and other ploys to cajole more scurrilous allegations out of her. And they closed by asking her to "pray on it" because there were "people out there that probably need your help." *Id.* at 174:8–11. Not surprisingly, that is the reason Ms. Leslie gave at trial for cooperating with the government. Trial. Tr. at 673:16-17.

As this lengthy recounting shows, the agents in this case worked Ms. Leslie over with every trick in the book to try to substantiate their sex-for-drugs theory. It is, of course, axiomatic, that "custodial police interrogations" like the one Ms. Leslie was subjected to create "inherently compelling pressures which work to undermine the individual's will to resist and compel him to speak where he would not otherwise do so freely."[20] *United States v. Riley*, 920 F.3d 200, 204 (4th Cir. 2019). Ms. Leslie never received any *Miranda* warnings to help reduce the coercive nature of the interrogation and instead was pressured, sweated, sweet-talked, cajoled, and threatened with jail for two hours.

Unsurprisingly then, Ms. Leslie's farm story bears all the hallmarks of a coerced confession. It became more graphic and detailed over time as she tried to find the version that would bring the inquisition to an end. It emerged only after she was threatened with criminal charges. Richard A. Leo, *False Confessions: Causes, Consequences, and Implications*, 37 J. Am. Acad. Psychiatry & Law 332, 335 (2009) ("Most documented false confessions in recent decades have been directly caused by or have involved promises or threats."). She revealed it in stages over the course of a lengthy interrogation in a DEA office. *Id.* ("The custodial environment and physical confinement are intended to isolate and disempower the suspect. Interrogation is designed to be stressful and unpleasant, and it is more stressful and unpleasant the more intense it becomes and the longer it lasts. . . . Some suspects come to believe that the only way they will be able to leave is if they do what the detectives say."). The agents lied repeatedly to make Ms. Leslie think they had photo or video evidence of a sexual relationship between her and Dr. Houdersheldt. *Id.* ("Interrogation techniques are meant to cause the suspect to perceive that his guilt has been

---

[20]    The government may argue that the ordeal Ms. Leslie was subjected to did not amount to a custodial interrogation, but surely a "reasonable person in [Ms. Leslie's] position" would not agree. *E.g.*, *United States v. Brice*, 2017 WL 3710800, *4 (W.D. NC Aug. 28, 2017).

established beyond any conceivable doubt, that no one will believe his claims of innocence, and that by continuing to deny the detectives accusations he will only make his situation . . . much worse.").

All of this—especially when combined with documentary evidence contradicting Ms. Leslie's story—destroys any credibility the farm story had. *See Gilliam v. Sealey*, 932 F.3d 216 (4th Cir. 2019) ("A coerced or fabricated confession that police know to be coerced . . . does not [even] give police probable cause to arrest [a] suspect as a matter of law [let alone convict them].); *see also Ashcroft v. Tennessee*, 322 U.S. 143, 155 (1944) ("The Constitution of the United States stands as a bar against the conviction of any individual in an American court by means of a coerced confession."); *Buckley v. Fitzimmons*, 20 F.3d 789, 795 (7th Cir. 1994) ("Confessions wrung out of their makers may be less reliable than voluntary confessions . . . ."); *LaFrance v. Bohlinger*, 499 F.2d 29, 34 (1st Cir. 1974) ("Due process does not permit one to be convicted upon his own coerced confession. It should not allow him to be convicted upon a confession wrung from another by coercion. . . . Involuntary confession have been excluded . . .because of the danger of unreliability. . . . [A] statement coerced from an accused is [not] less [un]trustworthy than one from a witness.").

The jury should never have heard it. And without the farm story, the government would have been left without any evidence whatsoever that Dr. Houdersheldt was motivated by anything other than a desire to provide his patients with appropriate medical care. Only a new trial can purge the prejudice that resulted from allowing it into the courtroom. The Court should grant it.

### 3.     Ms. Leslie is an Unindicted Co-Conspirator.

Finally, as the above account of Ms. Leslie interrogation shows, on the government's theory of the case, she was an accomplice, not a victim. The government charged Dr. Houdersheldt

with illegally prescribing drugs to her outside the bounds of medical practice. And as the agents bluntly told Leslie, if the prescription was illegal and she filled it, she too was in on the crime.

The agents were correct. At a minimum, Ms. Leslie could have been charged with obtaining and possessing illegally prescribed controlled substances. *See* 21 U.S.C. § 844 ("It shall be unlawful for any person knowingly or intentionally to possess a controlled substance unless such substance was obtained directly, or pursuant to a *valid* prescription or order, from a practitioner, while acting in the course of his professional practice." (emphasis added)). The government also could have charged her with conspiracy to distribute illegal drugs. To that end, the government was crystal clear at trial in its view that Ms. Leslie was criminally liable alongside Dr. Houdersheldt. During his closing argument, for example, Attorney Barras argued that Ms. Leslie and Dr. Houdersheldt met in the parking lot of the Hurricane City Park because "*they* needed to meet far away from the prying eyes because *they* knew what *they* were doing was wrong." Trial Tr. at 1036-37 (emphasis added).

The testimony of an accomplice or co-conspirator is "inevitably suspect" and unreliable. *See Bruton v. United States*, 391 U.S. 123, 136 (1968). Indeed, for more than one-hundred years, the Supreme Court has recognized that the testimony of a witness who turns "states evidence" should not "be taken as that of an ordinary witness of good character in a case, whose testimony is generally and prima facie supposed to be correct. On the contrary, the evidence of such a witness ought to be received with suspicion, and with the very greatest care and caution, and ought not to be passed upon by the jury under the same rules governing other and apparently credible witnesses." *Crawford v. United States*, 212 U.S. 183, 203–04 (1909); *see also United States v. Leonard*, 494 F.2d 955, 959–60 (D.C. Cir. 1974).

The reason for this is simple:  Unindicted, cooperating accomplices have a more than ordinary motivation to lie. "[S]he may . . . have escaped indictment . . . by telling a story which exonerates [her]self and shifts blame to the accused." Christine J. Saverda, Note, *Accomplices in Federal Court: A Case for Increased Evidentiary Standards* 100 Yale L. J. 785, 786 (1990). Her "sanctuary may depend upon the self-serving nature of" her story. *Id.* And this is exactly what the investigators told Leslie she could do if she told them what they wanted to hear—avoid being charged for filling the prescriptions. This is yet another reason, if one was needed, why Ms. Leslie's farm story was not credible and should have been excluded.

### B.      Dr. Munzing's Testimony Was Not Credible.

The testimony of the government's other key witness, Dr. Munzing, also was unreliable. Given the nature of that testimony, its reliability is more easily considered in the context of the *Daubert* argument below. But to the extent the Court finds that it cannot consider that challenge, or that the testimony was technically admissible under *Daubert* notwithstanding its considerable flaws, those flaws should weigh heavily in favor of a conclusion that Dr. Munzing's testimony should not have been credited by the jury.

* * *

For each of the reasons stated above, Dr. Houdersheldt's conviction was against the great weight of the evidence.  He is therefore entitled to a new trial.

### III.    THE COURT ERRED BY ADMITTING UNRELIABLE, UNCONSTITUTIONALLY OBTAINED, AND UNDULY PREJUDICIAL EVIDENCE AT TRIAL.

As Sections I and II show, the evidence admitted against Dr. Houdersheldt was fatally insufficient. But the problems with his trial run deeper still, as much of that insufficient evidence should never have made it in front of the jury in the first place.

41

### A.    Evidence of Dr. Houdersheldt's Other Acts Should Have Been Excluded Pursuant to Evidence Rules 403 and 404(b).

At trial, the Court erroneously permitted the government to introduce evidence regarding two episodes of Dr. Houdersheldt's (in one instance, alleged) conduct: (1) his February 2013 Memorandum of Agreement with the DOJ and DEA; and (2) Ms. Leslie's testimony about the "farm story" and the alleged sexual proposition Dr. Houdersheldt made after she supposedly toured the property he hoped to sell. Neither evidence of the 2013 agreement nor testimony regarding the purported sexual proposition was admissible under Evidence Rule 404(b), and both likewise should have been excluded pursuant to Evidence Rule 403. The Court's denial of Dr. Houdersheldt's motion in limine and failure to bar this highly prejudicial, inadmissible evidence entitles Dr. Houdersheldt to a new trial.

### 1.    The February 2013 Memorandum was inadmissible under Rules 403 and 404(b).

Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). In other words, the rule bars the government from introducing a defendant's non-charged or past conduct as evidence of his criminal propensity or of his guilt with respect to the crime charged. Such evidence is admissible only where it is: (1) "relevant to an issue other than character," (2) "*necessary* to prove an element of the crime charged," (3) "reliable," and (4), "as required by Federal Rule of Evidence 403, its probative value [is] not . . . 'substantially outweighed' by its prejudicial nature." *United States v. Queen*, 132 F.3d 991, 995 (4th Cir. 1997) (emphasis added). The fourth factor is particularly important:

> Absent such balancing of the prior act evidence's probative value against its prejudicial effect, the list of exceptions in Rule 404(b), if applied mechanically, would overwhelm the central principle. Almost *any* bad act evidence

> simultaneously condemns by besmirching character and by showing one or more
> of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of
> mistake.

*United States v. Hall*, 858 F.3d 254, 269 (4th Cir. 2017) (internal quotation marks omitted). In

order to introduce bad acts evidence under Rule 404(b), then, the government must articulate an

evidentiary theory pursuant to which such evidence is probative of a relevant issue in the case that

does not contain "bad character or propensity as a necessary link in the inferential chain." *United

States v. Varoudakis*, 233 F.3d 113, 118 (1st Cir. 2000) (internal quotation marks and citation

omitted).

Here, Dr. Houdersheldt's February 2013 agreement with DOJ and the DEA noting that his

recordkeeping was not as detailed as was required fails multiple prongs of the *Queen* test and thus

should not have been admitted.

> a. *The February 2013 Memorandum is not "relevant to an issue other
> than character," and is not "necessary to prove an element of the
> crime charged."*

It is virtually beyond dispute that the Memorandum was not "relevant to an issue other than

character" or "necessary to prove an element of the crime charged," as *Queen* requires. This

deficiency alone rendered it inadmissible.

Indeed, when this Court denied Dr. Houdersheldt's motion in limine seeking to exclude

the Memorandum from evidence, it justified its decision solely on the rationale that the

Memorandum "spoke to the defendant's knowledge of various recordkeeping and prescription

obligations." Order, ECF No. 116, at 2. But Dr. Houdersheldt's knowledge of "recordkeeping and

prescription obligations" imposed by a federal administrative agency is not relevant to a material

issue here.

The elements of the crimes charged are: "(1) that Appellant knowingly or intentionally distributed a controlled substance; (2) with knowledge that it was controlled under the law; and (3) that he did so outside the usual course of professional practice." *United States v. Mciver*, 470 F.2d 550, 556 (4th Cir. 2006). Nothing in the agreement signed by Dr. Houdersheldt evidenced his knowledge that he was distributing a controlled substance, that the substance he was prescribing was, in fact a controlled substance, or that the prescriptions were knowingly issued outside boundaries of professional medical practice. *See* Ex. G (February 2013 MOA). Rather, as the document itself makes plain, the MOA only found recordkeeping violations. *Id*. And, as Agent Armstrong testified at trial, the paperwork violations were not serious enough to warrant any further action by DEA. Trial Tr. at 94:7-17. But in closing argument, the government alleged that the MOA proved that Dr. Houdersheldt "**had knowledge as to what proper prescribing was, yet he chose to ignore it**." *Id*. at 1046:18-29 (emphasis added).

In short, the government improperly used the MOA as propensity evidence. Accordingly, the Court erred in admitting the MOA.

> b.   *The Memorandum had minimal, if any, probative value.*

Even if the Memorandum was relevant to a permissible purpose under Rule 404(b), it should still have been excluded under Rule 403's balancing test. At best, the Memorandum had minimal probative value, if any.

First, at no point did Dr. Houdersheldt claim that he was unaware of his professional and other obligations regarding recordkeeping and prescribing. "[T]he probative value of prior act evidence is diminished where the defendant *does not contest* the fact for which supporting evidence has been offered." *Cf. Hall*, 858 F.3d at 269. And merely pleading not guilty is, of course, not enough to put a fact or element at issue for purposes of the Fourth Circuit's pronouncement in

*Hall*, for otherwise the rule would have no practical force. *United States v. McBride*, 676 F.3d 385, 398 (4th Cir. 2012) ("Although a defendant's plea of not guilty places at issue all elements of the charged crimes, this does not throw open the door to any sort of other crimes evidence." ); *United States v. Hernandez*, 975 F.2d 1035, 1040 (4th Cir. 1992) (rejecting proposition that a "plea of not guilty" made "testimony about prior bad acts" tending to show intent or knowledge were admissible because "intent and knowledge are essential elements of the charge"). Rather, a defendant must actively contest the fact at trial. *McBride*, 676 F.3d at 398; *Hernandez*, 975 F.2d at 1040.

Moreover, the Fourth Circuit has held that a lapse of as little as one and a half years between the prior act and the charged conduct largely negates the prior act's probative value. *McBride*, 676 F.3d at 397; *see also Hall*, 858 F.3d at 273 (probative value of prior acts was undermined where they occurred more than five years before the charged conduct); *United States v. Johnson*, 617 F.3d 286, 298 (2010) (evidence of prior act that occurred "nearly five years" before the charged conduct was "tenuous and remote," and therefore inadmissible). In this case, Dr. Houdersheldt signed the Memorandum more than *seven* years before trial and more than *five* years before he issued any of the prescriptions charged in the indictment.

Finally, the Memorandum here has even less probative value than the prior convictions the Fourth Circuit excluded in *Hall*, *McBride*, and *Johnson*, because it was an *agreement* that arose in a consensual administrative context. As the Advisory Committee's commentary to Rule 408 notes, settlement-related evidence is often "irrelevant, because the offer [or, here, settlement] may be motivated by a desire for peace rather than from any concession or weakness of position." Fed. R. Evid. 408 cmt.; *see also Philpot v. LM. Commc'ns II of S.C., Inc.*, 343 F. Supp. 3d 694, 704 n.10 (E.D. Ky. 2018) ("Parties settle lawsuits for many reasons, not least of which is to avoid the costs

of trial"). While that rule does allow statements made during settlement talks with the government to be admitted in some cases, this recognition surely undermines their probative value.

Indeed, particularly in light of the lower burden of proof the government faces in administrative cases, defendants may be motivated to settle by a host of factors other than the merit of the alleged violations—including a desire to move on with their lives. In this case, it was uncontested that the Memorandum had no effect on Dr. Houdersheldt's ability to practice medicine or prescribe controlled substances. Trial Tr. at 125:14–126:2 ("Q. Since the memorandum of agreement was entered into[, Dr. Houdersheldt] was authorized to prescribe all classes of controlled drugs, right? A. Yes."). Whatever motivated Dr. Houdersheldt to sign the MOA, that agreement does not clearly evidence his acknowledgement of wrongdoing by any definition.

        c.      *The Memorandum was unduly prejudicial because it invited the jury to convict Dr. Houdersheldt using propensity reasoning.*

What little, if any, legitimate probative value the Memorandum had was greatly outweighed by the danger of unfair prejudice that it created. Just how damaging the Memorandum was is plain from how much hay the government made of it in closing. In this very argument, the government goes beyond the permissible purpose for which the Memorandum was admitted, which was to show knowledge of recordkeeping requirements, not prescribing practices. But the government continued, arguing that just as Dr. Houdersheldt tried to "cover his tracks" by not reporting the Memorandum when he renewed his license, he tried to "cover his tracks" in this case. *Id.* at 1046:20–1047:7.

In other words, the Memorandum, and the government's argument based on it, invited the jury to conclude precisely that which the law forbids:  that because Dr. Houdersheldt had run into administrative trouble involving opioid prescriptions before, he must have improperly prescribed opioids in this case. Such prior-bad-acts evidence "weigh[s] too much with the jury and so . . .

overpersuade[s] them . . . to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." *Michelson v. United States*, 335 U.S. 469, 476 (1948). Indeed, the power of this sort of evidence to "set the mood" for a jury might well explain why the government chose to introduce the Memorandum to the jury on the very first day of trial. Trial Tr. at 93:21–94:3. This sort of extreme mismatch between probative value and unfair prejudicial effect is exactly the kind of situation that Rule 403 is designed to prevent. And using other acts evidence to show propensity is likewise precisely what Rule 404(b) forbids. *Hall*, 858 F.3d at 266 ("Rule 404(b) protects against juries trying defendants for *prior acts* rather than *charged acts*.")  For all these reasons, the Memorandum should have been excluded in its entirety, and the failure to do so was a game-changing error.[21]

**2.     Ms. Leslie's testimony regarding Dr. Houdersheldt's purported advance was inadmissible under Rules 403 and 404(b).**

The Court also allowed Ms. Leslie to testify about her farm story: the allegation that, on one occasion, Dr. Houdersheldt purportedly asked if she would be interested in "fooling around" with him. But this other-acts testimony was, like the Memorandum, inadmissible for multiple reasons.

*a.     The alleged conduct was not intrinsic to the crime charged.*

Before trial, the Court concluded Ms. Leslie's testimony regarding Dr. Houdersheldt's purported romantic advance was not necessarily barred as inadmissible other-acts evidence pursuant to Rule 404(b)(1) because the purported advance was "intrinsic to the crime charged."

---

[21]     While the Court did give a limiting instruction forbidding the jury from drawing improper propensity inferences from the Memorandum, that did not cure this error. "The meager protection afforded by the [C]ourt's limiting instruction . . . cannot outweigh the prejudice incurred by evidence that does not meet the mandate of the rule in the first place." *Johnson*, 617 F.3d at 297.

Order, ECF No. 116, at 2. However, the Court's ruling was not as broad as the order might otherwise suggest.

During the hearing on the defense motion to preclude Ms. Leslie's testimony regarding the purported farm incident, the Court ruled as follows:

> THE COURT: I think I understand that. To me it's a pretty simple matter.
>
> If the Government has evidence that is otherwise admissible that demonstrates that a **witness will testify that Dr. Houdersheldt indicated the desire to have some type of relationship in exchange for one of these prescriptions, that evidence will be admissible as intrinsic to the charge.** If the evidence is not otherwise admissible, this doesn't make it admissible.
>
> They can't bring in, you know, some investigator who says that's what he thinks the doctor was up to. It has to be based upon testimony that is admissible. **So if a witness testifies from personal knowledge that that's what he did, and it relates to these prescriptions, it's intrinsic to that.**

ECF No. 168 at 40:24-25, 41:1-12.

At trial, the government was never able to satisfy the Court's requirement. As during her marathon interrogation on September 10, 2019, Leslie denied at trial that she received her prescription because of the alleged sexual overture. Specifically, when she was asked at trial about that first interrogation, Leslie characterized it as follows:

> Just, ah, what was going on as far as our relationship, and was I just meeting to get the prescriptions or was there something else, *like a form of payment or any favors to me or to him for getting a prescription,* **which there were not.**

Trial Tr. at 652:6-9 (emphasis added).

In light of Ms. Leslie's trial testimony, the government's introduction of this highly prejudicial evidence was therefore directly contrary to this Court's pre-trial order, and served no purpose other than to smear Dr. Houdersheldt.[22] *See United States v. Brizuela*, 962 F.3d 784,

---

[22] Perhaps due to the facial conflict between this Court's ruling during the hearing and the Court's written order, no objection was lodged when the government pushed the fanciful story in

793-94 (4th Cir. 2020) (uncharged conduct is "intrinsic" to a charged offense only where it "ar[ises] out of the same series of transactions as the charged offense or is necessary to complete the story of the crime on trial.").

    b.  *Ms. Leslie's romantic-overture testimony was not relevant.*

  Pursuant to Evidence Rule 401, "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) *the fact is of consequence in determining the action*. (Emphasis added). The evidence of the alleged romantic overture to Ms. Leslie was completely irrelevant to the crimes charged in the indictment.

  As the government made clear in both its pleadings and its highly inflammatory press releases, its theory of the case was that Dr. Houdersheldt was running a "pill mill" in which he was acting as a drug dealer, not a doctor. *See e.g.* Doc. No. 43, p. 2 ("Quite simply, '[a] licensed physician who prescribes controlled substances outside the bounds of his professional medical practice is subject to prosecution and is no different than a 'large-scale pusher.'") (citations omitted).

  But when the government could only find *three* potential patients who may have received prescriptions outside the bounds of legitimate medical practice out of more than *3,000* patients treated by Dr. Houdersheldt, the "drug pusher" – "pill mill" theory of prosecution fell apart. And so the government, without any evidentiary support created a new theory of prosecution:  although not a drug dealer in any traditional sense, Dr. Houdersheldt was trading sex for drugs. And the

---

front of the jury to fill the void for its missing sex-for-drugs evidence. Regardless, the Fourth Circuit has held that "[a]s a general rule, motions in limine may serve to preserve issues that they raise without any need for renewed objections at trial, just so long as the movant has clearly identified the ruling sought and the trial court has ruled on it." *United States v. Williams*, 81 F.3d 1321, 1325 (4th Cir. 1996).

only evidence that it could use at trial to support this manufactured tale, which the agents had to wring out of Ms. Leslie, was the alleged farm story.

But even here, the government was unable to establish any relevance of the farm story to the crimes charged because Ms. Leslie consistently and adamantly denied that there was any *quid pro quo* for her prescriptions. Accordingly, this evidence also should have been excluded pursuant to Fed. R. Evid. 401.

### c.    The testimony was not "necessary."

Testimony that is irrelevant is, by definition, unnecessary. Ms. Leslie's assertion that Dr. Houdersheldt hit on her was not, as is required, "necessary in the sense that it is probative of an essential claim or an element of the offense." *Queen*, 132 F.3d at 997. The government introduced this evidence for the sole purpose of its prejudicial effect on the jury. After all, if there is anything worse than a doctor who trades his medical license for financial gain, it is a doctor who trades his license to satisfy his prurient desires.

### d.    The testimony was unreliable.

To be admissible under Rule 404(b), evidence also must be reliable. *Id.* For the reasons already discussed, Ms. Leslie's account of these events was not. Indeed, Leslie's story was flatly contradicted by the government's own evidence, which shows that the September 20, 2018 appointment took place in Dr. Houdersheldt's office, and was the result of extensive government coercion. *Id.*

### e.    The testimony was unduly prejudicial.

Finally, even if Ms. Leslie's testimony were relevant, necessary, and reliable (it is none of these), it still would be inadmissible because its nonexistent probative value is vastly outweighed by the danger of unfair prejudice. *See* Fed. R. Evid. 403. The salacious nature of the accusation

has only one real purpose—to scandalize and offend the jury and taint their perception of Dr. Houdersheldt. This testimony should, therefore, have been excluded under Rule 403.

f. Conclusion

For each and all the reasons stated above, the jury should never have heard evidence of the alleged sexual overture by Dr. Houdersheldt to Ms. Leslie. The admission of this salacious evidence by itself warrants a new trial.

**B. Dr. Houdersheldt's Statements to Investigators Were Inadmissible under *LaSalle National Bank* and *Garrity*.**

DEA Special Agent Benjamin Henrich arrested Dr. Houdersheldt at the Charleston Area Medical Center on September 24, 2019. Trial Tr. at 256:20–23, 257:16–19. Upon meeting Dr. Houdersheldt, Henrich and his companions identified themselves and asked to speak with him privately. *Id.* at 258:14–17. After speaking to Dr. Houdersheldt for approximately 20 minutes, during which time the agents claimed that the conversation was part of an administrative inspection, they placed Dr. Houdersheldt under arrest. *Id.* at 259:2, 263:2–16, Gov. Ex. 301 at 0:01–0:30. Notwithstanding the fact that Dr. Houdersheldt had a patient under anesthesia and awaiting an operation, he was immediately taken into custody. *Id.* at 263:11–16.

*Immediately* prior to Dr. Houdersheldt's arrest, the government sent a team of DEA diversion agents to visit Dr. Houdersheldt. The agents approached Dr. Houdersheldt while he was on duty at Charleston Area Medical Center and while he had a patient under anesthesia. They demanded Dr. Houdersheldt submit to an "inspection" interview—a purely administrative process to which Dr. Houdersheldt believed he was required to submit to retain his DEA-sanctioned prescriber's license. *See* 21 U.S.C. § 842(a)(6) (it is unlawful for anyone who is authorized to dispense a controlled substance "to refuse any entry into any premises or inspection" authorized by the CSA). It was a ruse. Using the pretext of administrative inspection, the agents proceeded to

51

interrogate Dr. Houdersheldt and, for 20 minutes, gobbled up pre-arrest information while his already anesthetized patient lay ready for her procedure and the would-be arresting officers sat ready to pounce.

After the inspectors had gathered as much information as they could for use in the impending criminal case, they released Dr. Houdersheldt. But he was not released to resume his medical responsibilities or to attend to his anesthetized patient. Rather, he was released to the custody of two other law enforcement officials who were waiting in the wings to execute the previously authorized criminal arrest warrant. [23]

This pretextual "inspection" was constitutionally infirm for two independent reasons.

*First*, the use of a civil or administrative process for the purpose of aiding in a criminal investigation is prohibited. The Supreme Court has plainly stated as much. "In the law of administrative searches, one principle emerges with unusual clarity and unanimous acceptance: the government may not use an administrative inspection scheme to search for criminal violations." *New York v. Burger*, 482 U.S. 691, 724 (1987); *see also United States v. LaSalle Nat. Bank*, 437 U.S. 298, 316 n. 18 (1978) (rejecting IRS authority to use statutory summons authority to investigation possible crime; "summons authority does not exist to aid criminal investigations solely").

---

[23]  The public arrest of a well-respected physician for no purpose other than to make him do the "perp walk" is further evidence of the government's animus in this case. And if additional evidence of government misconduct is warranted, prosecutor McFadden filed a motion seeking Dr. Houdersheldt's detention pending trial. The basis of Ms. McFadden's motion: Dr. Houdersheldt was facing a mandatory minimum sentence of 10 years or more in prison which gave rise to a presumption in favor of detention. Doc. No. 8, pp. 1, 2. That claim had no basis in fact or law. *See* 21 U.S.C. §§ 841(b)(1)(C), 841(b)(1)(E). Whether this claim was made with the intent to deceive or ignorance has yet to be determined. But Ms. McFadden went further and requested that Dr. Houdersheldt be temporarily detained pending the detention hearing. Doc. No. 8, p. 2. As discussed further below, this was the first of two times that this prosecution team sought to pull a fast one past a judicial officer and seek to have Dr. Houdersheldt detained without justification.

Even more directly on point is *United States v. Lawson*, 502 F. Supp. 158 (D. MD. 1980). In *Lawson*, as here, a DEA agent applied for an administrative inspection warrant at the request of the Assistant United States Attorney to gather evidence for a criminal investigation. *Id*. at 164.  By the time of the putative administrative inspection, the government had decided to prosecute the defendant pharmacist. *Id*. The Court concluded that the administrative inspection was a sham and held that the government should have obtained a criminal search warrant rather than rely on administrative powers. *Id.*

Here, even more problematically than in *Lawson*, the arresting officers—arrest warrant in hand—were literally on site during the "administrative interview," and Dr. Houdersheldt was arrested as soon as they had garnered the information they wanted. Thus, the government cannot credibly argue that the "inspection" in this case was anything other than a mechanism for gathering evidence for its criminal case. That fact is further underscored by the government's heavy reliance on the bogus inspection interview at trial. *See* Trial Tr. pp 1073-74.

And government counsel cannot evade responsibility for this illegal act. The indictment had been returned and the agents were no longer able or authorized to operate on their own. Accordingly, *all* evidence obtained from the interview was inadmissible.

**Second**, the government's actions in forcing an interview under DEA's inspection authority violate the principles of *Garrity v. New Jersey* 385 U.S. 493 (1967), and its progeny. *Garrity* prohibits the state from using threats of termination against a public employee as a means of securing the employee's cooperation in an investigation, where such cooperation would require the employee to effectively surrender his Fifth Amendment right to silence. "The option to lose [one's] means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent." *Id*. at 497.

*Garrity* has been expanded to cases like this, where an individual is compelled to cooperate under the threat of losing a state-government-sanctioned professional license. In *Spevack v. Klein*, 385 U.S. 511 (1967), for example, a New York attorney was disbarred for refusing to turn over records that he claimed might incriminate him. *Id.* at 512. In reversing the state's decision to revoke the attorney's license, the Supreme Court held:

> The threat of disbarment and the loss of professional standing, professional reputation, and of livelihood are powerful forms of compulsion to make a lawyer relinquish the privilege. That threat is indeed as powerful an instrument of compulsion as the use of legal process to force from the lips of the accused individual the evidence necessary to convict him.

*Id.* at 516 (emphasis added) (internal quotation marks omitted).

So too here: DEA diversion agents, under the pretext of conducting an administrative inspection, tricked Dr. Houdersheldt into submitting to an interview or, as he believed, risk losing his license to prescribe controlled substances. Accordingly, any information Dr. Houdersheldt provided in that compelled interview was inadmissible against him in these criminal proceedings. *See Lefkowitz v. Cunningham*, 431 U.S. 801, 802 (1977) (threat of punishment of a state party official for refusing to waive his Fifth Amendment rights under pain of disbarment was unconstitutional); *Lefkowitz v. Turley*, 414 U.S. 70, 76 (1973) (disbarment of architects for exercising Fifth Amendment rights was unconstitutional). *See also Moody v. Michigan Gaming Control Board*, 871 F.3d 420, 428 (6th Cir. 2017) (race drivers faced with the option of surrendering their Fifth Amendment rights or being prohibited from participating in the state-sanctioned sport, was coercion and "an illegal action until an offer of immunity is made.").

## C.     Dr. Munzing's "Expert" Opinion Was Inadmissible under *Daubert*.

The testimony of the government's expert, Dr. Munzing, was inadmissible under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and its progeny because his opinions were: (1)

by his own account, based on unreliable methods; (2) internally inconsistent; (3) based on unwarranted assumptions; and (4) hampered by unacceptable gaps in reasoning. His testimony should have been excluded.[24]

### 1. Dr. Munzing flouted the very professional norms he accuses Dr. Houdersheldt of violating.

It is a cardinal rule of *Daubert* analysis that "an expert . . . [must] employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). Throughout his testimony, Dr. Munzing emphasized again and again that, to evaluate whether opioids are appropriate for a patient, a physician must perform an in-person examination. Trial Tr. at 409:12–23, 410:1–411:3, 414:15–415:3 ("Q. So based on your training and experience, would a doctor be able to provide and prescribe a controlled substance prescription in the usual course of professional practice, or for legit [sic] medical purpose, for a controlled substance without that physical exam? A. No, of course not. . . . Q. Is it ever appropriate not to do a physical exam? A. No, not in this situation."). But when it came to preparing his own expert report and testimony opining on whether opioids were appropriate for Ms. Leslie and Messrs. Williams and Wilson, Dr. Munzing performed no

---

[24]      While trial counsel did not object to Dr. Munzing's testimony under *Daubert* before or at trial, this Court may still consider this argument and grant a new trial without undertaking a plain error analysis. *See United States v. Dillingham*, No. 1:17-cr-184, ECF No. 84, Slip Op. at 17–18 (E.D. Va. August 22, 2018) (Attached as Ex. H) ("[T]he Government argues that the Court should reconsider its conditional grant of a new trial because it was based on evidentiary errors that were not timely raised by Dillingham's trial counsel. . . . In light of the volume of improper evidence admitted in this case and the inadequate jury instructions concerning *scienter*, Dillingham's substantial rights to a fair trial were affected and the interest[s] of justice require a new trial based on admissible evidence, notwithstanding the failure of Dillingham's trial counsel to object to excludable evidence.").

such exams. His review was limited only to the written records the government provided.[25] *Id.*at 501:18–507:3.

If Dr. Munzing's expert opinion extended only to what he believed to be flaws in Dr. Haudersheldt's paperwork, his failure to examine any of the patient's at issue would perhaps be understandable. But in his report and at trial, Dr. Munzing expressly opined on whether prescriptions for Ms. Leslie and Messrs. Williams and Wilson were "medically justified and generally consistent with usual medical practice." Ex. B (report of Dr. Munzing) at 4; Trial Tr. at 470:21-471:1. In that context, what is sauce for the doctor should be sauce for the testifying expert. That is, an expert who asserts that an in-person exam is *essential* to determining whether to prescribe opioids in the first place must in turn perform his own in-person exam before offering his opinions *on that very issue* (*i.e.*, whether the prescription was appropriate). And, indeed, the Fourth Circuit has concluded as much in an analogous situation.

As discussed above, the Fourth Circuit rejected similar expert testimony in *Tran*. There, the Fourth Circuit reversed the defendant's convictions on 80 counts, holding that the expert testimony in that case was insufficient to support them because the expert had not performed an in-person exam and admitted he could not make a judgment based on the medical records alone. *Tran Trong Cuong*, 18 F.3d at 1141. The flaws that prevented the expert's testimony from being sufficient in that case are also reasons to find that Dr. Munzing's testimony should not have even been admissible in this one—let alone sufficient to establish for the jury that Dr. Houdersheldt's

---

[25]    Dr. Munzing insisted that in-person examinations are only necessary for treating physicians, not post-hoc expert witnesses who later evaluate those physicians' treatment practices. *Id.* at 536:17–537:9. In other words, Dr. Munzing's rules apparently apply only to doctors facing criminal charges, not those helping put doctors in prison.

at-issue prescriptions were somehow without legitimate medical purpose and outside the bounds of usual practice.

Likewise, in *Cooper v. Smith & Nephew, Inc.*, the plaintiff sought to present the testimony of one Dr. Mitchell to demonstrate that a medical device caused the plaintiff's spinal injury. 259 F.3d 194, 198 (4th Cir. 2001). But Dr. Mitchell had failed to conduct a physical examination of the plaintiff even though "[w]ith his own patients, Mitchell insists upon a physical examination." *Id.* at 203. The Fourth Circuit affirmed the trial court's decision excluding the testimony, noting that "the fact that Dr. Mitchell did not employ in the courtroom the same methods that he employs in his own practice" supported "the district court's ultimate conclusion that his testimony was unreliable." *Id.*; *see also Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1255 (11th Cir. 2010) ("Dr. Marks admitted that although she would normally conduct an interview . . . she had only reviewed selections from [the plaintiff's] medical records. Not only does this cast doubt on Dr. Marks' differential diagnosis, but it also violates a primary purpose of *Daubert*: to ensure the expert 'employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" (quoting *Kumho Tire*, 526 U.S. at 152)). The failure to employ the very methods he opined were mandatory weighs heavily against finding Dr. Munzing's testimony reliable and admissible.

Notably, this is not a case where there was a complete absence of medical records or one in which the medical records provided no support for Dr. Houdersheldt's prescribed course of treatment. Rather, Dr. Munzing's testimony was that he either did not trust the records or that the information they contained was not sufficient for him to decide whether the course of treatment was appropriate. Based on his own testimony, then, performing an in-person exam was the only way he could properly determine whether, in his opinion, Dr. Houdersheldt's course of treatment

was *actually* within the bounds of medical practice. Because he did not do so, his testimony should have been rejected as unreliable under *Daubert.*

### 2.     Dr. Munzing's opinions were internally inconsistent.

"[I]nternal inconsistency weighs heavily against reliability" under *Daubert*. *In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices and Prod. Liab. Litig.*, 145 F. Supp. 3d 573, 582 (D.S.C. 2019);  *see also Gabor v. Barnhart*, 221 F. App'x 548, 550 (9th Cir. 2007) ("[I]nternal inconsistencies" are a "basis for excluding" expert evidence.). Here, Dr. Munzing's testimony and report were internally inconsistent and should have been excluded on that basis.

 For one thing, Dr. Munzing repeatedly criticized Dr. Houdersheldt's recordkeeping. Trial Tr. at 460:3–22, 478:25–479:22, 488:23–24, 525:8–12, 526:3–529:14. In fact, he testified that a person reviewing only Dr. Houdersheldt's records could not understand why certain controlled substances were prescribed. *Id.* at 526:11–23. In other words, thorough records are, in his view, essential to determining after the fact whether a patient's course of treatment was appropriate. *See id.* at 420:3–6 (thorough recordkeeping is important "so [that,] after the fact, anyone else who is either managing them in the future or, if there's a bad outcome, looking at the specifics of could this have been done better [*sic*], the details are all there").

But Dr. Munzing relied exclusively on those same, supposedly inadequate, records to reach his conclusions in this case. He opined for more than 150 pages in his report on the merits of Dr. Houdersheldt's treatment of three patients, based entirely on medical records that, he admits, were not sufficient to give him a full picture of those patients' care. The Fourth Circuit has affirmed the exclusion of this sort of internally inconsistent expert testimony. *Cooper*, 259 F.3d at 201; *In re Lipitor*, 892 F.3d at 633 ("Including patients with only a single reading, the district court explained,

was contrary to the position the plaintiffs and their experts had taken elsewhere in the litigation . . . that a single elevated glucose reading was not a reliable indicator of a diabetic patient.").

Similarly, Dr. Munzing also testified that records are conclusive evidence of what happened in an examination room.[26] Trial Tr. at 527:12–14. But when confronted with records showing Dr. Houdersheldt had evaluated a variety of physical conditions, he arbitrarily denied the reliability of those records because Dr. Houdersheldt had drawn a line through check boxes they contained rather than checking them individually. Trial Tr. at 460:5–19, 475:14–476:3, 479:4–22. He did the same in his report, saying: "frequently a line through the 'normal' column—*unlikely* all of these areas were actually addressed." *E.g.* Ex. B (Expert Report of Timothy Munzing) at 10. This was not an expert opinion; it was baseless, inconsistent conjecture. Further, neither in his report nor in his testimony does Dr. Munzing provide any standard for determining when Dr. Houdersheldt's records should be deemed sacrosanct or when they should be dismissed as unreliable. But while he articulated no such standard, the one he applied was plain:  Records are to be trusted when they help the government's case and written off when they do not.[27]

Moreover, with regard to one of Dr. Houdersheldt's patients, Dr. Munzing's report at one point says his findings with regard to the propriety of her treatment are "inconclusive" but

---

[26]     The government, of course, emphatically did *not* want the factfinders to view medical records as definitive when it came to Ms. Leslie, since Dr. Houdersheldt's records showed that he met with her in his office on September 20, 2018 and thus that the farm story and romantic advance that supposedly took place that day were fabrications. Gov. Ex. 401.

[27]     The intensity of Dr. Munzing's zeal to shore up the government's case come what may is explained, at least in part, by the astounding amount of money he makes from his government gigs:  He has been paid more than *$1.8 million* for his services as an expert in the *last two years alone*, and his performance has apparently pleased the government, as his compensation is on a trajectory that virtually anyone would envy:  around $62,000 in 2017, $320,000 in 2018, $1 million in 2019, and $900,000 so far in 2020. U.S. Treasury Department, Bureau of the Fiscal Service, *USAspending.gov* (last accessed Oct. 2, 2020), *available at*: https://www.usaspending.gov/search /2d4eb50d22ded26468c5d72ffce970a2.

elsewhere asserts instead that the treatment was inappropriate. *Id.* at 4, 65. The consequences of this difference are massive:  The government indicted Dr. Houdersheldt based on Dr. Munzing's findings of "inappropriate" treatment, but not where he found treatment to be "inconclusive."

Finally, a deeper look at the report reveals more inconsistencies. Of the 3,000 patients in Dr. Houdersheldt's practice, Dr. Munzing was asked by the government to review the cherry-picked files of only nine patients in preparing his report in the hope that he would find a basis to bolster the government's case. *Id.* at 3. Of those, he concluded that Dr. Houdersheldt's treatment of four patients was appropriate and that his treatment of two patients was inconclusive. *Id.* at 4. But there is little to no difference between his "findings" for patients in these two categories. In fact, the findings are essentially copied and pasted for each patient. *Compare id.* at p. 26–27, 39–40, 45–46 (finding Dana Black's, Tammy Chapman's, Regina Furr's care appropriate) *with id.* at 33–34 (providing "inconclusive" finding for Betsy Carter despite identifying nearly identical deficiencies).

### 3.   Dr. Munzing operated on a fundamental assumption that he knew was unsupported by the record.

The Fourth Circuit is clear that expert testimony based on faulty assumptions is inadmissible. *March v. W.R. Grace & Co.*, 80 F. App'x. 883, 885–888 (4th Cir. 2003) (rejecting expert testimony where the expert assumed the length and adequacy of plaintiffs' exposure to an allegedly cancer-causing substance). Thus, Dr. Munzing's testimony should also have been excluded under *Daubert* because his entire analysis was premised on a faulty assumption:  If something is "not documented, it didn't happen." Trial Tr. at 527:12–14. He operated on this false premise even though he knew (1) that Dr. Houdersheldt likely took additional steps that were not recorded, *id.* at 525:8–12, and (2) that Dr. Houdersheldt's failure to maintain thorough records was a cornerstone of the government's theory of the case, Trial Tr. at 1044:22-23, 1045:4–14, 20–22,

1047:12–16, 1077:1–11 (government's closing arguments, emphasizing failure to keep adequate records). Further, each of the patients testified, as discussed above, that the records do not tell the whole story of their treatment. *See, e.g.* Trial Tr. at 729:24–731:24, 738:20–739:3, 786:3–787:1, 812:15–20.

### 4. Dr. Munzing's opinions contained unexplained gaps in reasoning.

"[A]n expert's failure to explain the basis for an important inference mandates exclusion of his or her opinion." *Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1344 (11th Cir. 2003). And "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* [say so] of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Dr. Munzing's testimony thus should also have been excluded because so much of what was passed off as "expert" analysis was riddled with fundamental gaps in reasoning and premised not on evidence and logic, but instead purely on Dr. Munzing's say-so.

First, in several places, Dr. Munzing notes that the drugs Dr. Houdersheldt prescribed to certain patients were "those popular for abuse and/or diversion." Ex. B. at 10, 57, 64, 78, 84. He then treats this "fact" as a primary basis for his conclusion that Dr. Houdersheldt's use of these drugs with his specific patients was improper. *Id.* But that's it. He never explains how a generalized proposition—sometimes people abuse these drugs—applies to show that the prescriptions written for *these specific patients* were improper. The mere act of prescribing controlled substances that are sometimes abused is not a crime, nor even evidence of one.

Dr. Munzing's criticism of Dr. Houdersheldt's decision to prescribe both opioids and benzodiazepines is likewise intellectually stunted. *E.g., id.* at 85. As a justification for his assertion

61

that the two classes of drugs may not be prescribed together, he provides a general citation to CDC *guidelines*. *Id.* at 96. But those non-binding, advisory guidelines merely state that "[c]linicians should avoid prescribing opioids and benzodiazepines concurrently *whenever possible*." Centers for Disease Control and Prevention, Morbidity and Mortality Weekly Report, *CDC Guideline for Prescribing Opioids for Chronic Pain* 16, 30, 31–32 (2016) (emphasis added), available at https://www.cdc.gov/mmwr/volumes/65/rr/pdfs/rr6501e1.pdf. Dr. Munzing conveniently does not quote *that* language from the guidelines, nor does he explain why prescribing both classes of drugs simultaneously was inappropriate with respect to *these* particular patients.[28] That failure renders his testimony infirm. *See Eghnayem v. Boston Scientific Corp.*, 57 F. Supp. 3d 658, 676–77 (S.D. W. Va. 2014) ("An expert's opinion may be unreliable if he fails to account for contrary scientific literature and instead 'selectively [chooses] his support from the scientific landscape. [I]f the relevant scientific literature contains evidence tending to refute the expert's theory and the expert does not acknowledge or account for that evidence, the expert's opinion is unreliable." (alterations in original) (internal quotation marks and citations omitted)).

In contrast to his absolute—and baseless—pronouncement that it is never appropriate to prescribe opioids and benzodiazepines simultaneously, Dr. Munzing did at least admit both at trial and in his report that it *can* be appropriate to prescribe patients opioids with an MME higher than 100. *Id.* at 96; Trial Tr. at 483:2–6. Nonetheless, without bothering to explain why it was inappropriate under the circumstances, he condemns Dr. Houdersheldt for doing so in Mr.

---

[28]     At trial, the government mocked Dr. Whaley—both during his testimony and in closing—for correctly testifying that the guidelines did not prohibit prescribing both opioids and benzodiazepines concurrently. Trial Tr. at 964:14-19, 1045:15-18. This conduct—implying that the defense expert was lying when he was correctly summarizing the very report upon which the government's own expert relied—was improper and prejudicial.

Williams's case. Ex. B. at 78. Dr. Munzing further states that Dr. Houdersheldt "[r]arely, if ever, utilized" opioid tapering, *id.* at 11, but he fails to reconcile this proclamation with the undeniable evidence that *both* of the patients whose prescriptions underlie Dr. Houdersheldt's convictions were taking fewer opioids at the end of their treatment than they were at the beginning. Likewise, he concludes, based solely on notes showing Ms. Leslie may have been an addict, that it was inappropriate to prescribe opioids to her. *Id.* at 47. Yet in his own peer-reviewed article he states that it can be appropriate to prescribe opioids to drug addicts. Ex. F at 5 ("Patients with substance use disorder with medically legitimate pain sufficient to justify opioids must be closely monitored . . . .").

In short, in both his trial testimony and report, Dr. Munzing failed to follow his own methods, contradicted himself, and made unwarranted and unexplained assumptions. His testimony was, therefore, unreliable and should have been excluded under *Daubert* before it ever reached the jury's ears. The failure to exclude this unreliable evidence essential to the government's case deprived Dr. Houdersheldt of a fair trial and resulted in his wrongful conviction. Accordingly, he must be granted a new trial free of these fundamental errors.

### D.   Evidence from Dr. Houdersheldt's Medical Practice Was Obtained via a Fatally Flawed Warrant Affidavit and Should Have Been Excluded.

In his pretrial motion to suppress, Dr. Houdersheldt set forth a number of significant concerns regarding the integrity of the affidavit of probable cause, executed by Crane, that the Magistrate Judge relied upon in authorizing the search of—and seizure of records and effects from—Dr. Haudersheldt's medical practice. In denying the motion for a *Franks*[29] hearing, this Court acknowledged the legitimacy of several of Dr. Houdersheldt's concerns, but ultimately

---

[29] *Franks v. Delaware,* 438 U.S. 154 (1978).

decided that neither suppression nor a hearing was required because, after stripping away the false statements, probable cause for the warrant remained. But evidence that came to light at trial, and additional evidence that has been discovered post-trial, shows unequivocally that the key remaining allegations upon which the Court relied in denying Dr. Haudersheldt's motion to suppress and request for a *Franks* hearing were themselves false and, at a minimum, included within the probable cause affidavit with reckless disregard for their falsity.

It is therefore now clear that the government's supposed basis for probable cause was nothing but a house of cards, which has now fallen, and that the evidence seized from Dr. Houdersheldt's medical practice should have been suppressed.

A primary basis for this Court's determination that probable cause for the warrant existed even without the portions of the affidavit challenged by Dr. Houdersheldt was Crane's assertion that Dr. Houdersheldt lied to Duran during the encounter at Hurricane Park, allegedly telling him that the prescription he had just written for Ms. Leslie was instead written for Ms. Leslie's mother. Thus, when Dr. Houdersheldt challenged the affidavit's omission of Ms. Leslie's repeated denials that Dr. Houdersheldt had written the prescription not for her but for her mother, the Court concluded that these omissions, even if made to deceive, did not negate probable cause because the affidavit elsewhere asserted that "*Dr. Houdersheldt* [himself] told Officer Duran that he met with [Ms. Leslie] to write [Ms. Leslie's] mother a controlled substance prescription." Opinion & Order, ECF No. 61, at 9.

Similarly, when Dr. Houdersheldt challenged the affidavit's reliance on ludicrous, knowingly false, and salacious allegations made by an individual who was obviously high on drugs at the time and who had no ties to Dr. Houdersheldt's medical practice, the Court concluded that probable cause was still established because of Dr. Houdersheldt's suspicious encounter with

64

Officer Duran at the Hurricane City Park in which he *allegedly* falsely stated that the at-issue prescription was for Ms. Leslie's mother. *Id.* at 10. Likewise, though the Court noted Dr. Houdersheldt's concern about the affidavit's misleading assertion that 17 of Dr. Houdersheldt's (3,000) patients had died within 30 days of receiving a prescription from him was "well-taken," the Court again referred back to the supposed lie in the park as a basis for concluding that probable cause was nonetheless established.[30] *Id.* at 12.

It is thus clear from the record that Dr. Houdersheldt's supposed assertion that the prescription he had given to Ms. Leslie in the park was for her mother was fundamental to this Court's finding that neither suppression nor even a *Franks* hearing was warranted in this case. Simply stated, the Court credited Crane's assertion that Dr. Houdersheldt made that false statement despite the facts that (1) there was no trace of any such statement on the recording Duran made during the encounter at the park, *id.* at 8 n.8 (referencing recording), (2) such a statement would have been utterly nonsensical given that the actual prescription in the hands of Duran at the time said otherwise, (3) Ms. Leslie asserted no such statement occurred, and (4) Dr. Houdersheldt submitted a sworn statement that he made no such assertion. Doc. 55, Ex. D.

But now, post-trial, any remaining doubt as to whether the statement attributed to Dr. Houdersheldt ever occurred, and any lingering questions about Crane's and Duran's intent in including the supposed statement in the affidavit has disappeared. Dr. Houdersheldt *never* asserted that the prescription provided to Ms. Leslie at the park on November 20, 2018, was for Ms. Leslie's

---

[30]     The government, for its part, adopted the same line of reasoning, relying heavily on Dr. Houdersheldt's supposed lie. Opp. to Mot. to Suppress, ECF No. 51, at 6 ("Defendant's dishonest statement made directly to Officer Duran, that the prescription was for [Ms. Leslie's] mother, trumps the significance of any subsequent statements made by [Ms. Leslie] on the topic.").

mother, and Crane included the false assertion in the affidavit knowing that it was false. In other words, the real lie came from Crane and Duran, not Dr. Houdersheldt.

First, though Dr. Houdersheldt's supposed statement regarding the prescription loomed so large with respect to the finding of probable cause, Duran was *completely silent* on the issue at trial. *See* Trial Tr. at 44–46. That silence is deafening. When called to the stand to testify regarding the events that took place in the Hurricane City Park that night, Duran was careful not to say *a word* about any purported lies told by Dr. Houdersheldt. *Id.* Although Duran was happy to make the assertion second-hand to support a bogus search warrant, when it came time to make the statement under oath, he thought it best to stay mum. *Id.* That such an overzealous and unreasonably aggressive prosecution team would not have leaped at the opportunity to introduce evidence of a supposed direct lie of Dr. Houdersheldt—if Duran had been willing to testify to it— is not only implausible, it is impossible. Clearly, the threat of perjury is a remarkable truth serum— at least for Duran.

Even more significant is a document that was produced by the government *after* the motion to suppress was filed, buried in a mound of other documents provided shortly before the scheduled trial date of March 17, 2020, and—as the government no doubt intended—not discovered by Dr. Houdersheldt's counsel until *after* trial. That document is a DEA "Case Initiation" report prepared on December 3, 2018—less than two weeks after the park encounter between Dr. Houdersheldt, Ms. Leslie, and Duran. The report unequivocally states that, ***according to Duran himself***, Dr. Houdersheldt never lied and stated that the prescription was for Ms. Leslie's mother but, quite the opposite, stated truthfully that it was for Ms. Leslie herself. According to that near-contemporaneous report, though Ms. Leslie supposedly "told Officer Duran that she was just getting her mother's prescription," Dr. Houdersheldt *contradicted* that statement and instead

66

truthfully "**_confirmed[] that the prescription was for [Ms. Leslie] and not her mother_**." Ex. I, DEA Case Initiation Report (December 3, 2018), at 1 (emphasis added).

This document directly contradicting the assertions in the search warrant, and Duran's silence concerning this issue at trial, make clear that any assertion by Duran that Dr. Houdersheldt lied about the recipient of the prescription provided at Hurricane City Park was itself a lie. What's more, Crane either **_knew_** it was a lie or acted with reckless disregard for the truth. He later served as the primary case agent in this matter and had the December 2018 DEA report in his possession before he prepared the affidavit for the search warrant. *See* Ex. I. Nonetheless, presumably with the assistance of the government's attorneys,[31] he included that blatantly false statement in his affidavit anyway, presumably because he knew he could not establish probable cause without it.[32]

In summary, the evidence that Duran fabricated Dr. Houdersheldt's purportedly false statement concerning the intended recipient of the prescription provided at Hurricane City Park—and that Crane either included the false statement in the affidavit knowing that it was false, or simply made it up himself, is overwhelming: (1) there is no real-time recording containing the statement, though Duran recorded much of what occurred in the park that night; (2) it would have been ludicrous for Dr. Houdersheldt to make such an obviously false statement; (3) Ms. Leslie asserted that no such statement occurred on multiple occasions; (4) Dr. Houdersheldt *swore* that he did not make the statement; (5) Duran himself, while under oath, refused to swear that the

---

[31]   Dr. Houdersheldt has requested the government to produce any internal communications between government counsel and its agents which would demonstrate the hands-on involvement of the prosecutors in, among other things, drafting the search warrant affidavit and may shed light on the knowledge of the prosecutors as to the false assertions in that affidavit. The government has steadfastly refused to produce any such communications. Accordingly, Dr. Houdersheldt will likely be filing a separate motion to compel the production of those communications.

[32]   And he was correct, given how significantly the Court relied on this alleged lie in denying the motion to suppress and motion for *Franks* hearing.

statement was true; and (6) a contemporaneous DEA report explicitly states that Dr. Houdersheldt in fact stated that the prescription was for Ms. Leslie herself, *not* her mother. Thus, unlike when the Court denied Dr. Houdersheldt's motion to suppress before trial, it is now clear that the government's probable cause was hopelessly infirm. Dr. Houdersheldt is therefore entitled to a new trial from which the evidence illegally obtained from the government's search of his medical practice is omitted.

## IV.   THE JURY WAS PREVENTED FROM HEARING KEY EVIDENCE AS A RESULT OF THE GOVERNMENT'S *BRADY* AND *GIGLIO* VIOLATIONS AND THE COURT'S ERRONEOUS EVIDENTIARY RULINGS.

In addition to being exposed to improper evidence at Dr. Houdersheldt's trial, the jury was prevented from considering evidence in his defense. In particular, the government prevented the defense from presenting important evidence by repeatedly violating its obligations under *Brady* and *Giglio* [33] and by improperly limiting the testimony of Dr. Houdersheldt's expert. [34]

### A.   The Government Violated *Giglio* by Failing to Turn Over Critical Impeachment Evidence That Would Have Discredited Its Key Witness.

Due Process requires the government to disclose evidence that is favorable to the defense and material to guilt or punishment. *Giglio v. United States*, 405 U.S. 150, 154-155 (1972); *see also United States v. Higgs*, 663 F.3d 726, 734-35 (4th Cir. 2011) (the government's disclosure

---

[33]    Dr. Houdersheldt asserts *Brady* and *Giglio* claims in the following sections based on the evidence the government has turned over to date. That said, he continues to seek additional disclosures from the government through various means, including preparing motions to compel. Should those efforts reveal additional evidence that was not disclosed to the defense, Dr. Houdersheldt reserves the right to amend or supplement this motion.

[34]    The Court also improperly restricted the defense in offering evidence of Dr. Houdersheldt's good character. Doc. No. 54. But evidence of Dr. Houdersheldt's good character was, alone, a sufficient basis for the jury to acquit. *Michelson v. United States*, 335 U.S. 469, 476 (1948) (character evidence alone may be sufficient "to raise a reasonable doubt of guilt.").

obligation arises whether the evidence is exculpatory or impeaching and notwithstanding the good or bad faith of the government in failing to make the required disclosure). Thus, a failure to disclose violates a defendant's right to due process when the evidence (1) is favorable to the defendant because it is either exculpatory or impeaching, (2) was suppressed by the Government, and (3) is material. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The Supreme Court has held that evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995). And a "reasonable probability" is simply one sufficient to "undermine confidence in the outcome." *Id*. at 434.

In this case, the government failed to disclose two critical pieces of evidence related to Ms. Leslie. First, it failed to disclose the details of its non-prosecution deal with her. Second, it failed to disclose, until the eve of trial, BOP records showing her continued use of opioids.

> **1.** **The Government failed to provide the defense with the details of what was obviously an implied non-prosecution agreement.**

As discussed above, *see*, *supra*, Section II.A.2, the law enforcement officers charged with investigation of this case coerced Ms. Leslie into describing her meetings with Dr. Houdersheldt to pick up prescriptions outside the office and divulging the fake farm story. And, as also discussed above, this means that, based on the government's theory of the case, Ms. Leslie was an accomplice, not a victim.

Yet Ms. Leslie was not charged, and the reason is obvious:  The government needed her to testify against Dr. Houdersheldt because the other two patients whose prescriptions formed the basis of the indictment refused to cooperate. Both Messrs. Williams and Wilson, after all, ultimately testified *for the defense*.

Any claim that the government did not cut a deal with Ms. Leslie not to charge her in return for her testimony is simply not believable.[35] The deal may not have been written; it may not have been formalized; it may not even have been stated in so many words. But Ms. Leslie was both told and clearly understood that unless she cooperated with the government and gave it something it could use at trial, she would be charged and would face a prison sentence of her own.[36]

To this day, the government has never produced anything about its deal with Ms. Leslie. Has she been charged but that charge is under seal?  Has she been told that she will not be charged based on her cooperation, as the agents promised during her initial interrogation?  Comments those same agents made in numerous other interviews suggest they frequently discussed such deals with the prosecutors in this case and answers to these questions should have been provided in advance of trial pursuant to *Giglio*.

The government compounded the problem of its failure to disclose this agreement by repeatedly—and improperly—arguing in closing that Ms. Leslie had nothing to gain from testifying against Dr. Houdersheldt. "[Ms. Leslie] testified without any gain," the government

---

[35]     Once again, the defense has requested the government to provide any evidence of promises, inducements, or agreements with Ms. Leslie that she would not be prosecuted if she cooperated with the government. And, yet again, the government has resisted providing any information concerning the deal struck with Ms. Leslie. Accordingly, the defense will likely be filing a separate motion to compel the production of this evidence which the prosecutors are constitutionally required to provide.

[36]     The government was careful to excise any of the threats, inducements, or promises that the agents made to Ms. Leslie during the interrogation from the report it tendered to the defense, apparently hoping defense counsel would not bother to listen to the hour-long audio recording of the interrogation. Likewise, until he was forced, over the government's strenuous objection at trial, to listen to the recording wherein he personally made several of these threats, inducements, and promises, Crane feigned a complete lack of recollection that any such statements were ever made. Trial Tr. at 190-198. Once again, Crane simply cannot be believed, and the defense looks forward to exploring his credibility, should the Court grant a hearing on this motion.

falsely asserted. Trial Tr. at 1042:22. "Ms. Leslie has absolutely nothing to gain from participating in this process. She has nothing to gain from coming in here and testifying to you as to her addiction, as to her background, as to the issues that she's faced." *Id.* at 1067:8–12. But the truth is Ms. Leslie had everything to gain by testifying against Dr. Houdersheldt and everything to lose if she refused—indeed, this is what the investigators (including Crane) pounded into her head with threats in an effort to force her to tell them what they wanted to hear. *See*, *supra*, Section II.A.2.

 As the Fourth Circuit held nearly a half century ago, where the government threatens a witness with prosecution to induce that witness's cooperation, the government has an affirmative obligation to provide all of the details of the arrangement to the defense:

> Viewing the record as a whole, we conclude that the jury's verdict might have been different had it known of Cannon's apprehension that he might be put to trial as an active perpetrator. Because the jury was incorrectly assured that Cannon had not been threatened, and because [FBI Agent] Smith's threat may reasonably be viewed as impugning Cannon's veracity, and because the case was otherwise wholly circumstantial, we conclude the government's failure to disclose Smith's effort to induce (or coerce) Cannon's testimony was fundamentally unfair and in violation of the Due Process Clause of the Fifth Amendment.

*United States v. Sutton*, 542 F.2d 1239 (4th Cir. 1976). Similarly, the government deal with Ms. Leslie in this case, whether formal or wink-and-nod, should have been disclosed. The government's failure to do so deprived Dr. Houdersheldt of his right to due process and a fair trial.

This Court should be very hesitant to accept what will undoubtedly be the government's mechanical response to this argument—*i.e.*, that no deal was struck with Ms. Leslie and no *Giglio* evidence was withheld. As the Court undoubtedly recalls and as discussed below, on the very eve of trial, the government was forced to admit, over its strenuous prior protestations to the contrary, that it had withheld BOP records that could be used to impeach Ms. Leslie. Whatever credibility the government might ordinarily have with the Court has already been squandered by the prosecution team in this case.

2. **The government's suppression of evidence of Leslie's continued opioid use until the eve of trial requires dismissal of the indictment or a new trial.**

a. *The government withheld West Virginia Board of Pharmacy records and lied to the Court until compelled to disclose those records.*

On July 17, 2020, just over two weeks before trial, the government provided the defense with BOP documents showing that Ms. Leslie was continuing to obtain opioid prescriptions from her employers, father-and-son dentists Timothy and Lincoln Spears. ECF No. 168 at 3:21–24.[37] Defense counsel thereafter interviewed Timothy Spears who stated that the two prescriptions in his name were likely forgeries. *Id*. at 10:8–12:17.

Shockingly—and unbeknownst to the defense—when, following the interview with Timothy Spears, defense counsel notified the government of her concerns, two federal agents and one of the government attorneys immediately swarmed Dr. Timothy Spears's office to implement damage control. What threats and promises were made during that visit are unknown, but by the time the government left, Spears had changed his story completely, telling the government that he believed the prescriptions that purportedly bore his signature were valid. ECF No. 103-1. The government trio then proceeded to the office of Dr. Lincoln Spears and successfully extracted a statement purportedly verifying the validity of the other nine prescriptions issued to Ms. Leslie. ECF No. 103-2. Only after locking in the statements of the two dentists did the government turn over to the defense a DEA report reflecting that Timothy Spears ***had a history of writing illegal prescriptions***. Ex. J (DEA Case Initiation Report).

On July 26, 2020, the defense filed a motion to dismiss the charges pertaining to Ms. Leslie on the basis that the government had withheld critical impeachment evidence. ECF No. 97. In its

---

[37]     By their own admission, government counsel had no intention of making this disclosure until the following week, despite the Court's pretrial order requiring disclosure two weeks in advance of trial and the continuing duty to disclose even when the original trial date was continued. *See* ECF No. 18, at 5.

response, the government chastised defense counsel for failing to obtain the actual prescriptions or review the dentists' patient records, ECF No. 103 at 2, 5, and rejected the concern that Ms. Leslie was illicitly obtaining controlled substances. *Id*. at 5–6. Rather, according to the government, both Timothy and Lincoln Spears had confirmed that the prescriptions bore their legitimate signatures and matched up with their patient records for Ms. Leslie. *Id.* at 2–3.[38]

But the government failed to address three critical facts raised by the defense. First, the government ignored Timothy Spears's assertion that he did not perform any of the purported procedures on Ms. Leslie, and, therefore, there was no reason why he would have issued *any* prescriptions for her. This fact was confirmed by the government's interview of Timothy Spears. ECF No. 103-1 at 3. Second, the government ignored Timothy Spears's statement to defense counsel that the signatures on the prescriptions did not appear to be legitimate. ECF No. 168 at 10:8–12:17. Third, the government argued that the prescriptions were legitimate because each was supposedly tied to one of a series of dental procedures Ms. Leslie had undergone and because the prescriptions were typically for two to three days' worth of pain killers—a "reasonable length of time" for dental pain killer, by the government's lights. ECF No. 103 at 5. But the government completely ignored the fact that the Spears dental practice was closed during the month of June 2020—and thus no procedures were performed—even while Ms. Leslie purportedly received a prescription that month. ECF No. 98 at 4.

On July 29, 2020, this Court held the first of three hearings on the motion to dismiss. ECF No. 168. During the hearing, the defense argued that the patient records that were first provided to the defense shortly before the hearing, and which seemed to confirm the legitimacy of the

---

[38]    To ensure that the Spears' records would corroborate those assertions, the government left the prescriptions with them, Doc. 103-2 at 2, allowing them time to potentially alter their records to match the prescriptions.

prescriptions in issue, appeared to have been altered. *Id.* at 17:14–18:20. Regardless, the defense position was that the government had violated its obligation to provide, in a timely matter, evidence that could be used to impeach Ms. Leslie because it knew or should have known about the prescriptions issued from the Spears' dental practice to Ms. Leslie long before it made the records available because it was monitoring BOP records for both Ms. Leslie and Dr. Houdersheldt *Id.* at 22:2–21.

This Court focused on the critical question and raised its concern with Mr. Barras: "So I'm really puzzled at how or why the government didn't know before Friday the 17th that [Ms. Leslie] was getting prescriptions for narcotics, opioids and, therefore, you should have examined them." *Id.* at 28:3–6. "[Y]ou knew," the Court told government counsel, "that you should be looking at [Ms. Leslie]'s BOP records before trial to determine whether she was getting prescriptions for opioids regardless of whether they were properly written or not." *Id.* at 29:3–6.

At that point, Attorney McFadden falsely declared that the defense had been put on notice of a portion of the prescriptions Ms. Leslie received from the dental practice in December of 2019. *Id.* at 30:22–31:15. The government promised to check on the accuracy of this assertion but assured the Court that in any event, the BOP records for Ms. Leslie had not been obtained in March because the trial was continued. *Id.* at 32:4–34:3.

When pressed by the Court on when the government knew about Ms. Leslie's continued opioid use, government counsel falsely claimed that the government did not know until Ms. Leslie's prescription records were received from the BOP in July 2020. *Id.* at 33:20–34:3. Based on that representation, the Court found no discovery violation had occurred. *Id.* at 35:19–36:9. Nevertheless, the Court agreed to continue the hearing the next day to allow more time to explore the legitimacy of the prescriptions issued to Ms. Leslie. *Id.* at 36:25–37:3; 68:3–69:16.

74

The Court resumed the hearing on the motion to dismiss on July 30th. Doc No. 169. In responding to the Court's questions, the defense presented a compelling basis for believing that the Spears' patient records "appeared to be fabricated." *Id*. at 5:9–6:23. As defense counsel pointed out, each of the patient entries appeared to have been written in the same handwriting, on the same day, with the same pen. *Id*. at 6:14–16 Defense counsel also outlined numerous leads she intended to pursue, *id*. at 5:23–8:2, and requested a short, two-week continuance of the trial to allow the defense to conduct this essential investigation. *Id*. at 2:3–6.

In response, government counsel specifically denied withholding the records: "*We have not hidden the ball on that at all.*" *Id*. at 9:15–16 (emphasis added). As the Court now knows, subsequent acknowledgements by the government proved this statement to be a lie.[39]

But at the time, the Court credited the government's representations as true and concluded that there was no *Giglio* violation. Indeed, the government's misrepresentations were crucial to the Court's reasoning:

> I agree that the government had access to these records. I agree that they stated that they monitored them. And when Mr. Barras was first addressing it, I was reaching the same conclusion. *But Ms. MacFadden explained and has now confirmed that the government did not monitor those records in the interim time that we're talking about.* There is just no evidence that the government monitored the records of [Ms. Leslie] from the BOP and discovered in November, December or since then until now that she had prescriptions.
>
> *So I don't know how I can conclude otherwise based upon the full representation of the government and explanation of the government about what it had and when it had it*, and that's how you define their disclosure obligation.

---

[39]   If the government had reviewed its records, as promised during the earlier hearing and as it assured the Court it had done by July 30th, government counsel would have unquestionably known that this statement was false. *See id.* at 11:22–23 ("Your Honor, we have gone back through our records to determine what the time frames were."). Some sins simply cannot be forgiven. And government prosecutors, with all of the power and discretion bestowed upon them, intentionally making a false statement to a federal judge surely must be one of them.

*Id*. at 14:23–15:10 (emphasis added). [40]

       Any lingering doubt that the government intentionally misled the Court was removed when the defense pressed for a definitive statement as to when the government first came into possession of the records showing that Ms. Leslie was continuing to receive opioid prescriptions. The Court turned back to the government for an answer:

> THE COURT: Okay. Maybe just for the record you can clarify. At what point did the government obtain Board of Pharmacy records on DL's prescriptions?
>
> MS. MAC FADDEN: *On July 17th* when I was e-mailed by Mr. McMillian, and he said do you want to do a joint order? At that time, we then immediately reached out and said let's get it for all indicted patients. . . .
>
> THE COURT: *Had the government obtained Board of Pharmacy records on DL's prescriptions for any other time period at any earlier date?*
>
> MS. MAC FADDEN: ***No, Your Honor.*** What was provided in October, I believe, in the discovery was the entirety of what we had. . . .
>
> THE COURT: When you say *what we had*, are you talking about Board of Pharmacy records—
>
> MS. MAC FADDEN: Yes, Your Honor.
>
> THE COURT: —on DL?
>
> MS. MAC FADDEN: What we had, yes.
>
> THE COURT: So you did obtain Board of Pharmacy records on DL—
>
> MS. MAC FADDEN:   Yes.
>
> THE COURT: —on an occasion prior to July 17th.

---

[40]    It is not clear that the Court was correct on this point, as "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case," *Kyles v. Whitley*, 514 U.S. 419, 437 (1995), which includes an obligation to search available databases likely to contain discoverable information, *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. Unit A 1980) ("That the prosecutor, because of the shortness of time, chose not to run and FBI or NCIC check on the witness, does not change 'known' information into 'unknown' information [in the *Brady* context].").  Nonetheless, as discussed below, the prosecutors in this case had already learned of the records in this case by the time they made these representations to the Court.

MS. MAC FADDEN: Of 2020, yes, we did.

THE COURT:    Right. But those records were—confirm for me. Were those records from the Board of Pharmacy obtained before the November 2019 prescriptions started?

MS. MAC FADDEN:   Yes.

*Id*. at 21:19–22:25(emphasis added).

Thus, the government unequivocally stated to the Court that it did not obtain any post-November 2019 prescription records for Ms. Leslie until July 17, 2020. But whether pangs of conscience or fear of the incurring the Court's wrath, within hours of the hearing, government counsel Barras submitted a pleading, under seal, captioned as a "Notice of Record Production." Doc. No. 111. In his pleading, Mr. Barras conceded that, contrary to his answers the previous day and the answers provided by his co-counsel Ms. McFadden earlier that very day in direct response to the Court's questions, the government in fact had been in possession of the crucial, at-issue, prescription records for Ms. Leslie well before July 17, 2020.  *Id.* at 1.

In fact, Mr. Barras was forced to admit—again, contrary to the false statements made by Ms. McFadden to the Court—that the government had *twice* (in March and June 2020) received batches of documents showing Ms. Leslie's continued opioid use post-termination of her treating relationship with Dr. Houdersheldt following his indictment in September of 2019.  *See id.*  Yet, despite its obligations under *Brady* and *Giglio*, as well as the Court's pretrial order that imposed a continuing duty to disclose as new information came into the government's possession, the government only disclosed these documents on the eve of trial.

In light of this government about-face, the Court ordered yet another hearing. Doc. No. 170. But now, the question was no longer whether a remedy was required but rather what remedy, if any, would provide Dr. Houdersheldt with a fair trial. At that hearing, this Court expressed its exasperation with the government's lack of candor and obfuscation:

I am dumbfounded, stunned, and disappointed that the government, over the course of those two days [*i.e.*, the two days of the prior hearing], couldn't seem to figure out and accurately report to the Court what it knew and when it knew these things.

It's particularly disturbing to me that after the discussion Wednesday, that when the government came back on Thursday and firmly reiterated, despite having many opportunities to the contrary, that it had not received any Board of Pharmacy records from the time that these—during when these 11 prescriptions were written, meaning that there had been a pharmacy record obtained before that and disclosed, but that the government had not obtained and, therefore, had not disclosed anything in the interim until July 17th, now that appears not to be the case, on at least two occasions recent—recently enough that it dumbfounds me to think that the government did not identify—recognize the significance of its earlier obtaining of Board of Pharmacy records and then at least advise the Court accurately on Thursday, but apparently that's exactly what happened.

*Id*. at 23:25–24:19.

>  b.  *The Court's remedy for the government's dishonest conduct was wholly inadequate.*

Where, as here, "the government's contumacious conduct involves a delay in producing discovery, . . . the relevant inquiry is whether the defendant's counsel was prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case." *United States v. Sterling*, 724 F.3d 482, 511 (4th Cir. 2013) (internal quotation marks omitted). And when the material is provided too late for the defense to make effective use of the evidence, or as here, when the government's delay denies the defense a reasonable opportunity to investigate the disclosure further, the defendant has been denied his due process right to a fair trial. *E.g.*, *United States v. Russell*, 971 F.2d 1098, 1112 (4th Cir. 1992) (where evidence is provided to the defense "before it is too late for the defendant to make effective use of it, there is no due process violation"). In fashioning a remedy for a *Giglio* violation, the district court must consider several factors, including the reason for the government's delay, whether the government acted intentionally or in bad faith, the degree of prejudice suffered by the defendant, and whether

anything short of the dismissal of the indictment would be sufficient to remedy the prejudice. *United States v. Sterling*, 724 F.3d 482, 512 (4th Cir. 2013).

Here, as a remedy for the government's failure to disclose the crucial prescription information on a timely basis, the Court ordered the two dentists for whom Ms. Leslie worked—Timothy and Lincoln Spears—to produce their patient records and submit to a deposition. ECF No. 170 at 32:7–18. The deposition was held on a Saturday—the weekend before the trial was scheduled to begin. *Id*. at 32:4–5. This remedy was woefully inadequate to address the government's misconduct and the prejudice caused to Dr. Houdersheldt.

First, there is little question but that the government's concealment of evidence of Ms. Leslie's continued opioid use was in bad faith. This was no mere oversight. And when questioned about it, the government blatantly lied to the Court. As the Court stated, the government's malfeasance was "dumbfound[ing]."[41]

More shocking conduct by the government's attorneys would be hard to imagine but for what came next. When their misconduct was uncovered, the prosecutors affirmatively tried to sweep the whole sordid matter under the rug by visiting the doctors Spears and "correcting" their story, *see*, *supra*, at p. 72, and then arguing that, because the prescriptions were supposedly legitimate, their failure to turn over the evidence earlier, their deception of defense counsel, and their lies to the Court were of no moment. *Id.* at 6:8–8:7. The extraordinary bad-faith nature of the government's conduct weighs strongly in favor of a forceful sanction.

---

[41]    Of course, government counsel's false statements to the Court are understandable in context. Having already false claimed that Ms. Leslie was opioid free during the reverse proffer in June 2020, and having now twice intentionally withheld clear *Giglio* materials in March and again in June, the prosecutors had little choice but to stick to the lie that they had not received Ms. Leslie's BOP records prior to July 17, 2020, even if that meant taking the falsehoods to the next level and contemptuously lying directly to the Court. "Oh, what a tangled web we weave, when first we practice to deceive." Sir Walter Scott, *Marmion: A Tale of Flodden Field* (1808).

Regarding the prejudice to Dr. Houdersheldt caused by this misconduct, the withheld records were not ordinary, run-of-the-mill impeachment evidence. To the contrary, the evidence proved that Ms. Leslie was continuing to use opioids and also strongly suggested that she was doing so illegally—and that the government—in continued exchange for cooperation, permitted her to engage in such conduct or at least turned a blind eye to it. Had the defense been provided with this information in a timely manner and had been given sufficient time to conduct an investigation to prove that what the evidence suggested was true, then the credibility of the government's star witness would have been not merely impeached, but eviscerated. The government undoubtedly knew this to be the case and thus went to extraordinary lengths, first, to conceal the records as long as possible, second, to lie about the concealment, and, third, once the records were out, to conduct a suspicious clean-up operation with the Spears.

The remedial deposition ordered by the Court was thus inadequate because it failed to address the intentional nature of the government's conduct and did not operate to unwind the prejudicial effects of that conduct. Along these same lines, the deposition remedy was inadequate because it failed to undo the damage done by the government's wrongdoing. At a bare minimum, Dr. Houdersheldt was entitled to the modest two-week continuance requested by the defense that would have allowed him to thoroughly investigate the situation and run the origins of the likely illicit prescriptions to ground. ECF No. 169 at 2:3–6. Instead, Dr. Haudersheldt's trial counsel were forced to conduct a rushed investigation, on the eve of trial, and at the expense of other last-minute preparations.

Dr. Houdersheldt also should have been permitted to depose Ms. Leslie in order to inquire if, as suspected, she had stolen prescription pads from the Spears, whether she had been threatened or intimidated by the government, and whether she was promised that she would not be prosecuted

in order to secure her testimony. Dr. Houdersheldt was also entitled to pursue additional avenues of investigation, including engaging a handwriting or ink expert to determine whether the prescriptions ostensibly written by the Spears were in fact forged by Ms. Leslie and also to determine whether the dental-patient records that supposedly provided legitimacy to the prescriptions had been falsified.

These issues could not adequately be explored—and, with regard to some aspects, could not be explored at all—by deposing the dentists in the days before trial. In finding that deposing the dentists was a sufficient remedy, the Court misperceived the nature of the evidence, the investigation that could have been undertaken if the evidence had been disclosed earlier, and the use which could have been made of that evidence on cross-examination.

In short, the Court undervalued the nature of the evidence of Ms. Leslie's continued opioid use and failed to provide a constitutionally sufficient remedy for the government's outrageous conduct in concealing that evidence. In reality, dismissal would have been an appropriate sanction; at minimum, a generous continuance was required in to allow for the necessary investigation. The Court can rectify that error now by granting Dr. Houdersheldt a new trial with time to investigate the nature of Ms. Leslie's continued opioid use and without the continued involvement of the government attorneys who caused this problem.

That was the remedy provided for similar misconduct in a case from one of this Court's sister districts. In *United States v. Burns*, 2016 WL 3910273 (W.D. Va. July 14, 2016), like this case, the government engaged in the concealment of evidence and the government attorney lied to the Court about that concealment.

The court in *Burns* found that the government had intentionally suppressed evidence that would have been favorable to the defendant, *id*. at *4-*5, and further found that the defendant was

prejudiced by the suppression of that evidence because it could have been used to impeach, and show the bias of, the government's principle witness. *Id*. at *5. The court found that the suppression of the evidence "undermine[d] the confidence in the outcome of the trial" in violation of the Supreme Court's decision in *Kyles v. Whitley. Id.* at *6.

In reasoning directly applicable to this case, the *Burns* court went on to find that the most compelling evidence of the prejudice to the defendant was the government's use of the unimpeached testimony of its star witness. *See id.* at *5–7. Accordingly, the court determined that, although a complete dismissal of the indictment was not required, the violation of the defendant's Due Process rights mandated that he be granted a new trial with an opportunity to use the impeachment evidence to discredit the government's star witness. *Id*. at *7. But the *Burns* court also found that the government attorney's outrageous conduct could not go unpunished and ordered—as this Court should now order—that the prosecutor who tried the case originally be barred from participating in the retrial. *Id*. at *8. The *Burns* court reached this decision via language that is almost word-for-word directly applicable to this case:

> From these misrepresentations, omissions, and evasions, it is clear that the Government's main concern was to ***insulate its principal witness*** from damaging and embarrassing cross-examination, rather than disclosing the impeachment evidence as the Constitution and my Ex Parte Order required. The totality of the circumstances surrounding the suppression leads to the conclusion that this mistake was not an inadvertent oversight. In sum, the Government failed to exhibit candor toward this Court and has compromised the validity of Burns' conviction.

*Id.* (emphasis added).

In light of the government's egregious misconduct and the Court's failure to adequately address it on the first go-round, the indictment in this case should be dismissed with prejudice. Alternatively, Dr. Houdersheldt should be granted a new trial and the government's lawyers and agents on the original case should be removed.

**B.**     **The Government Wrongly Withheld Evidence Showing Dr. Houdersheldt Did Not, In Fact, Attempt to Interfere with a Police Investigation.**

At trial, the government made much of the fact that, after his encounter with Duran in the park, Dr. Houdersheldt called the Chief of the Hurricane Police Department, who happened to be his patient.  For example, Attorney McFadden hammered the point home in her closing:

> Ladies and Gentlemen, the first thing he did, the first call he made was to Chief Mullins, Hurricane Police Department Chief Mullins. He called Duran's boss immediately after running into him. He knew he could get the chief on the phone because he had his cell phone number at the ready. He was preparing his escape, and he needed to figure out his story quick. If you didn't have anything to hide, why would you be calling the chief of police after hours, after his detective had just rolled up on you?

Trial Tr. at 1037:6–15; *see also id.* at 1047:4–7 ("So what did he do? He had to lie to cover his tracks. Just like he had to call Chief Mullins to get his story straight to get out, because he knew what would happen if the truth came out."). And Attorney Barras could not help but do the same in his rebuttal:  "[W]hen he got back on the road, the first call he made was to Chief Mullins because he needed to get his story straight. He needed to fix this before it became a problem." *Id.* at 1073:3–6.

But the government was only able to suggest to the jury that Dr. Houdersheldt tried to use his connections to get out of trouble because it had hidden the truth from the defense. When Chief Mullins was interviewed—not just by law enforcement officers, but by government counsel—he unambiguously told them that Dr. Houdersheldt in fact did no such thing. Ex. K (Declaration of C. Maza). Chief Mullins denied that Dr. Houdersheldt asked him to intervene in the investigation in any way; instead, the sum total of the doctor's complaint was that the officer had been rude and intimidating. *Id.* at ¶¶ 9, 11, 12.

Incredibly, no record of this interview was ever disclosed to the defense. Whether it was in a formal report or otherwise, this was plainly *Brady* and *Giglio* material that could have been very

effectively used to impeach the testimony of various agents who testified about the Mullins call; it was also *Brady* information, as it clearly contradicted the theory of obstruction of justice the government sought to prove. *See Love v. Johnson*, *supra*, 57 F.3d 1305, 1313 (4th Cir. 1995) ("The basic constitutional right [under *Brady* and *Giglio*] is the well-established right of an accused to the disclosure of evidence in the prosecuting government's possession that is both favorable to the accused and material to guilt or punishment . . . Evidence may be "favorable" in the required sense not only when it tends to substantively negate guilt but also when it tends to impeach the credibility of a key witness for the prosecution." (internal quotation marks omitted). And it would have been a powerful rebuttal to otherwise damning evidence suggesting Dr. Houdersheldt had attempted to obstruct justice.

Deprived of that rebuttal, Dr. Houdersheldt was forced to sit mutely by while the government—knowing full well that it had no basis for its claims—suggested that he tried to use his relationship with Chief Mullins to quash Duran's investigation. This second *Brady* violation also entitles Dr. Houdersheldt to a new trial.

### C.   The Government Wrongly Withheld Evidence of the Massive Financial Benefits Dr. Munzing Reaps as a Government Expert Witness.

But the government was not done violating *Brady* yet. While, through Dr. Munzing's admission on cross-examination, the government (unintentionally) disclosed the tens of thousands of dollars it paid Dr. Munzing to purchase his testimony in this case, it failed to divulge the fact— discussed above, that the relationship between the government and Dr. Munzing ran far deeper— and was, by orders of magnitude, far more lucrative—than his already handsome compensation in this case would suggest. Post-trial, counsel for Dr. Houdersheldt has learned that the government has paid Dr. Munzing *nearly $2.5 million* for his "expert" services since 2014. This includes nearly $1 million in 2019 and, despite the nationwide drop in litigation due to COVID-19, nearly

$900,000 year-to-date in 2020. *Giglio*'s obligations are not fulfilled by honest, but incomplete, disclosures during cross-examination. Witness compensation is critical impeachment evidence that was directly relevant to Dr. Munzing's credibility at trial. It unquestionably falls within the confines of *Giglio*. *See Love*, 57 F.3d at 1313. And the government's failure to disclose it warrants a new trial.

### D.  The Government's Conduct in Another Case in this District Proves These Failures Were Intentional.

Any doubt that the prosecutors' failures to live up to their *Brady* and *Giglio* obligations— as well as their numerous other sins in this case—were intentional is dispelled by their similar misconduct in another pending case: *United States v. Kesari*, Case No. 2:19-cr-241, presently before Judge Copenhaver in the Charleston Division of the Southern District of West Virginia. According to pleadings filed in that case, Mr. Barras and Ms. McFadden are once again playing hide the ball with their *Giglio* obligations as well as engaging in other forms of misconduct similar to those outlined herein:

In summary form, the government attorneys engaged in the following misconduct:

1.  Notwithstanding repeated requests for the government to comply with its constitutional obligations, government counsel withheld evidence which was unquestionably exculpatory, obtained in October of 2019 until August of 2020. Doc. No. 176, p. 7.  This  conduct is strikingly similar to the conduct in this case where the prosecutors obtained impeachment evidence of Ms. Leslie but withheld it for four months, notwithstanding their constitutional obligations and an order from this Court.

2.  More than a year after the indictment of *Kesari*, the government continued to refuse to provide any of the email communications between government

85

counsel and their agents.   Similarly, government counsel has bluntly stated that the defense has no right to those communications in this case. But even assuming that none of those emails contain *Giglio* material, there is no legitimate basis for withholding the statements of its testifying officers as Jencks material.

3.      On September 24, the government had the defendant arrested so that he could be forced to do the "perp walk" like they did with Dr. Houdersheldt.  Doc. No. 29 at 6.  But the defendant in that case is seventy-eight years old and his wife is terminally ill.  *Id*. at 3.

4.      Like Dr. Houdersheldt, the defendant was caricatured as a drug dealer and opioid pusher, even though he ran a drug treatment program.  *Id*.

5.      The government failed to comply with the court's order to disclose its expert witness by October 16, 2019.  *Id.* at 11.

6.      The government finally provided the disclosure nearly three weeks later on November 4, 2019 but less than a month before the scheduled trial.  Moreover, the government's tardy disclosure failed to provide any of the required information, including the bases for the expert's opinion. *Id*.

7.      The government acknowledged that it had failed to comply with the court's pretrial discovery order but, again like this case, characterized the constitutional infirmity as a minor matter:  "[T]he the Government does not deny that it *was a little over two weeks* late in disclosing a letter that provided a summary of expert testimony" but the defendant did not suffer any prejudice.  Doc. No. 44

at 33.[42]  But the government did not rectify its disclosure violation until August of 2020, when contrary to the allegations in the indictment, the government stated that it planned to introduce evidence of six patients who the government believed were receiving inappropriate prescriptions. Doc. 124 at 8.

8.    In the second superseding indictment, the government alleged that Kesari's criminal conduct involved just four patients.  Doc. No. 33, p. 3.  But in a clear effort to hide the needle in a haystack, the government alleged a criminal conspiracy that spanned a seven-month period and, on the face of the indictment, arguably included every patient in Kesari's practice. *Id*. at 2.  But when the defense sought clarification of the number of patients the government was alleging had received illegal prescriptions, the government demurred arguing that it was under no obligation to provide that information.

Doc. No. 76, at 8-13.

No doubt there is more misconduct to be gleaned from a careful examination of the record in the *Kesari* case than has been identified in this section. But the point is that the outrageous government misconduct that pervaded the investigation and prosecution of Dr. Houdersheldt is not an outlier. Rather, the *Kesari* case demonstrates that abdication of their constitutional and professional responsibilities, concealment of evidence which every federal prosecutor knows must be disclosed, and deceit in the service of winning at all cost is the *modus operandi* of Mr. Barras and Ms. McFadden.

---

[42]    Once again, at best, a half-truth.  Nineteen days, by anyone's math, is closer to three weeks than "a little over two weeks."

**E.    The Court Erred by Precluding the Defense Expert From Testifying Based On His Interview With Dr. Houdersheldt.**

Finally, at trial, defense expert Dr. Lewis Whaley sought to rebut Dr. Munzing's faulty analysis discussed above. The substance of his testimony was to be that, while Dr. Houdersheldt's notes could have been clearer, he nonetheless provided appropriate care. As part of that, Dr. Whaley sought to testify that, despite maintaining less-than-copious formal written records, Dr. Houdersheldt was nevertheless deeply familiar with the detailed medical history of each of the at-issue patients. Trial Tr. at 869:14–870:7.

But the Court excluded this testimony, ruling that it was improper for the expert to rely on what he learned from his interview with Dr. Houdersheldt. *Id.* at 872:8–877:2. That is flatly contrary to Rule 703, which allows an expert to rely on materials reasonably relied upon in the field—including hearsay. Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). For that reason, the Fourth Circuit has upheld the admission of expert testimony based on interviews conducted by that expert. *See United States v. Palacios*, 677 F.3d 234, 242–44 (4th Cir. 2012); *United States v. Johnson*, 587 F.3d 625, 634–36 (4th Cir. 2009).

Excluding this crucial portion of Dr. Whaley's testimony precluded him from fully confronting and effectively rebutting the government's expert. Dr. Whaley's testimony on Dr. Houdersheldt's practices and the scope of his familiarity with his patients' medical history—information he gleaned from a first-person interview with Dr. Houdersheldt, these patients' primary care physician—would have provided disinterested validation of Dr. Houdersheldt's treatment of the three patients at issue, something even Dr. Houdersheldt could not provide in any

other way, even if he had taken the stand. And it would have served as a powerful rebuttal to Dr. Munzing's logically faulty position that the notes were absolutely dispositive of what actually occurred, except when they were not.

## V.   THE GOVERNMENT'S MISCONDUCT DEPRIVED DR. HOUDERSHELDT OF A FAIR TRIAL.

From the beginning of this case, Attorneys McFadden and Barras have had a peculiar fascination with Dr. Houdersheldt. This motion documents at length the various dishonest, coercive, and unethical means they and the prosecution team employed in investigating and prosecuting this case—and at least one other case. But their obsession with seeing Dr. Houdersheldt in a federal penitentiary infected even their public statements.

On September 24, 2019, the DOJ announced Dr. Houdersheldt's indictment alongside 12 other individuals. DOJ, *Second Appalachian Regional Prescription Opioid Strikeforce Takedown Results in Charges Against 13 Individuals, Including 11 Physicians* (Sept. 12, 2019), available at: https://www.justice.gov/opa/pr/second-appalachian-region-prescription-opioid-strikeforce-takedown-results-charges-against-13. His mere inclusion in this press statement is misleading.

The press release is full of inflammatory statements, such as this one from U.S. Attorney Mike Stuart of the Southern District of West Virginia:  "We have taken a very tough stance against those that fuel the opiate crisis at every level including pill writers, pill fillers and drug dealers." *Id.* The Assistant Attorney General for the criminal division was quoted thundering that:  "Medical professionals who violate their solemn oaths and peddle opioids for profit should know that we will find you and ensure the justice system treats you like the drug dealer you are." *Id.* The release further proclaimed that the charges against these 13 individuals "aggressively prosecute" those who "contributed to the opioid epidemic, particularly medical professionals who are involved in the unlawful distribution of opioid epidemic, particularly medical professionals who are involved

in the unlawful distribution of opioids and other prescription narcotics, a particular focus of the Department." *Id.*

Lumped in amongst pill-mill operators, Dr. Houdersheldt was made to look like a common drug pusher. But by this time Attorneys McFadden and Barras knew that, out of Dr. Houdershelt's 3,000 patients, they could only find one to include in the indictment—a total that, by the time of trial, they could only expand up to three. And they knew they could not prove Dr. Houdersheldt wrote prescriptions for financial gain, or indeed for any personal benefit. Likewise, they knew they had absolutely no evidence tying Dr. Houdersheldt's prescribing practices to any deaths.

None of that made it into the release. Instead, the only qualification DOJ was willing to include was the occasional use of the word "alleged." Cold comfort, at best.

But that's not all. At the press-conference accompanying the release, Assistant Attorney General for the Criminal Division Brian Benczkowski singled out Dr. Houdersheldt. Jake Flatley, *Federal charges filed against 11 doctors in Appalachian opioid sting,* MetroNews (Sept. 24, 2019), available at: https://wvmetronews.com/2019/09/24/federal-charges-filed-against-13-individuals-in-appalachian-opioid-sting/. He incorrectly claimed Dr. Houdersheldt met multiple patients at gas stations and convenience stores, prescribing them oxycodone, hydrocodone, and codeine, without performing any exam. *Id.* [43]

Beyond being false—the only patient the government alleges Dr. Houdersheldt met outside the office is Leslie—this spotlighting is bizarre. With indictments pursuing the distribution of more than 23 million pills, why focus on the doctor charged with distributing a relatively nominal amount?  The only plausible answer, it stands to reason, is that the AAG did not know the amount

---

[43]     This false allegation likely came directly from Ms. McFadden, who repeated the same false claim in a motion to detain Dr. Houdersheldt. Doc. No. 8 at 3.

was nominal and simply focused on the defendant his line prosecutors (*i.e.*, McFadden and Barras) told him to single out.

As the Court well knows, federal prosecutors are bound by the rules of professional conduct in the jurisdictions where they practice, regardless of where they are licensed. 28 U.S.C. § 530B(a) ("An attorney for the Government shall be subject to the State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State."). Rule 3.6(a) of the West Virginia Rules of Professional Conduct forbids lawyers to "make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communications and will have a substantial likelihood of materially prejudicing an adjudicate proceeding." The commentary to the rule further notes that public attacks on the character of criminal defendant, opinions of guilt, and inadmissible evidence (such as complete fabrications) are particularly problematic. W.V. Rules of Prof. Conduct 3.6 cmt.5. Indeed, Rule 3.8 commands prosecutors to take special care to avoid improper public statements, such as those made about Dr. Houdersheldt:

> [A] prosecutor's extrajudicial statement can create the additional problem of increasing public condemnation of the accused. Although the announcement of an indictment, for example, will necessarily have severe consequences for the accused, a prosecutor can, and should, avoid comments which have no legitimate law enforcement purpose and have a substantial likelihood of increasing public opprobrium of the accused.

W.V. Rules of Prof. Conduct 3.8 cmt. 5.

Likewise, the DOJ's U.S. Attorney Manual directs prosecutors not to discuss a defendant's character, discuss anticipated evidence or argument, or express opinions on a defendant's guilt. Justice Manual §1–7.610. In fact, where pre-conviction media contact is concerned, the Manual advises prosecutors to stick to the information in "publicly available material, such as an

indictment or other public pleadings." *Id.* § 1-7.700. Moreover, courts across the country have taken prosecutors to task for inflammatory, self-promoting press statements such as those implicated here. *See, e.g. United States v. Silver*, 103 F. Supp. 3d 370 (S.D.N.Y. 2015) ("In this case, the U.S. Attorney, while castigating politicians in Albany for playing fast and loose with the ethical rules that govern their conduct, strayed so close to the edge of the rules governing his own conduct that Defendant Sheldon Silver has a non-frivolous argument that he fell over the edge to the Defendant's prejudice."); *accord. Sheppard v. Maxwell*, 384 U.S. 333, 360 (1966); *United States v. Bowen*, 799 F.3d 336, 341 (5th Cir. 2015); *Aversa v. United States*, 99 F.3d 1200, 1203 (1st Cir. 1996). And no rule is required to warn prosecutors about intentionally issuing false press statements.

Somehow, none of that concerned the intrepid prosecutors in this case. Tossing Dr. Houdersheldt's case into an inflammatory press release and presumably feeding false information to the AAG, they disregarded West Virginia's ethics rules, judicial admonitions, and DOJ policy with equal abandon. It was neither the first nor last time they would do so in this case or, if the *Kesari* case is any guide, several others.

And while these press statements might not themselves be sufficient to warrant a new trial, the Court will not have to look far to find additional misconduct justifying one. Public statements were just the first and most obvious manifestation of the government's willingness to break the rules to complete their vendetta. Because the government's conduct violated Dr. Houdersheldt's constitutional right to a fair trial, a new trial is required. *See Kinsella v. U.S. ex rel. Singleton*, 361 U.S. 234, 246 (1960) (a denial of "fundamental fairness, shocking to the universal sense of justice," violates the due process); *United States v. Russell*, 411 U.S. 423, 432 (1973) (affirming this standard).

92

**A.      The Government Lied to Defense Counsel Just Before Trial to Induce a Plea Bargain.**

In June 2020, government counsel engaged in a "reverse proffer" during which they falsely represented that, having gained her freedom from Dr. Houdersheldt, Ms. Leslie had cleaned up her life and was now totally opioid free. But the government knew that statement was not true. Indeed, in preparation for the proffer session, the government pulled Ms. Leslie's BOP records for the second time and knew without any doubt that Ms. Leslie had continued to receive opioid prescriptions between December 2019 and June 2020. *See supra* at Section IV.A.2.

Despite believing that Ms. Leslie was a recovering opioid addict, purporting to know or have reason to know that Ms. Leslie had obtained opioid prescriptions in the past through illegal means, and knowing that she was employed by the dental practice that purportedly issued the prescriptions to her, the government took no steps to verify the legitimacy of the eleven prescriptions that Leslie received from the dentists in that practice. Rather, the government simply ignored the existence of those prescriptions entirely and, in an effort to unethically induce a guilty plea, falsely informed defense counsel that Ms. Leslie was opioid free. And worse, it withheld the records that would have allowed the defense to explore the very issues that the government had declined to pursue.

Because one falsehood was apparently not enough, during the same reverse proffer the government also falsely claimed to defense counsel that Chief Mullins would testify at trial that, on the night of his encounter with Duran in the park, Dr. Houdersheldt had tried to quash the investigation of his conduct. As noted above, government counsel indisputably knew that to be false, because they actively participated in the interview with Chief Mullins during which he emphatically denied any such thing. Ex. K at ¶¶ 13–15.

As Dr. Houdersheldt has already argued, *see*, *supra*, Sections IV.A, IV.B, and IV.C, the government's withholding of all of these records violated *Giglio* and *Brady* and Dr. Houdersheldt's constitutional right to due process. But government counsel's withholding of those records ***while representing*** to the defense that Ms. Leslie was opioid free and Chief Mullins would testify against Dr. Houdersheldt, created an independent but no less serious problem.

Rule 3.4 of the West Virginia Rules of Professional Responsibility demands that lawyers act fairly with respect to opposing parties and their counsel. Indeed, counsel may not "unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value." W.V. Rules of Prof. Conduct 3.4. Furthermore, Rule 4.1 prohibits attorneys from "knowingly mak[ing] a false statement of material fact or law to a third person" while "representing a client." W.V. Rules of Prof. Conduct 4.1.

Here, the government not only withheld critical evidence, it intentionally and affirmatively misled the defense into believing that such evidence ***did not exist***. In the larger scheme of the government's misconduct in this case, it easy to gloss over the import of false statements made during a reverse proffer. But the Court should not do so. When prosecutors make representations to the defense about what key witnesses will say at trial, they must tell the truth. And just as a prosecutor cannot try to strong arm a plea by falsely stating a witness who has died or is in the wind will testify at trial, it was wholly improper here for the government to mislead the defense concerning the anticipated testimony of both Ms. Leslie and Chief Mullins. Such conduct is a clear violation of the canons of ethics and presents further justification for either dismissing the indictment or granting Dr. Houdersheldt a new trial without the participation of the two prosecutors who sought, and obtained, a conviction at all costs.

94

**B.**   **Government Counsel Solicited Perjury from Sergeant Crane When It Allowed Him to Testify That Leslie Had Not Been Pressured or Threatened to Force Her Cooperation with the Government.**

"Due process is denied if the government knowingly uses perjured testimony against the accused to obtain a conviction." *United States v. Griley*, 814 F.2d 967, 970–71 (4th Cir. 1987); see also *United States v. Ellis*, 121 F.3d 908, 927 (4th Cir. 1997) ("The government violates its duty to deal fairly with a defendant where it either solicits testimony it knew or should have known to be false or allows such testimony to pass uncorrected." (emphasis added)).  Indeed, the government does not even "have to solicit the false evidence; it is enough if the government allows the evidence to go uncorrected when its surfaces." Id. at 971. Here, the government knowingly solicited false testimony about its interrogation of Ms. Leslie and made no effort to correct it.

During his examination of Crane, government counsel Barras engaged in the following colloquy with the witness:

> Q.   In terms of meeting with Ms. Leslie, whether it be September 10th, 2019, or September 14th, 2019, in your mind did you do anything to pressure Ms. Leslie to make allegations of wrongdoing regarding anyone?
>
> A.   No.
>
> Q.   During your meetings with Ms. Leslie and other members of law enforcement that you've described, in your mind did you hear attempts by them to pressure Ms. Leslie to make incriminating statements as to anyone in particular?
>
> A.   No.
>
> Q.   Did you make any promises to her, whether it be September 10th, 2019 or September 14th, 2019?
>
> A.   No.
>
> Q.   Did you hear any members of law enforcement make any promises to her on those days?
>
> A.   No.

Trial Tr. at 181:10–25. No one who has listened to the recording of the interrogation of Ms. Leslie

on September 10, 2019, or read the summary above, *see supra* Section III.A.2, could possibly

believe that any of those answers were true. In fact, as both Mr. Barras and Crane knew, they were

lies. Crane was present for all of Shoeman's hints and outright threats of criminal prosecution, and

even made some himself. *Id.*

The evidence thus unequivocally demonstrates that Ms. Leslie was indeed pressured. In

fact, she was overtly threatened with prosecution if she did not cooperate. And when she finally

agreed, she was promised that she would not be prosecuted. Perhaps the only relevant question at

this point is not whether—but the manner in which—Mr. Barras or Ms. MacFadden approved of

the promise of immunity from prosecution by the agents—expressly or implicitly, before or after

the interview.

Both the Supreme Court and the Fourth Circuit have reversed convictions based on similar

misconduct.  In *Napue v. Illinois*, as in this case, the prosecutor asked whether the government's

key witness had been promised anything in exchange for his testimony. 360 U.S. 264, 265 (1959).

He denied it and the prosecutor, knowing that testimony to be false, did nothing to correct it. *Id.*

The Supreme Court unanimously reversed, explaining that "a conviction obtained through the use

of false evidence, known to be such by representatives of the State, must fall under the Fourteenth

Amendment. The same result obtains when the State, although not soliciting false evidence, allows

it to go uncorrected when it appears." *Id.* at 269 (internal citations omitted). The Court brushed

aside the government's argument that the lie was inconsequential because it merely related to

credibility:

> The principle that a State may not knowingly use false evidence, including false
> testimony, to obtain a tainted conviction . . . does not cease to apply merely because
> the false testimony goes only to the credibility of the witness.  The jury's estimate
> of the truthfulness and reliability of a given witness may well be determinative of

guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend. . . . . **A lie is a lie, no matter what the subject, and . . . the [prosecutor] has the responsibility and duty to correct what he knows to be false and elicit the truth**.

*Id.* at 270 (emphasis added).   Likewise, in *Campbell v. Reed*, the Fourth Circuit reversed Campbell's conviction after the prosecutor—knowing the testimony to be false—allowed Campbell's accomplice to testify at trial that he had not been offered any plea agreement in exchange for his testimony. 594 F.2d 4 (4th Cir. 1979).

So too here:   The evidence in this case indisputably shows that government agents, including Crane, pressured, threatened, and enticed Ms. Leslie *ad nauseum* to fabricate allegations against Dr. Houdersheldt. Attorney Barras unquestionably reviewed the recordings of Ms. Leslie's interview and knew beyond doubt that this was the case. Yet he posed the line of questions above, deliberately urging Crane to falsely state that Ms. Leslie was not "pressure[d]" and was not "promise[d]" anything.   Trial Tr. at 181:10–25.

His questions to Crane were nothing short of the solicitation of perjury.   At the very least, Mr. Barras should have known the statements were false. *Ellis*, 121 F.3d at 927. And given the crucial nature of Ms. Leslie's testimony, this profound misconduct also deals a fatal blow to the integrity of the jury's verdict.

### C. The Government Sought to Mislead the Jury at Trial to Prevent It From Learning of Its Own Past Misconduct.

"[D]ue process is violated not only when the prosecution uses perjured testimony to support its case, but also where it uses evidence which it knows creates a false impression of a material fact." *Hamric v. Bailey*, 386 F.2d 390, 394 (4th Cir. 1967) (citing *Miller v. Pate*, 386 U.S. 1 (1967)); *accord. United States v. Gentry*, No. 7:07-cr-294, 2011 WL 13172167, at *4–11 (D.S.C. March 10, 2011) (granting a new trial based on the false testimony of government witnesses,

quoting *Hamric*, and explaining that "it is incumbent on the government to notify the defendant and the Court and to correct false testimony whenever it is offered by one of its witnesses"). That is exactly what the government did in this case when it attempted to conceal its effort to detain Dr. Houdersheldt based on false accusations that he violated the conditions of his bond and introduced testimony designed to mislead the jury into believing Dr. Houdersheldt had, in fact, violated those conditions.

According to Crane's trial testimony, he had been monitoring the BOP records since the date of Dr. Houdersheldt's arrest. *See* Trial Tr. at 202:18–24. It would be more accurate to state that Crane was hoping to catch Dr. Houdersheldt with violating his conditions of bond by issuing new prescriptions.

Regardless, Crane came across information from the BOP website that *suggested* that Dr. Houdersheldt had been continuing to issue new prescriptions after his release on bond. *See* ECF No. at 9:17–10:7. Crane provided this unverified information to government counsel Barras. Trial Tr. at 203:3–204:9. But rather than taking any steps to verify that these were, in fact, new prescriptions, Mr. Barras simply fed this information to the probation officer assigned to supervise Dr. Houdersheldt while on bond who felt constrained to file a petition to revoke Dr. Houdersheldt's bond. ECF No. 166 at 4:18–24 ("On January 16th, I was contacted by Andrew Barras, who is a U.S. Department of Justice attorney. He had received documentation from DEA Jason Crane, it was documentation pulled directly from the West Virginia prescription drug monitoring program. It appeared that the defendant had written 20 prescriptions for controlled substances, which was in violation of his bond.").

As a result of the petition, a warrant was issued for Dr. Houdersheldt's arrest. At his initial appearance on the petition, the government moved for detention and asked for a continuance to

prepare for the detention hearing. *See id.* at 2:8–21. Although granting temporary detention, the Magistrate Judge set the detention hearing for the next day. *Id*. at 14:4–7. Nevertheless, Dr. Houdersheldt was required to spend the night in the local county jail and appeared the next morning for the detention hearing in manacles and an orange jumpsuit.

Before the hearing, Crane went to the three pharmacies where the prescriptions were filled where he learned that two of the prescriptions were not new prescriptions but simply refills of prescriptions issued before the date of Dr. Houdersheldt's arrest. ECF No. 163 at 39:15–44:11; 44:18–45:5. As to the third prescription, Crane could not read the original prescription date because it was covered by a pharmacy sticker. *Id*. at 35:1–36:3. But government counsel was careful not to ask Crane whether he had learned when the prescription was issued from the pharmacist. *Id*. Thankfully, the defense was able to establish that this prescription was also written prior to Dr. Houdersheldt's arrest and the imposition of his bond conditions. *Id*. at 62:5–11.

In short, Crane knew before the hearing that Dr. Houdersheldt had not violated any condition of his bond. Trial Tr. at 211:3–5, 227:3–228:15. None of them were written in violation of the court order by Dr. Houdersheldt. *Id*. at 227:4–10. And Crane told the government attorneys that these prescriptions were refills prior to the hearing. *Id*. at 228:8–15.

Nevertheless, the government inexplicably went forward with the detention hearing knowing there was no legitimate basis to revoke Dr. Houdersheldt's bond. *Id*. at 228:14–15. Despite the evidence from his own witness that two of three allegedly new prescriptions were simply refills, and despite the uncontradicted evidence demonstrating that the third prescription was also a refill, government counsel improperly and unjustifiably argued for Dr. Houdersheldt's continued detention:

> [W]e believe there is sufficient clear and convincing evidence that the defendant
> was issuing controlled substance *prescriptions* in violation of the Court's original

order. We feel that this type of behavior is significant enough that we believe detention is actually the appropriate remedy in this instance.

ECF No. 163 at 14–19 (emphasis added). The Magistrate Judge rejected this government overreach and released Dr. Houdersheldt without even hearing any argument from counsel for Dr. Houdersheldt. *Id.* at 75:21–7 ("All right.  Before you speak, Mr. McMillian, there is not clear and convincing evidence here.").

But during the trial of this case, government counsel again attempted to mislead both this Court and the jury to conceal the misconduct associated with the attempt to revoke Dr. Houdersheldt's bond. To preclude any questions by the defense as to the government's improper conduct in connection with the petition to revoke Dr. Houdersheldt's bond, government attorney Barras made the following statements to the Court:

> The government's greater concern would be efforts by the defense to demonstrate that the defendant was arrested based on that petition and placed in custody based on that petition. That petition itself, that arrest has actually of course nothing to do with the matter currently before the Court. *The arrest occurred as a result of the petition which was filed by the probation department, signed by Magistrate Judge Eifert.*
>
> *This witness **[i.e., Crane]** had no role in the arrest of the defendant.* **It's my understanding** his role was at some point to pull the [BOP records] for the defendant. He made an effort to locate the hard copy prescriptions referenced in the [BOP records], which seemed to demonstrate after September 24th, 2019, the defendant had been writing controlled substance prescriptions in violation of the order regarding his pretrial release.

Trial Tr. at 127:9–23. These statements to the Court were yet another instance of blatant falsehoods. And they were made for no other purpose than to mislead the Court into believing that the government somehow had nothing to do with the attempt to revoke Dr. Houdersheldt's bond, which it did, and that the prescriptions Crane obtained actually supported revoking Dr. Houdersheldt's bond, which of course they did not.

There was no ambiguity in what government counsel was attempting to do, as recognized by the Court:  "As I understand it, the government's position is that this agent isn't responsible for initiating the petition nor arresting the defendant." *Id*. at 128:13–15. Accordingly, the Court ruled that defense counsel could at least ask Crane "whether or not he provided inaccurate or false testimony concerning whether or not the defendant wrote prescriptions in violation of his pretrial conditions." *Id*.

But what was unknown to the Court was that both Crane and government counsel Barras had played an integral role in causing the probation officer to file the petition to revoke bond. The probation officer explained that role during Dr. Houdersheldt's initial appearance on the petition:

> On January 16th, I was contacted by *Andrew Barras*, who is a U.S. Department of Justice attorney. *He had received documentation from DEA Jason Crane*, it was documentation that was pulled directly from the West Virginia prescription drug monitoring program. It appeared that the defendant had written 20 prescriptions for controlled substances, which was in violation of his bond.

ECF No. 166 at 4:18–24 (emphasis added).

And during his trial testimony, Crane confirmed that DEA had been monitoring Dr. Houdersheldt's BOP records, so Crane could send those records to government counsel, Mr. Barras, or Ms. McFadden.  *See* Trial Tr. at 202:18–24. And when Crane received the records suggesting that Dr. Houdersheldt had violated his release conditions, Crane did just that and sent the records to Mr. Barras. *Id.* at 227:3–228:15

Although Crane tried to protect Mr. Barras by "failing to recall" whether it was government counsel or the probation officer who requested the records, *id*. at 204:22–25, the fact that he provided the records to Mr. Barras, who then forwarded them the probation officer, necessarily answers that question. And the probation officer confirmed that Crane had a substantial role in causing the filing of the petition. Mr. Barras, contrary to his feigned limited understanding before the Court, was the catalyst for the petition.

101

But government counsel took the next step and attempted, perhaps successfully, to deceive the jury. Knowing that the Court was going to allow at least some limited exploration of Crane's role in getting the probation officer to file the petition to revoke bond, Mr. Barras carefully directed Crane's testimony through leading questions, to imply, falsely, that the government had done nothing wrong in connection with securing that petition. *Id.* at 182:1–184:14. At no time during Crane's direct testimony did the government acknowledge that it had been responsible for feeding the probation officer the misleading information, that it knew before the detention hearing that there was no basis for seeking to revoke Dr. Houdersheldt's bond, or that the continued attempt to keep him detained was nothing short of vindictive.  Rather, the false impression left (after Mr. Barras effectively testified for Crane) was that Dr. Houdersheldt probably violated his conditions of release, but that the Magistrate Judge denied the probation officer's petition anyway. *Id.*

After defense counsel made it clear through his cross-examination of Crane that Dr. Houdersheldt had not violated the conditions of his bond, *id.* at 202:21–211:11, *see also* 227:3–228:15 (establishing the same later on re-cross), Mr. Barras made one more attempt to mislead the jury. On redirect, he asked Crane whether "eventually it was determined *for the most part* [the prescriptions that were used to seek Dr. Houdersheldt's detention] were actually refills." *Id.* at 223:16–7. *For the most part?* This question was intended to leave the impression with the jury, and this Court, that one or more of the prescriptions giving rise to the petition to revoke bond had, in fact been new prescriptions. Again, this characterization of the facts is flat-out false.

The Due Process Clause prohibits this type of chicanery. *Gentry*, 2011 WL 13172167, at *7 (rejecting the government's attempt to "parse the language" of defense counsel's questions to show that misleading testimony was literally true). And government counsel's false statements to this Court and the intentional efforts to mislead the jury are just two more reasons that Dr.

102

Houdersheldt is entitled to a new trial, free from the vindictive influence of the current government attorneys.

> **D.**   **Government Counsel Intentionally Asked Inflammatory Questions of Ms. Leslie to Mislead the Jury Into Believing That Dr. Houdersheldt Had Traded Drugs For Sex.**

While Ms. Leslie stalwartly denied a sexual relationship between herself and Dr. Houdersheldt, government counsel nonetheless seeded the record with inflammatory—and patently false—suggestions that evidence existed (which did not) to prove that Ms. Leslie traded sex for drugs. To do so, Mr. Barras posited a series of leading questions on direct examination designed to mislead the jury:

> Q.    During the course of that two hour [government interview], were you asked anything in particular regarding the defendant and your relationship with him?
>
> A.    Yes.
>
> Q.    What were you asked?
>
> A.    Just, ah, what was going on as far as our relationship, and was I just meeting to get the prescriptions or was there something else, like a form of payment or any favors to me or to him for getting a prescription, which there were not.
>
> Q.    *What kind of favors*?
>
> A.    Well, I took it as, after we had talked for a little while, sexual favors.
>
> Q.    *Why was that your interpretation*?
>
> A.    Because one of the interviewers was basically saying that.
>
> Q.    *Saying what exactly*?
>
> A.    If there was any favors, more than a hug, more than a friendly hug, things like that. And I said, no, there was not.
>
> Q.    *More than a hug in terms of what exactly*?
>
> A.    I guess sexual -- they were getting at sexual favors, like for -- I took it as for getting my prescription, but that wasn't the case. [Dr. Houdersheldt] was trying to help me out because I was trying to run the farm and take care of our property in the valley and my mother.

Q.      *How many times did the officers, if you can give us a number, did they mention sex or a sexual relationship with the defendant?*

A.      Several times. I don't know the exact number.

Q.      *At any point, did you tell the officers that you had a sexual relationship with the defendant*?

A.      No huh-uh No, not at all.

Q.      *Why not*?

A.      Because there wasn't. It didn't happen.

Q.      Did you describe generally your relationship with the defendant?

A.      Yes.

Q.      ***At no point did you say you and the defendant had sex***?

A.      No.

Q.      Did you describe any physical contact with the defendant outside of what you just referenced, a hug, that kind of thing?

A.      Pardon me?

Q.      At any point during your contact with the officers that day, did you reference any actual physical contact outside of that hug that you just mentioned?

A.      No.

Q.      ***Was it your impression that the officers believed you had a sexual relationship with the defendant***?

A.      At first, yes, that's what I believed.

Q.      Why not just tell them what you thought they wanted to hear?

A.      Because I was telling the truth, and there was no sexual relationship.

Q.      During your contact with the officers, did you mention the incident we talked about yesterday with the farm and the comments the defendant had for you?

A.      Yes.

Q.      Okay. Specifically the incident regarding him asking about sex?

A.      Yes.

Trial Tr. at 652:1–654:10 (emphasis added).

Ms. Leslie was the government's star fact witness. But because she would not say what the government needed the jury to hear, government counsel testified for her to persuade the jury that the missing evidence existed.

The government knew before trial that Ms. Leslie had repeatedly denied having a sexual relationship with Dr. Houdersheldt. More importantly, she repeatedly denied that she had ever traded sex for drugs or that Dr. Houdersheldt had even suggested such an arrangement. In other words, the government had no evidence to support their hope that such an arrangement had been made between Dr. Houdersheldt and Ms. Leslie.

But there was no concern for the truth or the answers the witness gave. If it could not introduce evidence of sex for drugs, the government would suggest that such evidence existed based on the questions government counsel asked. With no good faith basis for the questions, the government's conduct was improper. *See Barbe v. McBride*, 521 F.3d 443 (4th Cir. 2008) ([T]o have a good faith basis, [t]he examiner must have a reasonable factual foundation . . . . The good faith basis does not have to be admissible evidence, but it must be something that persuades the trial judge the question is proper . . . ." (quoting Michael H. Graham, *Handbook of Federal Evidence* § 607:2 (6th ed. 2006) and Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 6–8(B)(2)(c) (4th ed. 2000)) (internal citations omitted) (second alteration in original)). And because they were highly prejudicial and designed to mislead the jury, this line of questioning violated Dr. Houdersheldt's right to a fair trial. *See Hamric v. Bailey*, 386 F.2d at 394; *Gentry*, 2011 WL 13172167, at *4–11.

**E.**     **The Government Prejudiced the Jury Immediately Prior to Deliberations By Misstating the Evidence During Closing Argument.**

Improper closing arguments "may so infect the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Lighty*, 616 F.3d 321, 359 (4th Cir. 2010). "To determine whether a prosecutor's argument violated a defendant's due process rights," the Fourth Circuit "examines: (1) whether the remarks were, in fact, improper, and, (2) if so, whether the improper remarks so prejudiced the defendant's substantial rights that the defendant was denied a fair trial." *United States v. Abdallah*, 911 F.3d 201, 220-21 (4th Cir. 2018) (citations omitted). Factors relevant to the question of whether a prosecutor's improper argument warrants a new trial include:

> (1) the degree to which the prosecutor's remarks had a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters. We also consider (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel, and (6) whether curative instructions were given to the jury.

*United States v. Chong Lam*, 677 F.3d 190, 203,04 (4th Cir. 2012). The Fourth Circuit has emphasized that the relevant factors must be considered in "in the context of the entire trial, and no one factor is dispositive." *United States v. Wilson* 135 F.2d 291, 299 (4th Cir. 1999).

The requirement to consider the factors in the light of the entire trial is often read to mean that if the remainder of the trial is free of error a prosecutor's improper closing arguments may be harmless. *See United States v. N-Jie*, 276 F. App'x. 325, 331 (4th Cir. 2008) (where comments were isolated and the evidence was otherwise strong, improper argument did not warrant a new trial). But the converse is also necessarily true:  Even where an improper closing argument, considered in isolation, appears relatively harmless, when such arguments are part of a pattern of misconduct that pervades the entire trial, the prejudice of the comments may well tip the balance

106

in favor of a new trial. *See, e.g.*, *United States v. Basham*, 561 F.3d 302, 330 (4th Cir. 2009) ("Pursuant to the cumulative error doctrine, the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error.").

In this case, the prosecutors made multiple improper and highly prejudicial statements during their closing arguments. The following statements, placed in the full context of trial, are the most egregious:

> **1.    The Government Lied to the Jury, Telling Them that Dr. Whaley Prescribed Drugs Illegally and Falsely Asserting that He Agreed with Dr. Munzing's Testimony.**

During cross-examination, defense expert Dr. Whaley acknowledged that his license to prescribe controlled substances had not been renewed approximately a month before trial. Trial Tr. at 982:16–20. Dr. Whaley, who is retired, attempted to explain that he had not written prescriptions for any controlled substances since his DEA license expired, but the prosecutor, who had consistently badgered him throughout cross, cut him off. *Id*. at 984:3–13. Attempting to prevent Dr. Whaley from ever making that point, the prosecutor proceeded to repeatedly ask whether he had a *current* prescriptive license until the Court finally sustained an objection to the repetitive, filibustering questions. *Id*. at 984:3–985:13. Despite this skullduggery, Dr. Whaley was able to clearly testify—twice—that he had not prescribed controlled substances since the date that his license expired. *Id*. at 984:12–13; 1013:15–20. No testimony or other evidence was ever introduced to suggest that Dr. Whaley had violated any law or DEA regulation in his prescriptive practices.

But in her closing argument, Ms. McFadden told the jury this: "By his own admission, as he sat there today, [Dr. Whaley] is in violation of DEA regulations that require him to have a valid state license to prescribe. *Those were his words.*" *Id.* at 1044 (emphasis added). That was a lie.

Then, the government went even further, asserting Dr. Whaley had testified that Dr. Houdersheldt improperly prescribed opioids for the treatment of a patient's fibromyalgia: "Both experts testified to that." *Id.* at 1040:16–18. Another falsehood. In fact, Dr. Whaley testified that Dr. Houdersheldt was *not* prescribing controlled substances for fibromyalgia. *Id.* at 899:7–14. Rather, the patient was receiving opioids to help control the pain from his inflammatory arthritis. *Id.*

### 2.     The Government Lied to the Jury By Arguing That Dr. Houdersheldt Was Providing Drugs to Ms. Leslie to Groom Her for Sex.

Unable to browbeat Ms. Leslie into agreeing that she had traded drugs for sex, the government was left without a shred of evidence to support that wild theory. Desperate to compensate in some way for this complete lack of evidence, Ms. McFadden made the following misleading statements to the jury:

> Leslie, he used these prescriptions as a means to kind of groom her and get her to be dependent on him and his prescriptions, so he could get up that courage to talk to her, travel with her, get in a car with her, travel to a farmhouse with her and prescribe her pills as he asked her to have sex.

Trial Tr. at 1036:10–15.

> He continued to provide her with opioids so that she would provide him companionship, friendship, and he could possibly use to groom her to give her those prescriptions that she craved because that was what was best for him, not for his patient.

*Id.* at 1042:17–21.

Since she could not prove that Dr. Houdersheldt had already traded drugs for sex, Ms. McFadden sought to confuse and deceive the jury into believing that it was simply a matter of time

108

before that occurred. But Ms. Leslie had been Dr. Houdersheldt's patient for over a decade when this fanciful farm trip supposedly took place. *See* Trial Tr. at 553:2–3. And she was his patient for nearly another year after. Yet Ms. Leslie testified that except for that one instance, Dr. Houdersheldt never made romantic overtures of any kind to her. *Id.* at 683:22–684:3. And he never, ever suggested that he would only give her prescriptions in return for sex.

In short, the government's argument was salacious, prejudicial, and unsupported by any evidence whatsoever. It undoubtedly misled the jury and is an additional ground for granting a new trial here.

### 3. The Government Lied to the Jury, Telling Them Ms. Leslie Had Nothing to Gain by Her Testimony.

The most outrageous and intentionally prejudicial comments were those asserting that Ms. Leslie had nothing to gain by her testimony. These statements were not only unsupported by any evidence, they were directly contradicted by the recording of, and Ms. Leslie's testimony regarding, her first interrogation, during which she was cajoled, warned, threatened, and then offered a deal. *See supra* Section II.A.2. But the prosecutor completely ignored that evidence and lied to the jury: "[Ms. Leslie] testified without any gain." Trial Tr. at 1042:22. "Ms. Leslie has absolutely nothing to gain from participating in this process. She has nothing to gain from coming in here and testifying to you as to her addiction, as to her background, as to the issues that she's faced." *Id*. at 1067:8–12. And, "she's got nothing to gain from this, except as she told you yesterday, perhaps she can help someone else who is on this very scary and dangerous path." *Id.* at 1067:14–17.

In addition to the fact that this argument was not based on any evidence and had, as they were intended to do, a high probability of misleading the jury, they also constitute improper vouching. *See, e.g.*, *United States v. Lewis*, 10 F.3d 1086, 1089 (4th Cir. 1993) ("Vouching

generally occurs when the prosecutor's actions are such that a jury could reasonably believe that the prosecutor was indicating a personal belief in the credibility of the witness."). By claiming, falsely, that Ms. Leslie had nothing to gain,  government counsel was telling the jury that he knew she had not been promised anything in return for testimony; that she did not have a non-prosecution agreement with the government; and, therefore, that her testimony was credible. But "the prosecutor may not, among other things, make explicit personal assurances that a witness is trustworthy *or implicitly bolster the witness by indicating that information not presented to the jury supports the testimony*." *Lewis* at 1089 (emphasis added).

### 4. The Government Lied to the Jury, Suggesting That Dr. Houdersheldt Attempted to Obstruct Justice

As discussed above, Chief Mullins was interviewed by government investigators ***and*** counsel about the telephone call Dr. Houdersheldt made to him after encountering Duran in the park. When asked if Dr. Houdersheldt had attempted to interfere with Duran's investigation, Chief Mullins told government counsel and company that Dr. Houdersheldt had not done or requested anything improper. Ex. K at ¶ 13–15. But, as explained in Section IV.B, *supra*, both McFadden and Barras argued to the contrary in closing.

Both knew that is not what happened. But once again, the truth was not about to stand in the way of a conviction.

### 5. Government counsels' improper closing arguments deprived Dr. Houdersheldt of his right to a fair trial.

"Whether improper argument by government counsel has so prejudiced the trial process as to require reversal must be gauged from the facts of each trial." *United States v. Harrison* 716 F.2d 1050, 1051 (4th Cir. 1983). Vouching for Ms. Leslie's credibility by itself provides a sufficient basis for concluding that Dr. Houdersheldt's right to a fair trial was denied. But when

added to the other examples of improper argument, it is beyond cavil that Dr. Houdersheldt suffered prejudice. And this undeniable reality is only amplified when considered in context with the other errors and instances of misconduct that pervaded Dr. Houdersheldt's trial.

The prosecutors' comments were neither isolated nor inadvertent. Rather, these arguments were calculated to persuade the jury that Dr. Houdersheldt was a disreputable person, a bad doctor, and nothing short of a drug dealer who preyed upon his patients for sexual gratification. But when "gauged" against the evidence actually presented at trial, and when viewed through the lens of the repeated acts of government misconduct, there can only be one conclusion:  the prosecutors in this case abandoned their constitutional duty to ensure that Dr. Houdersheldt received a fair trial, and instead became advocates for a conviction at all costs.

Dr. Houdersheldt is entitled to a new trial free of the stains of this misconduct.

## VI.    THE COURT FAILED TO PROPERLY INSTRUCT THE JURY

This Court's instructions to the jury were erroneous in two critical respects:  First, the Court failed to instruct the jury that, to convict Dr. Houdersheldt, it must find that he *knowingly and intentionally* issued prescriptions outside the boundaries of legitimate medical practice. Second, the Court failed to give an accomplice/co-conspirator instruction regarding Ms. Leslie. The failure to give these instructions inured to Dr. Houdersheldt's prejudice and warrants a new trial.

### A.    The Court Failed to Instruct the Jury Regarding the Specific Intent Component of "Beyond the Bounds of Medical Practice."

Title 21, Section 841(a) makes it a crime to distribute or dispense a controlled substance, except as authorized under other provisions of the Controlled Substance Act. On the face of the statute, no medical practitioner could legally prescribe controlled substances.

But the CSA expressly provides an exemption for medical practitioners who are registered with DOJ. Specifically, § 822(b) provides that persons who register with DOJ (that is, persons who

obtain a license from DEA) "are authorized to possess, manufacture, distribute, or dispense such substances or chemicals." The only limitation on a medical practitioner's authority to prescribe controlled substances is found in 21 C.F.R. § 1306.04:

> A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of *his* professional practice. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829)) and the person *knowingly* filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

(Emphasis added). And therein lies the problem with the Court's instructions.

In explaining the elements of the offense with which Dr. Houdersheldt was charged, the Court instructed the jury as follows:

> Now, to sustain its burden of proof in connection with each of these charges, the government must prove the following three elements beyond a reasonable doubt: First, the defendant knowingly and intentionally distributed a quantity of a controlled substance; second, at the time of distribution, the defendant knew that the substance distributed was a controlled substance; and, third, the defendant's actions were not for legitimate medical purposes in the usual course of professional medical practice or were beyond the bounds of medical practice**.**

Trial Tr. at 1029:22–1030:6. The requirement to prove knowledge and intent with respect to the first two elements prevents a conviction based on a mistaken or accidental distribution of a controlled substance.

But notably absent from this instruction is the requirement that the jury find that Dr. Houdersheldt *knew* that he was issuing prescriptions outside the boundaries of *his* professional practice and that he *intended* to do so. The failure to include this necessary *mens rea* with respect to the third element invited the jury to convict based on nothing more than an honest but mistaken belief on Dr. Houdersheldt's part that the issuance of the prescriptions charged as a crime were within the bounds of medical practice.

But the CSA does not make mistakes in judgment or differences of opinion among physicians concerning appropriate treatment a federal crime. Nor should it. Rather, as every court to consider this issue has held, the only way to differentiate honest doctors who are exercising *their* medical judgment in how to treat *their* patients from those who use their medical licenses as a means to get rich on the backs of drug addicts is to require proof of knowledge and intent not just, as this Court instructed, with respect to the first two elements, but also—and most critically— with respect to the only element that is ever really in dispute in the prosecution of a physician for illegally prescribing controlled substances:   whether the prescriptions were knowingly and intentionally issued outside the bounds of legitimate medical practice.

In *Feingold*, for example, the court squarely held that:

> a practitioner who acts outside the usual course of professional practice may be convicted under § 841(a) only if he does so intentionally. If a practitioner's distribution of controlled substances becomes illegal only by virtue of the fact that his actions are outside the usual course of professional practice, it follows that *the practitioner must have deliberately acted in this fashion in order for him to be convicted of a crime.*

454 F.3d at 1007-08 (emphasis added). Accordingly, the *Feingold* court set forth the requirements for conviction of a physician under § 841 as follows:

> [T]he government must prove (1) that the practitioner distributed controlled substances, (2) that the distribution of those controlled substances was outside the usual course of professional practice and without a legitimate medical purpose, and (3) that the practitioner acted with intent to distribute the drugs *and with intent to distribute them outside the course of professional practice.* In other words, the jury must make a finding of intent not merely with respect to distribution, but also with respect to the doctor's intent to act as a pusher rather than a medical professional.

*Id.* at 1008 (emphasis added).

Similarly, the Fourth Circuit itself has stated that conviction under § 841 requires that the physician "act with specific intent." *Tran*, 18 F.3d at 1144. Accordingly, the Court approved the following jury instructions:

113

> A doctor dispenses a drug in good faith in medically treating a patient, then the doctor has dispensed the drug for a legitimate medical purpose in the usual course of medical practice. That is, he has dispensed the drug lawfully. Good faith in this context means good intentions in the honest exercise of best professional judgment as to a patient's need. *It means the doctor acted in accordance with what he believed to be proper medical practice.*

*Id*. at 1138 (emphasis added). In short, it is a physician's subjective belief that is critical, not whether an honestly held belief is contrary to some arbitrary standard applied by pseudo-experts who spend their time on the witness stand rather than in the day-to-day grind of treating actual patients with a variety of illnesses and medical needs.

Every other circuit court which has considered this issue has reached this same conclusion. *See United States v. Kohli*, 847 F.3d 843, 490 (7th Cir. 2017), ("the evidence must show that the physician not only intentionally distributed drugs, but that *he intentionally acted as a pusher rather than a medical professional*" (emphasis added, citation omitted)); *United States v. Sabean*, 885 F.3d 27, 46 (1st Cir. 2017) (to prove a violation of the CSA, "the government had to establish beyond a reasonable doubt that the defendant *knowingly* prescribed a controlled substance outside the usual course of professional medical practice and without a legitimate medical purpose" (emphasis added, citation omitted)); *United States v. Birbragher*, 603 F.3d 478, 488 (8th Cir. 2010) ("The language in the course of professional practice clearly means that a doctor is not exempt from the statute when he takes actions that *he does not in good faith believe* are for legitimate medical purposes." (emphasis added, citations omitted)); *United States v. Veal*, 23 F.3d 985, 988 (6th Cir. 1994) ("To convict him on the drug distribution charges, therefore, the government was required to prove (a) that Mr. Veal filled prescriptions that were not issued for a legitimate medical purpose, and (b) that he did so *knowing that the prescriptions were invalid."* (emphasis added)); *United States v. Rosenberg*, 515 F.2d 190, 197 (9th Cir. 1975) ("[T]he jury had to look into Dr. Rosenberg's mind to determine whether he prescribed the pills for what *he thought* was a medical

purpose or whether he was passing out the pills to anyone who asked for them. (emphasis added)).

*See also United States v. Chube II*, 538 F. 3d 693, 697 (7th Cir. 2008) ("In order to support a violation of the CSA, the jury had to find that the Doctors *knowingly and intentionally* acted "outside the course of professional practice" and without "a legitimate medical purpose." (emphasis added)).

Despite this circuit unanimity, the instructions here failed to direct the jury that, in order to convict Dr. Houdersheldt, it was required to conclude beyond a reasonable doubt that Dr. Houdersheldt **intentionally** issued the prescriptions in question outside the bounds of legitimate medical practice, not simply that the prescriptions, perhaps mistakenly, were outside the bounds of legitimate medical practice.

The problem with the Court's instructions was succinctly identified by the Massachusetts Supreme Judicial Court in *Commonwealth v. Stirlacci*, 137 N.E. 3d 375 (Mass. 2001):

> The distinguishing factor between proper and improper prescribing, or between mere malpractice and criminal conduct, is the practitioner's intent. The defining feature of a valid prescription is that it is issued for a legitimate medical purpose. This means that its issuance is the product of an honest exercise of professional judgment as to a patient's medical needs in accordance with what the practitioner reasonably believes to be proper medical practice.

*Id*. at 385 (citations omitted). This Court's instructions failed to recognize this distinction.

As such, they permitted the jury to convict based on much less than what the law requires. Dr. Houdersheldt deserves a new trial with a properly instructed jury.

### B.     The Court Failed to Instruct the Jury on How to Consider the Testimony of an Unindicted Co-Conspirator Like Ms. Leslie.

As discussed above, if the government's theory of the case is to be given any credit, Ms. Leslie was unquestionably an unindicted coconspirator. *See*, *supra*, Sections II.A.3, IV.A.1. Indeed, the agents told her as much during her first interview. *Id.* Accordingly, this Court erred in failing to give an accomplice instruction.

115

The Fourth Circuit has long held that an instruction warning the jury to consider the testimony of an accomplice or coconspirator is required when that accomplice testifies at trial. *See, e.g.*, *United States v. Harvey*, 159 F. App'x. 451, 457 (4th Cir. 2005) (the "general rule is that accomplice instructions are preferred" because of the "inherent unreliability of this testimony"). Indeed, the Fourth Circuit has held that, in cases like this, accomplice instructions are so critical that a court must give one *sua sponte*; failure to do so can be reversible error. *United States v. Smith,* 459 F.2d 12 (4th Cir. 1972) (In "close cases where the uncorroborated testimony of an accomplice provides the sole basis for the government's case and where that testimony is shown to be unreliable or incredible, then the trial court's failure to give such an instruction may constitute reversible error."). The instruction is also warranted where—as likely was the case here, *see*, *supra*, Sections II.A.3, IV.A.1—the accomplice is testifying under some form of immunity. *See United States v. Brooks*, 928 F.2d 1043, 1049 (4th Cir. 1990).

The government's case here was essentially a one-fact-witness case. It is thus undeniable that the prosecution was heavily dependent on Ms. Leslie, and, indeed, could not have proceeded without her. This explains, at least in part, the lengths to which the government was willing to go to coerce Ms. Leslie into cooperating and lie to the defense and the Court regarding the government's efforts to avoid or delay discovery of her ongoing addiction problems. *Supra*, Section II.A.2.

Given the crucial role she played in the case, then, an accomplice instruction was essential. Among other salubrious effects, such an instruction would have thwarted the government's shameless—and demonstrably false—argument in closing that Ms. Leslie had nothing to gain from her testimony and also would have given the jury much-needed pause before crediting Ms. Leslie's

116

uncorroborated testimony. The failure to give the instruction was prejudicial, reversible error but can be remedied now by granting Dr. Houdersheldt a new trial.

## VII.  EVEN IF NO SINGLE ERROR OR INSTANCE OF MISCONDUCT ENUMERATED IN THIS BRIEF IS INDEPENDENTLY SUFFICIENT TO WARRANT DISMISSAL OR A NEW TRIAL, THE CUMMULATIVE IMPACT OF THESE MYRIAD MISSTEPS MAKES DISMISSAL OR A NEW TRIAL AN ABSOLUTE NECESSITY.

For the reasons explained above, the errors and many of the government's acts of egregious misconduct in this case, taken individually, justify either dismissal of the indictment or the granting of a new trial to Dr. Houdersheldt. But even if the Court were, for some reason, to disagree with this conclusion, the cumulative impact of error and misconduct undoubtedly is severe enough to warrant complete dismissal. Instances of government misconduct may rarely be enough to justify full-blown dismissal of an indictment. *See United States v. Chapman*, 209 F. App'x 253, 275 (4th Cir. 2006) ("conduct warranting a dismissal of the indictment would need to be substantially more egregious than conduct that would warrant the granting of a new trial."). *But see United States v. Omni Intern. Corp*. 634 F. Supp. 1414, 1440 (D. Md. 1986) (dismissal of indictment warranted for multiple acts of government misconduct). But this is one of those rare cases.

The government's misconduct here knew virtually no bounds. To name a few instances, its attorneys and agents:  (1) unlawfully seized, interrogated, and threatened the star witness with indictment to secure her cooperation; (2) included false information in an affidavit for purposes of misleading a Magistrate Judge and securing a search warrant; (3) misused an administrative process to illegally secure evidence for use in a criminal case; (4) sought to detain Dr. Houdersheldt based on false evidence for no purpose other than to punish him for exercising his right to trial; (5) misled this Court with regard to the role the government attorneys played in seeking to revoke Dr. Houdersheldt's bond; (6) withheld critical evidence of a non-prosecution agreements with a key witness; (7) suppressed evidence of Ms. Leslie's continued opioid use in violation of *Giglio*

117

and this Court's pretrial order; (8) lied to defense counsel about Ms. Leslie's continued opioid use in an effort to induce a guilty plea;  (9) lied to this Court about the withholding of that same impeachment evidence; (10) suppressed critical impeachment evidence with regard to the government's expert witness; (11) suppressed exculpatory evidence from an interview with Chief Mullins; (12) sought to inflame the jury through questions to government witnesses regarding a supposed trade of sex for drugs when there was no evidence to support those allegations; (13) misled the jury through the solicitation of false testimony, including about whether the government's star witness's testimony had been induced by threats or promises; and (14) made prejudicial statements in closing argument that were not based on evidence introduced during the trial or that were rendered false by evidence already in the government's possession.

Even if any one of these examples was not sufficient in isolation to warrant dismissal, surely the entire constellation of misconduct, when viewed as a whole, demands dismissal of the indictment. In *Omni*, a strikingly similar case, the district court felt compelled to dismiss the indictment, albeit without prejudice, based on the cumulative effect of repeated acts of government misconduct. Specifically, the district court found that, as in this case,  the government attorneys withheld and perhaps altered documents requested by the defense, the government agents testified untruthfully during pre-trial proceedings, and the government attorneys showed a total lack of candor regarding these deceptions during colloquies with the court. 634 F. Supp. At 1423–36. Accordingly, although the court dismissed the indictment without prejudice, it prohibited the original investigating agents and the prosecutors from participating in any new case brought. *Id.* at 1436–40; *accord United States v. Burns*, 2016 WL 3910273 (suppression of evidence and false statements to the court warranted a new trial and the removal of the prosecutor from the case).

118

As in *Omni*, the amount of misconduct in this case warrants the severe sanction of dismissal of the indictment—and here, with prejudice. But should the Court elect to dismiss the indictment without prejudice, Dr. Houdersheldt's constitutional right to a fair trial can only be vindicated by the removal of the rogue prosecutors and agents, hell-bent on putting Dr. Houdersheldt's head on a pike, who willingly offered false testimony and committed so many other acts of misconduct before this Court. *Omni*, at 1440. Permitting their continued involvement will simply embolden this prosecution team to acts of further misconduct.

If the Court nonetheless believes that dismissal is too severe a sanction, the cumulative impact of the errors and misconduct identified in this brief, as well as the overall weakness of the government's case, justifies granting Dr. Houdersheldt a new trial. *See, e.g.*, *United States v. Basham*, 561 F.3d 302 (4th Cir. 2009) ("Pursuant to the cumulative error doctrine, the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error."); *United States v. Mitchell*, 1 F.3d 235, 245-46 (4th Cir. 1993) ("In light of the pervasive nature of this error, and the failure of the district court to even attempt to cure that error, we conclude that this case presents the 'rare instance' where fundamental fairness requires that we grant the appellant a new trial."). And should the Court opt to grant Dr. Houdersheldt a new trial rather than dismiss the indictment, the prosecutors and agents should still be excluded from participation in those new proceedings.

Eighty-five years ago, the Supreme Court laid down the standard for the conduct of federal prosecutors:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute

119

> with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88 (1935).

The outrageous government misconduct in this case flies in the face of these standards. The prosecutors in this case and their investigatory accomplices must be held to account. Their conduct, combined with the numerous other legal errors and the weakness of evidence against him, deprived Dr. Houdersheldt of a fair trial and cries for redress. At the very least, he is entitled to a new trial based on their cumulative impact.

## <u>CONCLUSION</u>

It is true that motions for judgment of acquittal, dismissal of an indictment, or for a new trial are rarely granted. But this case should be the exception to the rule. Here, the government failed to present sufficient evidence to support Dr. Houdersheldt's convictions. And it was only able to obtain convictions because of evidentiary errors, constitutional violations, and deeply troublingly government misconduct. Dr. Houdersheldt therefore asks this Court to enter a judgment of acquittal or dismiss the indictment. In the alternative, based on these numerous errors, Dr. Houdersheldt is entitled to a new trial.

Dated: October 8, 2020                    Respectfully submitted,

/s/ *Paul M. Flannery*
Paul M. Flannery (OH: 0091480) *(pro hac vice)*
**Flannery │ Georgalis, LLC**
1375 E. 9th St., 30th Floor
Cleveland, OH 44114
Tel/Fax: (216) 367-2094
paul@flannerygeorgalis.com

/s/ *David A. Brown, Sr.*
David A. Brown, Sr. (NC 48997) *(pro hac vice)*
**Flannery │ Georgalis, LLC**
212 South Tryon Street, Suite 1410
Charlotte NC 28281
Tel/fax: (704) 949-2251
dbrown@flannerygeorgalis.com

/s/ *Colin J. Callahan*
Colin J. Callahan (PA 328033) *(pro hac vice)*
**Flannery │ Georgalis, LLC**
707 Grant Street, Suite 1745
Pittsburgh, PA 15219
Tel/Fax (412) 254-8602
ccallahan@flannerygeorgalis.com

/s/ *Mark McMillian*
Mark McMillian (WV 0009912)
**Mark McMillian – Attorney at Law, L.C.**
Boulevard Tower, Suite 900
1018 Kanawha Blvd., East
Charleston, WV 25301
(304) 720-9099
(304) 720-0290 (FAX)
mark@markmcmillian.com

/s/ *Jerri Jeaneen Legato*
Jerri Jeaneen Legato (WV 0006978)
**Legato Law PLLC**
1018 Kanawha Blvd. East, Suite 1200
Charleston, WV 25301
(304) 340-9910
(304) 344-2869 (FAX)
jeaneenlegato@gmail.com

*Counsel for Defendant Dr. Houdersheldt*

121

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 8, 2020, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.

Respectfully submitted,

*/s/ Paul M. Flannery*
Paul M. Flannery