## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

UNITED STATES OF AMERICA

v.                                         CRIMINAL ACTION NO. 3:19-00239

RICKY L. HOUDERSHELDT, D.O.

### MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant Ricky L. Houdersheldt's "Renewed Motion for Acquittal or, in the Alternative, a New Trial." ECF No. 185. The Government submitted its Omnibus Response (ECF No. 202), to which Defendant replied (ECF No. 213). The Motion is now ripe for review. For the following reasons, the Motion is **GRANTED** as to Counts 1-2 and **DENIED** as to Counts 3-17.

### I. BACKGROUND

Defendant Ricky L. Houdersheldt is a doctor of osteopathic medicine licensed to practice in West Virginia. On September 18, 2019, the Government charged him with prescribing controlled substances in violation of 21 U.S.C. § 841(a)(1).[1] The Second Superseding Indictment includes 23 counts, each arising from a prescription to one of three patients: D.L. (Counts 1-6), B.W. (Counts 7-17), and R.W. (Counts 18-23). The trial commenced on August 3, 2020. On August 10, 2020, the jury returned a verdict of guilty on Counts 1-17 and not guilty on Counts 18-23.

#### 1. Evidence at Trial

At trial, the Government's case centered upon the testimony of its expert witness, Dr.

---

[1] The Government subsequently filed two superseding indictments. ECF Nos. 24, 74.

Timothy Munzing, a family physician and clinical professor. Dr. Munzing reviewed Defendant's patient files and compared those files to the standard of care for medical providers. Dr. Munzing testified that he formed his opinion of the standard of care from his professional training and experience, and publications by the West Virginia Medical Board and Board of Pharmacy, Center for Disease Control, American Academy of Pain Medicine, and the American Society of Interventional Pain Practitioners. Dr. Munzing concluded that Defendant's prescriptions to D.L. and B.W. were outside the usual course of professional practice.

A.  Counts 1-6

Dr. Munzing concluded that Defendant's prescriptions to D.L. were beyond the bounds of medical practice in light of D.L.'s health history. Based on his review of D.L.'s patient file, Dr. Munzing determined that D.L. was a self-reporting opiate addict who referred herself to a rehabilitation program in 2012. Dr. Munzing also determined that D.L. had tested positive for buprenorphine (commonly known as Suboxone) in May 2012, which is a medication used to treat opiate addiction.

Dr. Munzing also testified that several of D.L.'s drug screens produced suspicious results. For example, on September 25, 2017, D.L.'s urinalysis produced results that were inconsistent with her reported prescriptions. D.L. tested negative for Norco and amphetamine, despite being prescribed those substances, and positive for tramadol, oxycodone, and noroxycodone, despite not having prescriptions for those substances. Dr. Munzing counted approximately 20 aberrant urine screens between 2012 and 2017 and noted that the repeated failed tests lead "to the suspicion that the prescribing is happening regardless of whether the medications are showing up or not, which is dangerous . . . . " Trial Tr. vol. 3 at 449:13-19; 456:19-457:11. D.L. also refused to submit to drug screens on several occasions.

Dr. Munzing testified that it can be "very hazardous" to prescribe controlled substances to patients who are addicted to such substances. Trial Tr. vol. 3, 427:13-19. Indeed, notes on D.L.'s records indicate that Defendant understood this hazard. On a urinalysis report dated March 11, 2016, a handwritten note reads "Per RLH, PT needs inpatient tremeant [sic]. Dismiss from Suboxone[.] No Meds to be give[n] to her." Another abnormal urinalysis report dated August of 2017 contained a similar note: "Per RLH No More Meds." And just a month later, another abnormal urinalysis report reads "No More Meds Per RLH."

After Defendant indicated that D.L. should not receive more opioids, he prescribed her Suboxone for several months. However, between June and November of 2018, Defendant prescribed D.L. opioids more than 20 times, with seven prescriptions written just in November. Dr. Munzing testified that these prescriptions were "[e]xceedingly dangerous," and placed her at "risk for worsening addiction" and a "significant risk for overdose. . . ." Trial Tr. vol. 3, 462:3-13.

Dr. Munzing testified that although opioids can be prescribed to patients with a history of substance abuse, it should only be for "acute, severe injury" for "very limited periods." *Id*. at 431:8-10; 434:9-13. Dr. Munzing asserted that standard medical care for chronic pain should involve a multi-modal approach, which includes a personalized combination of oral medication (opioid and non-opioid), topical medication, and nonpharmacologic therapies (physical therapy, chronic pain cognitive therapy, steroid injections, etc.). Dr. Munzing testified that there is no evidence in D.L.'s patient file that Defendant used a multi-modal approach to manage her pain, and instead only prescribed her opioids. Based on these facts, Dr. Munzing concluded that the six prescriptions in the indictment (each of which were prescribed in the window between June and November of 2018) were outside the usual course of professional practice and without a legitimate medical purpose.

In addition to Dr. Munzing's testimony, D.L. testified that Defendant wrote her prescriptions for controlled substances outside of his office after office hours and without a physical exam. D.L. testified that on August 22, 2018 she met Defendant at a gas station parking lot and received a prescription for hydrocodone (Count 3). She testified that he did not check her pulse, blood pressure, or weight, or perform a physical exam of any sort. Between August and November of 2018, these types of meetings were not uncommon. According to D.L., on September 20, 2018, she met Defendant at a K-Mart parking lot and Defendant gave her a prescription for Percocet without conducting a physical exam (Count 4). On October 7, 2018, D.L. met Defendant at a Dollar General parking lot and received a prescription for Tylenol No. 4 without a physical exam (Count 5). And on November 20, 2018, she met Defendant at a Hurricane City Park parking lot where he prescribed her Tylenol No. 4 without a physical exam (Count 6). According to Dr. Munzing, this sort of prescribing places patients at risk of addiction and overdose.

The Government also presented circumstantial evidence to support the guilty verdict. First, D.L. testified that on September 20, 2018 (the same day that she said that Defendant wrote her a Percocet prescription at K-Mart), he drove her to see a farm that he was selling. D.L. testified that on the drive back, Defendant asked D.L. about whether she was dating or having a sexual relationship with anyone. She testified that she was "shocked" by this question because she had never discussed anything like that with him before. Trial Tr. vol 3. at 623:16-24. She then testified that he proposed that they "get a room" to "just go fool around." *Id*. at 624:18-20. According to D.L., she declined and asked him to take her back to her car. She also testified that Defendant later apologized and stated that he "stepped over the line." *Id*. at 626:2-3. In its closing argument, the Government argued that Defendant was prescribing D.L. controlled substances with the hope that she would start a sexual relationship with him. According to Dr. Munzing, Defendant's

propositioning violated the Hippocratic Oath and West Virginia Board of Medicine rules prohibiting doctor/patient sexual relationships.

The jury also heard testimony that a Hurricane City Police Officer, Timothy Duran, encountered Defendant and D.L. during their November 20, 2018 meeting. Duran testified that he approached Defendant's vehicle after he noticed it in an abandoned parking lot next to Hurricane City Park. Duran described D.L. as exiting from the car "frantic" and "in a state of panic" because "her voice was up and down" and "[s]he couldn't stay still," Trial Tr. vol. 1 at 44:3-10. Duran testified that when D.L. got out of the car, she said "I was just leaving. I had to pick up a prescription" and that this statement "seemed really odd." *Id*. at 44:6-10.

Duran also testified that Defendant acted suspiciously. According to Duran, Defendant claimed he needed to leave for a "medical emergency," even though Duran did not see Defendant checking his phone or receiving a ring or vibration during the duration of their conversation. Defendant also told Duran that he knew Duran's boss, Police Chief Michael Mullins. Defendant's phone records established that Defendant placed a call to Chief Mullins soon after he left the park. In its closing argument, the Government stated that these actions indicated that Defendant knew what he did was wrong, and that he needed to "get his story straight to get out." Trial Tr. vol. 5, 1074:2-12; 1047:4-7.

 After hearing the above evidence, the jury returned a verdict of guilty as to Counts 1-6.

B.  Counts 7-17

Dr. Munzing also concluded that Defendant's prescriptions to B.W. were illegitimate. Much like D.L., B.W.'s patient file showed signs that B.W. struggled with addiction. For example, Dr. Munzing found several notations showing B.W. was reporting "symptoms of chronic opioid[] use," including irritability and tooth decay. Trial Tr. vol. 3, 476:17-477:19. Dr. Munzing also noted

-5-

that B.W.'s file lacked documentation that Defendant discussed substance abuse issues with B.W.

In addition, Dr. Munzing found that Defendant prescribed B.W. opioids in dangerously high dosages. Dr. Munzing explained that opioid doses are often measured in milligrams of morphine equivalent ("MMEs"). MME conversions enable providers to compare the strength of different medications and to gauge the risk of abuse and overdose. According to Dr. Munzing's characterization of CDC guidelines, providers should avoid going over 50 MME per day because the risks of addiction and overdose "are higher" for the patient. *Id*. at 401:9-17. Dr. Munzing also testified that "[i]f you get to . . . 90 [MME] per day, the risk is even higher," and that the CDC "strongly encourage[s] you not to go above 90 [MME] without . . . close monitoring." *Id*. Dr. Munzing further testified that once a patient's dosage reaches 100 MME, the risk of overdose is about nine times higher than if the patient is on a much lower dose or no dose of opioid. According to Dr. Munzing, risks to a patient's health also increase when taking an opioid with a benzodiazepine, which the CDC advises against.

Counts 7-17 of the Indictment are summarized in the following chart:

| Count | Exhibit at Trial | Date Rx Written | Prescribed Substance | Dosage | Daily MME |
|---|---|---|---|---|---|
| 7 | 453 | 3/29/18 | Fentanyl | 100 mcg per 72 hours | 240 MME |
| 8 | 454 | 3/29/18 | Morphine | 30 mg 4 times per day | 120 MME |
| 9 | 455 | 1/5/18 | Diazepam | 10 mg 3 times per day | |
| 10 | 456 | 6/4/2018 | Fentanyl | 100 mcg per 72 hours | 240 MME |
| 11 | 457 | 6/4/2018 | Morphine | 30 mg 4 times per day | 120 MME |
| 12 | 458 | 4/30/18 | Diazepam | 10 mg 3 times per day | |
| 13 | 459 | 8/2/18 | Fentanyl | 100 mcg per 72 hours | 240 MME |
| 14 | 460 | 8/2/18 | Morphine | 30 mg 4 times per day | 120 MME |

| 15 | 461 | 9/4/18 | Fentanyl | 100 mcg per 72 hours | 240 MME |
| 16 | 462 | 9/4/18 | Morphine | 30 mg 4 times per day | 120 MME |
| 17 | 463 | 9/4/18 | Diazepam | 10 mg 3 times per day | |

Dr. Munzing testified that a 100 mcg of fentanyl patch dispenses 240 MME per day and that 120 mg of morphine sulphate (30 mg tablets taken 4 times per day) equals 120 MME. Taken together, Defendant prescribed B.W. up to 360 MME per day. The Government's exhibits also indicate that Defendant's prescriptions of diazepam (a type of benzodiazepine) overlapped with these high dosages of opioids. Dr. Munzing testified that he could not discern a justification for these prescriptions from B.W.'s patient file.

Based on the above observations, Dr. Munzing concluded that Defendant's prescriptions to B.W. were illegitimate because of the high doses of opioids, the concurrent prescribing of benzodiazepines and opioids, and the fact that his patient records indicated that he suffered no acute distress or ailment that would justify these prescriptions.

C. Other Evidence

The Government entered into evidence a 2013 Memorandum of Agreement ("MOA") between the Defendant and the Drug Enforcement Administration ("DEA"). The MOA notes that Defendant violated 21 C.F.R. § 1304.03(c), which requires registrants to keep records of controlled substances "that are prescribed in the lawful course of professional practice, unless such substances are prescribed in the course of maintenance or detoxification treatment of an individual." The MOA required Defendant to, among other things, "develop a defined policy to prevent patients from obtaining controlled substances that Defendant did not intend for them to consume," and "develop a defined policy for keeping records of controlled substances prescribed in the course of maintenance or detoxification treatment of an individual." Trial Ex. 101, ECF No. 150-16. The

agreement was in effect during the conduct giving rise to the Indictment.

Finally, the Government produced evidence that Defendant misled law enforcement. In a conversation that was recorded by law enforcement, Defendant denied writing prescriptions outside of his office or keeping a prescription pad in his vehicle. Both statements were contradicted by other evidence presented at trial, which included D.L.'s testimony that she met Defendant outside of his office several times to collect prescriptions from him, and law enforcement's photographs depicting prescription pads around the center console of Defendant's vehicle.

### 2. Post-Trial Motions

In addition to the present motion, Defendant filed two motions to compel and a motion for an order requiring the Government to show cause as to why the Government's lead attorneys should not be disqualified. *See* ECF Nos. 188, 193, 190. The Court denied all three motions. Order, ECF No. 233. With respect to the motions to compel, the court held (1) that Defendant was not entitled to in camera review of the prosecutorial team's communications because he had not made the request with specificity; (2) that Defendant was not entitled to discovery regarding a tacit agreement between the Government and D.L. because he did not make a plausible showing that such an agreement exists; and (3) that Defendant was not entitled to discovery regarding a phone call between the Government and Mullins because the request was not supported by a viable *Brady* claim. The Court also denied the motion for a show cause order because Defendant had not demonstrated that Attorneys MacFadden and Barras would be required to testify in post-trial proceedings or that sanctions were warranted.

In the present motion, Defendant seeks a judgment of acquittal or a new trial. Defendant raises numerous arguments, which can be summarized as follows: (1) the jury instructions were erroneous, (2) there was insufficient evidence to support the verdict, (3) the Government violated

*Brady*, and (4) the Government's misconduct denied him due process. The Court will address each of these arguments respectively after a brief overview of the applicable legal standard.

## II. LEGAL STANDARD

Defendant's motion arises from Federal Rules of Criminal Procedure 29 and 33. Under Rule 29, a court may enter a judgment of acquittal based on insufficiency of evidence if, as a matter of law, "the government's evidence was insufficient 'to establish factual guilt' on the charges in the indictment." *United States v. Millender*, 970 F.3d 523 (4th Cir. 2020) (citing Fed. R. Crim. P. 29(a), (c)). When the court reviews the sufficiency of the evidence on a charge, it must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 528 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, (1979)). This standard leaves very little discretion on the part of the trial court.

On the other hand, when the court considers a motion for a new trial, its "authority is much broader . . . . " *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985). Under Rule 33, the Court has the discretion to grant a new trial if doing so is in "the interest of justice." *Millender*, 970 F.3d at 531 (first citing *Arrington*, 757 F.2d at 1485; then citing Fed. R. Crim. P. 33(a)). A new trial is warranted "[w]hen the evidence weighs so heavily against the verdict that it would be unjust to enter judgment." *Arrington*, 757 F.2d at 1485. Though a district court may not "draw inferences . . . unfavorable to the Government" in considering a motion for a judgment of acquittal, "[i]n determining the necessity of a new trial, such inferences are allowed." *Millender*, 970 F.3d at 532 (quoting *United States v. Campbell*, 977 F.2d 854, 860 (4th Cir. 1992)). The court may also use its observations at trial to "evaluate the credibility of the witnesses" in adjudicating a motion for a new trial. *Id*. Despite this broad standard, the Fourth Circuit has advised district courts to

exercise this discretion "sparingly." *Arrington*, 757 F.2d at 1486.

## III. DISCUSSION

### 1. Jury Instructions

A.  Elements for Medical Practitioner Liability under Section 841(a)(1)

It is well established that the Government must prove three elements to convict a medical practitioner under Section 841. The evidence must show: (1) "that the defendant distributed or dispensed a controlled substance"; (2) that the defendant "acted knowingly and intentionally"; and (3) "that the defendant's actions were not for legitimate medical purposes in the usual course of his professional medical practice or were beyond the bounds of medical practice." *United States v. Hurwitz*, 459 F.3d 463, 475 (4th Cir. 2006) (internal quotes and citations omitted). The Court gave instructions echoing this standard.[2]

Defendant argues that the jury instructions incorrectly stated the legal standard.[3] Specifically, Defendant asserts that the jury should have been required to find not only that he intentionally dispensed a controlled substance, but that he also intentionally acted without a legitimate medical purpose or beyond the bounds of medical practice. This issue has not been

---

[2] The Court instructed:

> Now, to sustain its burden of proof in connection with each of these charges, the government must prove the following three elements beyond a reasonable doubt: First, the defendant knowingly and intentionally distributed a quantity of a controlled substance; second, at the time of distribution, the defendant knew that the substance distributed was a controlled substance; and, third, the defendant's actions were not for legitimate medical purposes in the usual course of professional medical practice or were beyond the bounds of medical practice.

Trial Tr. 1029:22-1030:6, ECF No. 178.

[3] The Government contends that Defendant forfeited this claim because he did not raise it before the jury retired to deliberate. *See* Fed. R. Crim. P. 30(d). However, Defendant timely objected to the instructions (Trial Tr. 956-54, ECF No. 178), and his proposed instructions are consistent with the present argument (ECF No. 92). Therefore, Defendant has properly preserved this claim.

settled in the Fourth Circuit. Therefore, before addressing the parties' arguments, an explanation of the legal background of Section 841(a)(1) is necessary.

Defendant was charged with violating Section 841(a)(1), which provides that "[e]xcept as authorized by [the Controlled Substances Act], it shall be unlawful for any person knowingly or intentionally to . . . distribute[ ] or dispense . . . a controlled substance." 21 U.S.C. § 841(a)(1). The CSA authorizes medical practitioners to dispense controlled substances with a "prescription." *Id.* at § 829(a)-(b). For a prescription to be valid, it must be "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). Accordingly, a medical practitioner may be prosecuted under Section 841 if he or she writes a prescription for a controlled substance that is not for a legitimate medical purpose or in the usual course of professional practice.

The seminal Supreme Court case for medical practitioner liability under Section 841(a)(1) is *United States v. Moore*, 423 U.S. 122 (1975). In *Moore*, the defendant argued that, as a medical practitioner, he was exempt from criminal liability under Section 841 because the legislature intended practitioners to be disciplined under Sections 842 and 843, which prescribe less severe penalties. The Court disagreed and held that Congress passed the CSA with the intent to "strengthen . . . existing law enforcement authority in the field of drug abuse." *Id*. at 132 (first citing Comprehensive Drug Abuse Prevention and Control Act of 1970, 84 Stat. 1236 (preamble); then citing H.R. Rep. No. 91-1444 (1970)) (internal quotations omitted). The Court upheld the conviction because "[t]he evidence presented at trial was sufficient for the jury to find that respondent's conduct exceeded the bounds of 'professional practice.'" *Id*. at 142.[4]

---

[4] The Court did not discuss or otherwise find any error in the district court's instructions, which required the jury to find "beyond a reasonable doubt that a physician, who knowingly or intentionally, did dispense or distribute methadone by prescription, did so other than in good faith

Although *Moore* affirmed that practitioners can be prosecuted under Section 841, it is not particularly instructive on the issue Defendant raises. In *Moore*, there was little question that the defendant knew that he was acting outside the usual scope of professional practice. He "concede[d] in his brief that he did not observe generally accepted medical practices" and asserted that his large-scale distribution of methadone was an "experiment[al] [] new blockade theory of detoxification." *Id.* at 126, 142. These startling facts and the limited questions presented to the Court have left lower courts to interpret the appropriate boundaries for practitioner liability. Understandably, this has led to uncertainty and a circuit split.

On the one hand, at least three courts of appeal have held that the jury must find that the defendant deliberately acted without a legitimate medical purpose or outside the bounds of medical practice. *See, e.g.*, *United States v. Sabean*, 885 F.3d 27, 47 (1st Cir. 2018); *United States v. Kohli*, 847 F.3d 483, 488 (7th Cir. 2017). Defendant urges the Court to adopt the Ninth Circuit Court of Appeals' reasoning in *United States v. Feingold*, 454 F.3d 1001 (9th Cir. 2006). In that case, the defendant argued that "to convict a licensed practitioner under Section 841(a), a jury must look into his subjective state of mind and determine that he intended to act outside the course of his professional practice." *Id.* at 1007. The court agreed and held:

> If a practitioner's distribution of controlled substances becomes illegal only by virtue of the fact that his actions are "outside the usual course of professional practice," it follows that the practitioner must have deliberately acted in this fashion in order for him to be convicted of a crime.

*Id.* at 1007-08 (internal citation omitted). In so holding, the court cited to *Morissette v. United States*, 342 U.S. 246 (1952), which established the long-standing principle that conduct cannot be

---

for detoxification in the usual course of a professional practice and in accordance with a standard of medical practice generally recognized and accepted in the United States." *Moore*, 423 U.S. at 138-39 (internal quotes omitted). The Court also noted that the jury was instructed that they could not convict the defendant if they "found that he merely made 'an honest effort' to prescribe for detoxification in compliance with an accepted standard of medical practice." *Id.* at 142, n. 20.

criminal unless it is intentional.

On the other hand, at least one circuit has reached the opposite conclusion. In *United States v. Celio*, 230 F. App'x 818 (10th Cir. 2007), the Tenth Circuit Court of Appeals held that "nothing in the statutory language at 21 U.S.C. § 841(a)(1), the regulatory language at 21 C.F.R. § 1306.04, or any case law [] requires the physician to 'knowingly' act without a legitimate medical purpose or outside the usual course of professional practice." *Id*. at 825.

The Fourth Circuit has not expressly addressed this issue. Rather, in the most recent case in which this question was raised, the court expressly declined to weigh in. *Hurwitz*, 459 F.3d at 476. Nevertheless, its analysis of the good faith instruction can be instructive. In *Hurwitz*, the court held that the district court erred by refusing to include a good faith instruction but determined that the defendant was not entitled to the subjective good faith standard he requested. *Id*. at 478. The court reasoned that "allowing criminal liability to turn on whether the defendant-doctor complied with his own idiosyncratic view of proper medical practices is inconsistent with the Supreme Court's decision in *Moore*." Hurwitz, 459 F.3d at 478. This interpretation of *Moore* indicates that a jury need not find that the defendant intentionally acted outside the bounds of medical practice, but simply that the defendant acted without objective good faith.

Even so, the Court need not decide whether Fourth Circuit precedent is more aligned with *Feingold* or *Celio*, because the instructions are valid under Defendant's preferred standard. According to the Defendant, if the Court applies *Feingold's* rule, it must find that its instructions were erroneous. However, *Feingold* does not require that result. Although the court held that a jury must determine whether the defendant acted intentionally outside the bounds of medical practice, it ultimately upheld the jury's convictions because the district court's good faith instruction fulfilled that requirement. *Feingold*, 454 F.3d at 1008 (emphasis in original). Looking

-13-

at the instructions "in their entirety," the court held that the instructions compelled the jury to acquit if they found that Feingold acted "in good faith." *Id*. The district court explained that "good faith" involved Feingold's "sincerity" and "honest effort." *Id*. Accordingly, the court held that the good faith instruction sufficed. *Id*. at 1008-09.

Here, as in *Feingold*, the Court instructed the jury that it could not find Defendant guilty if he acted in good faith. The Court explained good faith as "a doctor, reasonably exercising professional judgment as to the patient's legitimate needs acting in accordance with what he *reasonably believed to be proper medical practice*." Trial Tr. vol. 5 at 1029:32-1033:8 (emphasis added). This definition required the jury to consider Defendant's state of mind.[5] Thus, even if the Court adopts the *Feingold* standard, it finds that its instructions were proper.

Defendant asserts that the Court's good faith instruction fails under *Feingold* because it was objective rather than subjective. Admittedly, "objective" standards can sometimes foreclose an inquiry into the subjective intent of an individual. *See, e.g.*, *Kingsley v. Hendrickson*, 576 U.S. 389, 395 (2015) ("[T]he relevant standard is objective not subjective. Thus, the defendant's state of mind is not a matter that a plaintiff is required to prove.") And when "objective" takes on that meaning, the term "objective good faith" is oxymoronic. *See Hurwitz*, 459 F.3d at 483 (Widener,

---

[5] The Court's full instructions are as follows:

> Finally, if a doctor distributed a drug in objective good faith in medically treating a patient, then the doctor has dispensed that drug lawfully. But a doctor's good faith must be objective. Objective good faith in this context means a doctor, reasonably exercising professional judgment as to the patient's legitimate needs acting in accordance with what he reasonably believed to be proper medical practice.
> If you find that the defendant acted in objective good faith in dispensing the drug charged in any specific count in the second superseding indictment, then you must find the defendant not guilty as to that count.

Trial Tr. 1029:32-1033:8, ECF No. 178.

J. concurring and dissenting) ("I do not believe good faith should be objective; the two terms are contradictory, it seems to me."). Nevertheless, the instruction here did not preclude the jury from considering Defendant's intent. The Court defined "objective good faith" as requiring the jury to contemplate whether Dr. Houdersheldt acted in accordance with what he reasonably believed to be proper medical care. Under this definition, the word "objective" simply required the Defendant's belief to be reasonable. It did not foreclose all consideration of that belief as Defendant contends.

In short, because the Court gave a good faith instruction that expressly required the jury to consider Defendant's state of mind as to the proper standard of medical care, its instructions were not erroneous. No relief is warranted on this ground.

### B. Co-Conspirator or Accomplice Instruction

Defendant's second objection is that the Court did not include an instruction cautioning the jury to consider D.L.'s credibility as an accomplice or co-conspirator to the offense. As a threshold matter, the Court finds that this objection is subject to plain error review because Defendant did not object to the instructions on this ground before the jury retired. *See* Fed. R. Crim. Pro. 30(d).

To support this argument, Defendant quotes *United States v. Harvey* 159 F. App'x 451, 457 (4th Cir. 2005) as follows: "The general rule is that accomplice instructions are preferred when accomplices testify against defendants, due to the inherent unreliability of this testimony." Def.'s Br. 116, ECF No. 186. (internal quotations omitted). However, Defendant omits the last part of the court's sentence: "*but the failure to give such an instruction is not reversible error.*" *Harvey* 159 F. App'x at 457 (reviewing for plain error under Rule 30(d)). According to *Harvey*, several circuits have held that failure to give this instruction is only erroneous where "the accomplice testimony is not supported by a minimum amount of corroboration." *Id.* at 955-56 (collecting

-15-

authorities). Here, the evidence does not support a finding that D.L. was an accomplice or co-conspirator. Even if it did, her testimony was corroborated by other evidence, such as Defendant's cell phone records and Duran's testimony. Thus, the absence of these instructions was not a plain error.

## 2. Sufficiency of the Evidence

Defendant next argues that the Court should issue a judgment of acquittal or grant a new trial because the Government did not present sufficient evidence to support the convictions. Defendant argues that there was insufficient evidence to support the verdict because the Government did not show that Defendant sought a personal benefit from D.L. or B.W. Alternatively, Defendant argues that the evidence does not support the verdict even if no evidence of a personal benefit is required. The Court will first consider the Defendant's evidentiary challenges, then it will analyze whether there is sufficient evidence to support the conviction.

### A. Evidentiary Challenges

#### i.  *D.L.'s Testimony*

Defendant raises three challenges to D.L.'s testimony. First, Defendant argues that D.L.'s testimony regarding her September 20, 2018 meeting with Defendant was not credible because there was a record in her patient file that was also dated September 20, 2018. According to Defendant, this proves that he met D.L. at his office that day and not the K-Mart parking lot.[6] However, the Government presented phone records showing that D.L. spoke to Defendant multiple

---

[6] Defendant also argues that he was prejudiced by the Government's argument that the record was fabricated. Though it is true that the Government made this suggestion, it did so when the jury was not present. *See* Trial Tr. 710:7; 715:2-6, ECF No. 176. Recognizing the argument as speculation, the Court notified the Government that it "wouldn't permit an argument to that effect." *Id*. Therefore, it is unclear to the Court how the Defendant could have been prejudiced by this suggestion.

times that day, including a calls placed around 11:40 AM and 5:00 PM. Moreover, evidence contradicting a witness' recollection of the exact date of an event does not necessarily mean that the witness is not credible, or that the event did not occur.

Second, Defendant argues that D.L. was not a credible witness because her "farm story" was a product of government coercion. Specifically, Defendant argues that DEA agents pressured D.L. to falsely testify that Dr. Houdersheldt asked her if she wanted to "fool around." *See* Def's Mot., Ex. C 88:1-6, ECF No. 185-3. Despite Defendant's arguments otherwise, D.L.'s testimony is not indicative of a forced statement because it was consistent. She stated at the interview and in trial that Defendant asked her if she was interested in a sexual relationship one time, apologized after, but otherwise did not pursue her or condition her prescriptions on sexual favors. She maintained this story even after the agents suggested that she was lying. *Id*. at 34:24-35:4 (denying that a sexual relationship took place); 37:12-19 (denying that Defendant conditioned her prescriptions on anything), 58:6-11 (denying that Defendant asked for favors in return for writing the prescriptions). To the extent that D.L. initially denied that Defendant made "sexual overture[s]" toward her, she clarified on cross examination that she thought those questions were asking "if [they] had sexual contact." Trial Tr. vol. 4, 683:6-25. Accordingly, the Court does not find a sufficient basis for which to discount the jury's assessment of D.L.'s credibility.

Finally, Defendant argues that the court erred in admitting D.L.'s "farm story" because it was inadmissible character evidence under 404(b)(1). Defendant states that this was not intrinsic to the crime because D.L. repeatedly denied that Defendant conditioned her prescription upon her acceptance of his suggestion for sex. But even if the testimony was not intrinsic, it was admissible as evidence of Defendant's motive. *See* Fed. R. Evid. 404(b). A reasonable juror could have interpreted his proposition as motivating his willingness to prescribe D.L. opioids beyond the

bounds of medical practice. The probative value of this evidence is further increased by the fact that the event took place within the time period represented by the charges in the Second Superseding Indictment. The Court cannot conclude that unfair prejudice to the Defendant substantially outweighed the probative value of the evidence. Therefore, there was no error.

ii.    *Munzing Testimony*

Next, Defendant argues that Dr. Munzing's expert testimony was inadmissible. The admissibility of expert testimony in court proceedings is governed by Rule 702 of the Federal Rules of Evidence.[7] In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), the Supreme Court held that Rule 702 assigns district courts "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *See also Belville v. Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019). The proper analysis entails "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.

Defendant argues that the Court should have excluded Dr. Munzing's testimony because (1) his methodology did not include in-person examinations of D.L. and B.W. and assumed that lack of documentation equated to lack of care; and (2) his opinion contained several inconsistences

---

[7] In whole, Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

and gaps in reasoning.[8]

First, Defendant argues that because Dr. Munzing testified that the Defendant should have conducted a physical examination of his patients before prescribing them controlled substances, Dr. Munzing should have conducted a physical examination before forming his expert opinion. Although this certainly identifies a weakness in Dr. Munzing's testimony, it does not mean that his methodology was unreliable; standard medical practice is distinct from the *Daubert* standard. Therefore, this alone does not render an expert's opinion inadmissible.

Defendant's reliance on *Tran Trong Cuong* for this argument is misplaced. Defendant represents that the *Tran Trong Cuong* court reversed the conviction on several counts because the government's expert had not interviewed or examined the patients.[9]  This misrepresents the court's holding. The court held that there was insufficient evidence to support the verdict because the government's theory for 80 prescriptions was "guilt by association or "proof by pattern." [10] Although the court noted that the expert did not examine the patients, the court did not find that

---

[8]  Defendant draws support for these arguments from Dr. Munzing's testimony and report. However, the report was not entered into evidence at trial. To the extent that the Defendant believes that the report should have been a basis to preclude Defendant's testimony at trial, he should have raised that issue before trial. Therefore, the Court will only address the Defendant's challenges regarding Dr. Munzing's testimony.

[9]  Likewise, Defendant's reliance on *Cooper v. Smith & Nephew, Inc.*, is not persuasive because that decision expressly stated that "[b]y itself, [the expert's] failure to conduct a physical examination may not be grounds to exclude his methodology as unreliable." 259 F.3d 194, 203 (4th Cir. 2001). Although it can be indicative of unreliability, Defendant has not shown that Dr. Munzing's methodology is otherwise unreliable under *Daubert*.

[10]  In the Reply, Defendant argues that the court concluded that there was insufficient evidence because of the absence of patient exams. Def.'s Reply at 17. Defendant asserts that this "point was so important to the Fourth Circuit that it made it *twice*." *Id*. (emphasis in original). However, the two statements Defendant quotes were not part of the court's holding. Rather, those statements were part of the court's summaries of *other cases*. Defendant's reliance on these dicta is further belied by the fact that the court expressly held that those cases were distinguishable from the Tran's arguments. *Id*. at 1142 (citing *United States v. Stump*, 735 F.2d 273 (7th Cir.), *cert. denied*, 469 U.S. 864 (1984), and *United States v. Chin*, 795 F.2d 496 (5th Cir.1986)).

-19-

this alone rendered the expert's opinion invalid. Rather, the court held that there was insufficient evidence because the expert had not examined the patients, had not discussed the patients by name during his testimony, did not comment on the individual prescriptions, and failed to examine the prescriptions individually in the report. *Id*. at 1141. This reasoning cannot be interpreted as requiring all experts to examine individual patients to produce reliable opinions.

In fact, the Fourth Circuit directly addressed this issue in *United States v. Boccone* 556 F. App'x 226 (4th Cir. 2014), and held that patient examinations are not required. In *Boccone*, the defendant argued that the district court erred in admitting the government's expert testimony because, among other things, the expert did not examine any of the patients referred to in her report and only relied on the defendant's records.[11] The court rejected this argument, holding that the expert's methodology and conclusions were sufficiently reliable because she "cited red flags similar to those identified by experts in [other Fourth Circuit cases], including negative drug screens, lack of documentation and follow up treatment for medical conditions, prescriptions over a long period of time without medical examinations, high dosage combinations, and prescriptions despite signs of drug addiction or street sales." *Id*. at 226. Though unpublished, *Boccone* held that the government's expert testimony was consistent with other Fourth Circuit precedent—including *Tran Trong Cuong*. *Id*. at 226 ("Similar to the expert testimony in *McIver*, *Alerre*, and *Tran Trong Cuong*, Dr. Hamill–Ruth described her understanding of the standard of care for treating patients in a pain management context and then compared the treatment shown in the medical records in the case with that standard of care, finding the treatment shown to be outside legitimate medical practice.").

---

[11] Although Boccone was not a medical practitioner, the court applied the *Singh* standard because he was charged with conspiring with his employee, a nurse practitioner, who prescribed controlled substances at the direction of Boccone. *Boccone*, 556 F. App'x at 222.

Dr. Munzing adopted a similar methodology and drew his conclusions based on the same "red flags," including negative drug screens, lack of documentation and follow up, high doses and dangerous combinations of prescriptions, and symptoms of addiction. *Id*. at 226. Despite Defendant's representations otherwise, Dr. Munzing did not rely on the absence of records as grounds for finding that the prescriptions were not proper. Dr. Munzing recognized that he did not have all of the information during cross examination, stating "my conclusion was that the care was not medically justified based on the information I had." Trial Tr. vol. 3, 506:1-507:3. Therefore, the Court finds that these complaints do not render Dr. Munzing's opinion unreliable.

Second, Defendant argues that there are internal inconsistencies and gaps in reasoning that made Dr. Munzing's opinion inadmissible. For example, Defendant argues that Dr. Munzing failed to explain why, in this case, it was improper to prescribe opioids to drug addicts, despite his admission that such prescriptions can be appropriate in some instances. Defendant also argues that Dr. Munzing's testimony failed to explain why concurrent prescribing of benzodiazepines and opioids were improper in this case. However, while these arguments identify a gap in the testimony, those gaps do not necessarily indicate that Dr. Munzing's testimony was not reliable for the purposes of *Daubert*. Instead, the Court finds that these arguments indicate a lack of evidence. Therefore, to the extent that the Court finds that Munzing's testimony was lacking, those findings will be addressed below.

### iii.    *February 2013 Memorandum of Agreement Understanding*

Next, Defendant argues that the MOA was inadmissible under Federal Rule of Evidence 404(b). However, the Court finds no error in its previous ruling. *See* Hr'g Tr. 168 50:17-52:16, ECF No. 116. In those rulings, the Court held that the MOA was admissible under Rule 404(b) because it was probative of the Defendant's knowledge of his recordkeeping and prescription

obligations. To the extent that the document was unfairly prejudicial, the Court took the appropriate mitigative steps. It ordered the Government to redact all information regarding the Defendant's admissions regarding another patient to whom he prescribed Suboxone and hydrocodone concurrently. *See* ECF No. 107. The Court also gave a limiting instruction: "remember that the compliance investigation and memorandum of agreement between Dr. Houdersheldt and the DEA was admitted not of evidence of conduct charged in this indictment, but only as evidence of his knowledge and intent." Trial Tr. vol. 5, 1027:8-12. Accordingly, the Court finds that there was no error in admitting this document.

Defendant argues that the MOA is barred by Federal Rule of Evidence 403 because it was not probative. According to Defendant, the MOA could not have significant probative value because he did not argue that he was unaware of his recordkeeping obligations. This reasoning misses the point. The MOA was admitted as evidence that the Defendant acted knowingly or intentionally when he failed to keep proper records of his interactions with D.L. and B.W. Defendant disputed this fact at trial and in the present motion. But a reasonable jury could infer that because Defendant failed to comply with the recordkeeping policies referenced in the MOA, he was acting intentionally and not in good faith when treating B.W. and D.L. Thus, the Court finds that the probative value of the MOA was not substantially outweighed by unfair prejudice.

iv.    *DEA Interview*

Next, Defendant argues that his statements to the DEA are inadmissible because (1) the use of a civil or administrative process for the purpose of aiding a criminal investigation is prohibited under *LaSalle National Bank*; and (2) consent by the Defendant was inadequate under *Garrity*, which prohibits the use of threats of termination as a means of securing the employee's cooperation in an investigation. Defendant has not identified any part of the record in this case in

-22-

which he preserved this claim. The Court reviews the admission for plain error. Fed. R. Crim. Pro. 51(b); Fed. R. Evid. 103.

Defendant's first argument fails as a matter of law. Defendant argues that the Court's holding in *United States v. LaSalle National Bank* 437 U.S. 298 (1978), prohibited the Government from summoning Defendant for an interview with the DEA as pretext for what was a criminal investigation. Again, Defendant's argument fails because he overstates the holding in that case. There, the Court held that the Internal Revenue Service must use its summoning authority within the scope of Section 7602 of the Internal Revenue Code, 26 USC § 7602, and in good faith. *Id*. at 307. Given that the Court relied so heavily on the statutory scheme specific to the IRS, *LaSalle* bears little weight on the issue here. Defendant's reliance on *United States v. Lawson*, 502 F. Supp. 158 (D. MD. 1980) is similarly misguided. In *Lawson*, the court held that administrative investigation warrants are subject to the Fourth Amendment; it did not hold that administrative searches can never be used to investigate criminal conduct. *See id*. at 164-66.

Defendant's grievance is more properly framed as a voluntariness challenge under the Fourth Amendment. However, even if the Court reframes Defendant's claim to adhere to the *Lawson* standard, it fails because there is no indication that the Government's interview violated Defendant's Fourth Amendment rights. The DEA agents approached Defendant at his work, asked if he would answer their questions, and Defendant agreed. The agents read him his constitutional *Miranda* rights and gave him a written notice containing the same information. A DEA agent told Defendant that he had the right to remain silent, that his answers could be used against him in court, and that he had the right to an attorney.

Defendant argues that this consent was not valid under the principles established in *Garrity v. State of N.J.*, 385 U.S. 493 (1967). In that case, the court held that the defendants' statements

were involuntary because they were only given the choice "to forfeit their jobs or to incriminate themselves." *Id.* at 497-98. The Court held that this interrogation technique ran afoul of *Miranda v. State of Arizona*, 384 U.S. 436, 464-65 (1966), because it was "likely to exert such pressure upon an individual as to disable him from making a free and rational choice." *Id*.

Here, Defendant's assertions that he felt coerced to participate in the interview due to DEA regulations are unfounded by the interview transcript. *See* Def.'s Mot. 51 (quoting 21 U.S.C. § 842(a)(6)) ("it is unlawful for anyone who is authorized to dispense a controlled substance 'to refuse any entry into any premises or inspection' authorized by the CSA."). Once the interview began, the agents informed him he had the constitutional right not to submit to the administrative inspection without an administrative inspection warrant and the right to refuse to consent to the inspection. ECF No. 202-2 at 1. Defendant agreed to proceed with the interview. Therefore, Defendant's statements were properly admitted.

### v. Office Record Warrant

Defendant next argues that the affidavit submitted to obtain a search warrant covering his medical office contained an intentionally false statement and was unsupported by probable cause. Specifically, Defendant argues that DEA Agent, Jason Crane, intentionally sought to mislead the magistrate judge when he asserted that "Dr. Houdersheldt told Officer Duran that he met with D.L. to write DL's mother a controlled substance prescription." *See* Crane Aff., ECF No. 3-1. Defendant reasons that this statement renders the warrant unreliable and invalid.

There is a strong "presumption of validity with respect to [an] affidavit supporting [a] search warrant." *Franks v. Delaware*, 438 U.S. 154, 171 (1983). Nevertheless, the Supreme Court "carved out a narrow exception to this rule." *United States v. Allen*, 631 F.3d 164, 171 (4th Cir. 2011). Specifically, the Court held that where a defendant can support "allegations of deliberate

falsehood or of reckless disregard for the truth" with an offer of proof, *Franks*, 631 F.3d at 171, he or she is "entitled to an evidentiary hearing on the veracity of statements in the affidavit," *Allen*, 631 F.3d at 171. If a Court concludes that "a Franks hearing is appropriate and an affiant's material perjury or recklessness is established by a preponderance of the evidence, the warrant 'must be voided' and evidence or testimony gathered pursuant to it must be excluded." *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990) (quoting *Franks*, 438 U.S. at 156).

Defendant previously requested a *Franks* hearing on this basis. *See* Def.'s Mot., ECF No. 45. The Court denied the motion, finding that the contested statements were neither intentionally misleading nor material. *See* Order, ECF No. 61. The Court finds no error in its initial denial. As the Government described in its response, Crane had a reasonable basis for which to include the statement in his affidavit because it was directly supported by Duran's police report.   *See* Omnibus Resp. 61, ECF No. 202. Consequently, Defendant's claim that this was an intentional misstatement falls short.

The statement was also immaterial. Under *United States v. Moody*, 931 F.3d 366, 371 (4th Cir. 2019), "the defendant must show materiality—that is, that the false statements were 'necessary to the finding of probable cause.'" (quoting *Franks*, 438 U.S. at 156). Here, the statement is not required for a finding of probable cause. The affidavit included a description of (1) Duran's interaction with Defendant and D.L. at the Hurricane City Park on November 20, 2018; (2) D.L.'s claims that she met with Defendant outside his office to obtain prescriptions on "multiple occasions," but never submitted to a physical examination or during those meetings; (3) Defendant's lengthy history of prescribing controlled substances to D.L.; and (4) the MOA, which indicated that Defendant had a history of prescribing dangerous combinations of drugs. Given all of this evidence, the Court finds that the statement regarding D.L.'s mother was immaterial and

that the Court did not err in denying Defendant's prior motion to suppress.

vi.   *Dr. Whaley Testimony*

Defendant's final evidentiary challenge is that the Court erred by precluding portions of his expert witness' testimony. Dr. Whaley intended to rebut Dr. Munzing's analysis regarding Defendant's recordkeeping by testifying that, while Dr. Houdersheldt's notes could have been clearer, he nonetheless provided appropriate care because he was familiar with his patients. The Court sustained the Government's objection to this questioning and precluded Dr. Whaley from asserting the testimonial fact that Dr. Houdersheldt was "deeply familiar" with his patients. However, the Court allowed Dr. Whaley to testify that recordkeeping requirements may be more or less stringent depending on the doctor's knowledge and familiarity with the patient. The Court finds no error with its previous holding. As previously stated, this factual testimony fell was outside the scope of Rule 703.

Defendant argues that the Court erred because an expert witness may rely on hearsay in forming his or her opinion. However, Dr. Whaley did not simply seek to rely on hearsay in forming his opinion, he attempted to convey testimonial facts to the jury. In essence, the defense sought to introduce Defendant's testimony without subjecting him to cross examination. District courts have discretion to preclude testimony when a party seeks to use an expert as a "conduit for hearsay testimony." *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009).

In *Johnson*, the Fourth Circuit held that the government's expert witnesses were not "transmitters of testimonial hearsay" because, although the experts relied on information they learned in interviews, they "never made direct reference to the content of those interviews or even stated with any particularity what they learned from those interviews." 587 F.3d at 635. In contrast, in *United States v. Mejia,* the Second Circuit held that the trial court should not have permitted an

expert to explain that he was told "by a gang member " that the gang "taxed" non-gang individuals who wanted to deal drugs in certain areas. 545 F.3d 179 (2d Cir. 2008). The court held that this testimony was improper because the expert simply passed along an important testimonial fact he learned in an interview. *Id.* at 188.

Here, Whaley's intended testimony is more akin to *Mejia* than *Johnson*. Just before the Government objected, Dr. Whaley explained "keep in mind, that I had multiple conversations with Dr. Houdersheldt about the level of his care of his patients. He very intimately knows the details of most of his patients' lives." Trial Tr. vol. 4, 869:14-23. This was improper hearsay and outside the scope of Rule 703. Therefore, the Court finds that it did not err in limiting Dr. Whaley's testimony.

B.  Evidence of a Personal Benefit

With those evidentiary findings in mind, the Court will now turn to Defendant's two sufficiency-of-the-evidence arguments. First, Defendant argues that he is entitled to a judgment of acquittal because the Government failed to present evidence that he acted as a drug "pusher" or received a benefit from D.L. and B.W. for his prescriptions. In support of his argument Defendant points to the Supreme Court's use of the term "pusher" in *Moore*, arguing that the Court intended criminal liability under Section 841 to arise only when a practitioner acts as a pusher or common drug dealer. *See Moore*, 423 U.S. at 138. However, it is unclear whether the Court intended to hold that evidence that the defendant acted as a drug "pusher" is necessary to sustain a conviction, or that it is simply sufficient.

The Court's decision in *Gonzalez v. Oregon*, 546 U.S. 243 (2006), suggests that *Moore* requires such a finding. In that case, the Court considered whether the Attorney General could issue an interpretive rule declaring that prescriptions of controlled substances for use in physician-

assisted suicide under state law does not have a legitimate medical purpose and is outside the bounds of usual medical practice. *Id*. at 248 When analyzing the scope of the CSA, the Court noted that it had not considered "the extent to which the CSA regulates medical practice beyond prohibiting a doctor from acting as a drug 'pusher' instead of a physician." *Id*. at 269. (*Moore*, 423 U.S. at 143). The Court went on to note that "[t]he statute and our case law amply support the conclusion that Congress regulates medical practice insofar as it bars doctors from using their prescription-writing powers as a means to engage in illicit drug dealing and trafficking as conventionally understood." *Id*. This dictum could be interpreted as requiring the government to show that the doctor received a benefit in exchange for the prescriptions. Yet, several circuit courts, including the Fourth Circuit, have rejected that interpretation.

In *Singh*, the defendant argued that the jury improperly convicted him on certain counts because the evidence only indicated a difference in medical opinion. *Singh*, 54 F.3d at 1187. The court concluded that "although the testimony does not adduce compelling evidence that Dr. Singh prescribed with malicious motive or the desire to make a profit, those motivations, though common in § 841(a)(1) prosecutions, are not required to convict." *Id*. at 1188-89 (citing *Tran Trong Cuong*, 18 F.3d at 1137). Similarly, in *United States v. Pellmann*, 668 F.3d 918, 924 (7th Cir. 2012), the Seventh Circuit upheld the conviction even though "the facts here do not fall within [] more common 'drug pusher' cases." The court held that there was sufficient evidence to sustain the verdict where the government showed that the defendant ordered excessive amounts of fentanyl and morphine, that he regularly administered these drugs to a patient at her home (which the court described as a "drug house"), that he did not maintain records of these treatments, and that he kept his employees "in the dark" about this patient. *Id*. at 924-25. Finally, in *United States v. McIver*, 470 F.3d 550, 559 (4th Cir. 2006), the Fourth Circuit noted that illegitimate prescriptions include

those made not only for personal benefit, but also those intended to "assist[] another in the maintenance of a drug habit."

Here, as in the above cases, there is no compelling evidence that Defendant acted with malice or attempted to personally benefit from writing D.L. and B.W. opioid prescriptions. He did not condition his prescriptions on a personal benefit such as money, sex, or other favors typically indicative of a doctor acting without a legitimate purpose or outside the bounds of medical practice. However, the Court must follow the controlling and clear holdings in *Singh and McIver*. Therefore, the Court cannot upset the verdict on this basis.

C.  Sufficiency of the Evidence Analysis

Defendant's second argument is that the evidence cannot support the convictions, even if the jury was not required to find that he sought a personal benefit from D.L. or B.W. In reviewing whether the evidence was sufficient to convict a defendant, the court must sustain the jury's conviction if "*any* rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *United States v. Murphy*, 35 F.3d 143, 148 (4th Cir.1994) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original), *cert. denied,* 513 U.S. 1135 (1995).

As noted above, doctors are more commonly prosecuted under Section 841 when there is substantial evidence that the defendant intentionally acted as a drug pusher. However, the Fourth Circuit has also upheld convictions based solely on an expert's medical opinion that the prescriptions were beyond the bounds of professional practice. In *Tran Trong Cuong*, the court held that some counts were sufficiently supported by the evidence and others were not. 18 F.3d at 1140-41.[12] On the one hand, the court held that some prescription counts were properly supported by patient and expert testimony, which showed that the defendant prescribed controlled substances

---

[12] The counts that were sufficiently supported were remanded for a retrial on other grounds.

for "nebulous" conditions like headaches, and prescribed controlled substances despite the patient's recent hospitalization for drug abuse. *Id*. at 1141. On the other hand, the court held that 80 counts were unsupported. No patient testified as to those counts, nor did the expert individually analyze those prescriptions. The expert merely stated that he "had no way of judging whether they were valid," but that they "followed a pattern." *Id*. at 1141. The court held that "[n]o effort was made by the prosecution to focus [the expert's] testimony on any of these 80 counts," and reversed the convictions. *Id*.

The court's decision in *Singh* follows this general rule. As noted above, the court rejected the defendant's argument that the jury should have acquitted him where the government only presented evidence of a difference in medical opinion. *Singh*, 54 F.3d at 1188. The court further held that there was sufficient evidence to support those convictions because the government's medical expert gave an "individualized conclusion on each count." *Id*. For example, the expert concluded that one prescription was beyond the scope of medical practice because narcotics cannot be used to treat "cluster headaches." *Id*. The expert also testified that the defendant acted outside the scope of usual medical practice when he prescribed Tylenol and Valium to the patient who had just been admitted to the hospital for alcohol abuse and had been referred to anti-abuse and anti-depressant therapy. *Id*.

In addition to the prescriptions supported by medical evidence, these courts also upheld convictions supported by circumstantial evidence that the defendant wrote the prescriptions for an illegitimate purpose. In *Singh*, the court upheld convictions where the defendant prescribed controlled substances to individuals defendant had never examined or met. *See id*., at 1186-87. In *Tran Trong Cuong*, the court upheld the conviction where the defendant told certain patients to claim that their pain was in different parts of their body and to fill prescriptions at pharmacies that

were not close to his office. *Tran Trong Cuong*, 18 F.3d at 1140. Similarly, the Seventh Circuit in *Pellmann* upheld a verdict where the evidence showed that the defendant regularly administered fentanyl and morphine to a patient at her home without recording the treatment or telling his staff, and where he continued administer these drugs even after his arrest and initial arraignment. 668 F.3d at 924.

   *i. Counts 1-6*

   As noted above, Dr. Munzing testified that the Defendant's prescriptions to D.L. were illegitimate based on his general findings regarding her health history, including her opioid addiction. He testified that by 2012, D.L. was identified as an opioid addict in Defendant's records and that this fact should have caused Defendant to exercise greater care in prescribing opioids for her chronic back and leg pain. Dr. Munzing recounted that about twenty of D.L.'s drug screens from 2012, 2014, 2015, 2016, and 2017 produced "aberrant" results, indicating reasons for further concerns. As stated above, some reported concerning results, including positive results for opioids not prescribed, negative results for opioids that should have been found, and combinations of controlled substances that should not be prescribed together.[13]

   Dr. Munzing also criticized Defendant's treatment of D.L. in a number of other general findings. He opined that opioids should be prescribed only when documented circumstances are present, such as a sufficient physical examination and use of diagnostic tests to confirm chronic pain that may be appropriately treated by opioids. He described the standard of care for chronic

---

[13] Dr. Munzing noted that on several different drug screen results, the words "no more meds" were written on the chart. Despite this, more opioid prescriptions were issued. Though he was critical of this apparent inconsistency, he also testified that this was "off and on" during a significant portion of this whole time. *See* Trial Tr. vol. 3, 461. Dr. Munzing did not relate any particular drug screens with the charged prescriptions or even specifically the time period covered by the Second Superseding Indictment (June 8, 2018 through November 20, 2018).

pain management should include documentation of patient visits to track the patient's condition. He also testified that a physician must consider alternative methods of treating chronic pain, such as using physical therapy, pain control measures not based on addictive medicines like opioids, and other options.

Upon close review of the testimony and medical records submitted to the jury, the Court concludes that this evidence was not sufficient to support the convictions on Counts 1 and 2.[14] Although Dr. Munzing generally condemned Defendant's conduct and these two prescriptions, he made no effort to connect those general condemnations to these prescriptions. Rather, the extent of Dr. Munzing's testimony regarding these prescriptions was simply that they were beyond the bounds of medical practice because he wrote them after D.L.'s aberrant drug screens. However, the last of D.L.'s screens discussed by the expert occurred on September 17, 2017—nearly eight months before Count 1. Moreover, Dr. Munzing testified that there are some instances in which it may be appropriate for a physician to prescribe opioids to someone with a history of substance abuse. But Dr. Munzing made no attempt to explain why Counts 1 and 2 were improper. He made no reference to any drug screening or to a particular office visit, concurrent prescriptions, or to the lack of examination, history, or patient discussion in connection with either of these prescriptions.

Perhaps buried in the hundreds of pages of D.L.'s medical records, there may be documents which fill this gap. However, the Government's memorandum fails to identify any such records or evidence. The Court has spent considerable time poring over D.L.'s medical records and other lengthy exhibits for the other patients at issue in the charges. But those exhibits are not organized

---

[14] The original Indictment alleged that all six counts arose from prescriptions delivered by the defendant to D.L. outside of the office and regular hours. In superseding indictments, the Government changed the location of these two counts to Defendant's office address and added counts seven through twenty-three arising from two other patients but at the office.

chronologically or indexed such that the trier of fact could be reasonably expected to locate documents pertinent to the charged prescriptions or contemporaneous with the dates they were issued by Defendant. Though the Court credits the diligence of these jurors (who spent many hours deliberating over two days with all exhibits accessible to them), it is very unlikely they could have identified, much less considered, any document other that those discussed in the testimony or referred to in closing arguments.

This lack of evidence is made still more conspicuous by D.L.'s testimony. She stated that on June 8 (date of Count 1) and July 10, 2018 (date of Count 2), she received both prescriptions after visiting Defendant's medical office. Specifically, on July 10, 2018, she stated that she visited the office, allowed Defendant's assistants to check her vital signs (blood pressure, temperature, pulse oximeter, weight), completed a drug screen, and talked to the doctor about pain in her legs.

In sum, neither Dr. Munzing's testimony, nor DL's testimony or medical records sufficiently establish a connection between Dr. Munzing's generalized findings regarding D.L.'s medical history or treatment and Counts 1 and 2. As such, the Government's evidence lacked the level of specificity required by *Tran Trong Cuong* and *Singh*. The Court issues a judgement of acquittal as to these counts.

In contrast, the Court finds that there is enough evidence to support the convictions on Counts 3, 4, 5, and 6. Although these counts are affected by the same gap in medical evidence as Counts 1 and 2, the convictions are supported by other evidence. It is virtually uncontested that Defendant issued these four prescriptions outside the office and after usual hours.[15] Based on this

---

[15] Although Defendant argues that a record dated September 20, 2018 indicates that he did not meet D.L. at a K-Mart on that date, the Court must consider the evidence in a light most favorable to the Government for the purposes of this analysis. Accordingly, a reasonable jury could conclude that Defendant's record is incorrectly dated, or that he met D.L. at K-Mart on another date close to September 20, 2018.

information, a jury could reasonably infer that there was no medical examination, no discussion of D.L.'s current health or history, and no other steps taken to show that these prescriptions were truly medical judgments. Indeed, that inference finds further support in D.L.'s claim that Defendant did not conduct any physical examination or consult any record before writing these prescriptions.

In addition, the Government sufficiently drew a connection between these four prescriptions and Dr. Munzing's testimony regarding the ethical duties of a physician treating patients. He stressed the importance of avoiding a relationship with a patient that could influence the physician to issue, or the patient to request, opioids without a legitimate medical purpose. Of course, this standard precludes any romantic or similar relationship forming between them. The Government elicited testimony from D.L. about her meetings with Defendant outside the office after regular business hours to obtain four of the prescriptions with which he was charged. On one of these occasions, she testified that Defendant suggested a sexual encounter which she refused.

Although the Government's initial interviews of D.L. and arguments at trial make it evident that it sought to prove that Defendant participated in a "sex for drugs" scheme, D.L.'s testimony provided only minimal support. She testified credibly that Defendant's proposition was brief, that she refused it, that he apologized for it, and that she never perceived any sort of quid pro quo or other effects on his treatment of her. Nevertheless, a reasonable jury could have found that this suggestion violated Defendant's ethical duties, and that Defendant asked D.L. to meet him out of the office because he wanted something other than a patient-doctor relationship.

Finally, Defendant's later denials that he had ever carried his prescription pad in his truck or delivered prescriptions outside the office and after hours, reflect guilty knowledge which the jury was entitled to consider.

In sum, because Counts 3, 4, 5, and 6 are all supported by more than just Dr. Munzing's generalized findings about D.L.'s health history, the Court finds that a reasonable jury could have convicted him on those counts.

    ii.    Counts 7-17

With respect to Counts 7-17, the Government presented evidence that was stronger and more specific to each charged prescription. Long before he became Defendant's patient in 2008, B.W. was disabled by serious back and spine injuries and had received treatment including opioid prescriptions for chronic pain. Dr. Munzing's testimony focused on the period from March 2, 2018 through March 29, 2019 and summarized relevant portions of Defendant's notes and records. He testified that throughout this period, Defendant prescribed fentanyl patches, morphine sulfate, and diazepam (commonly known as Valium) which together produced a daily MME level of 360 MME. Dr. Munzing characterized this MME level as extremely high and inappropriate for treating chronic pain. He also referred to specific progress notes made by Defendant of office visits and drug screen results during this period. The notes indicated that B.W. suffered "no acute distress" and that his systems were "normal." Dr. Munzing concluded that these findings did not support continuation of high doses of opioids. Also, these notes show that Defendant failed to consider alternative treatments such as physical therapy, nonopioid medications, or referrals to specialists. Further, the drug screens during this period showed that B.W. was not only positive for his prescription opioids but also for nonprescribed opioids.[16] These screens also confirmed that during this period, Defendant prescribed a potentially dangerous combination of opioids and benzodiazepines.

---

[16] Specifically, B.W.'s March 27, 2018 drug screen produced aberrant results just a few days before the earliest opioid prescription in the Indictment to B.W. Another drug screen produced abnormal results a year later on March 29, 2019.

Dr. Munzing expressed his overall opinion that these prescriptions of Schedule II and IV controlled substances were outside the bounds of, and not for, a legitimate medical purpose. Applying the same general criticism he expressed with regard to Defendant's treatment of D.L., he opined that Defendant's office notes did not reflect supporting findings for continuation of opioids, that the risks associated with the combination of these controlled substances greatly outweighed the benefits, and monitoring the patient to lessen or avoid addiction and other ill effects of long-term use of opioids were not considered. In addition, he emphasized that the extremely high MME dosages over a long period was well beyond any acceptable medical judgment. Because his conclusions were supported by specific contemporaneous records, the basis for convictions on these eleven counts is sufficient.

### 3.  Giglio and Brady Violations

Defendant next argues that the Court must order a new trial because the Government failed to timely turn over favorable and material evidence in violation of *Brady* and *Giglio*. To prevail on a *Brady* claim, a defendant must show that: "(1) the evidence at issue must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) it must have been suppressed by the state, whether willfully or inadvertently; and (3) it must be material." *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 555 (4th Cir. 1999) (citation omitted). Under *Giglio v. United States,* 405 U.S. 150 (1972), when the reliability of a given witness may be determinative of guilt or innocence, disclosure of evidence relating to credibility is required.

This Court has previously dispelled at least two of the Defendant's arguments. First, the Court found that Defendant's *Brady* claim regarding the Government's call with Mullins failed because the Defendant could have uncovered that evidence through his own reasonable pre-trial investigation. ECF No. 233. Second, the Court found that the Defendant failed to make a plausible

showing that D.L. and the Government had an implied non-prosecution agreement. *Id.* Consequently, his corresponding *Giglio* claim fails.

Defendant's remaining claims are similarly unavailing. The Government did not suppress evidence regarding Dr. Munzing's compensation because that information is publicly available. *See* Def.'s Br. 22, ECF No. 186; *cf. Hoke v. Netherland*, 92 F.3d 1350 (4th Cir. 1996) ("where the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the Brady doctrine.") Moreover, Defendant's Counsel did not ask Munzing about his compensation for his work on other cases during cross examination.

The Government also did not violate *Brady* by failing to turn over evidence regarding D.L.'s continued opioid use for several months, because "no due process violation occurs as long as *Brady* material is disclosed to a defendant in time for its effective use at trial." *United States v. Campbell*, 237 F. App'x 787, 788 (4th Cir. 2007) (citing *United States v. Smith Grading & Paving, Inc.*, 760 F.2d 527, 532 (4th Cir.1985). The Government disclosed that material more than two weeks before trial and the Court enabled Defendant's effective use of the evidence by granting him a deposition of the prescribing dentist. *See* Hr'g Tr. ECF No. 170. Moreover, after a pre-sentencing evidentiary hearing, the Court found that Dr. Houdersheldt had improperly obtained a copy of these records as early as May 2020. Nevertheless, he continued to argue in July that he was prejudiced by the Government's delay and asked the Court to dismiss Counts 1-6. Accordingly, the Court rejects Defendant's *Brady* claims.

### 4. Allegations of Misconduct

Finally, Defendant argues that the Government's misconduct deprived him of a fair trial. The "touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness

of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). The Court finds that, although the Government misstated facts or misled the jury twice, those instances did not prejudice Defendant and deprive Defendant of a fair trial.

A. Misleading Questioning

Defendant argues that the Government misled the jury when questioning D.L. and Crane. Specifically, Defendant claims that the Government "solicited perjury" from Crane when it he denied pressuring D.L. to falsify her testimony, and when he denied that the Government promised her something in exchange for providing inculpatory evidence of Defendant. Crane was entitled to express his perceptions regarding D.L.'s interview, and as held above, there is no evidence of an agreement. Defendant also objects to the Government's questions to D.L. regarding her relationship with Defendant, which he claims misled the jury into believing that D.L. had a sexual relationship with Defendant. In reality, MacFadden's questioning of D.L. squarely addressed the agent's repeated suggestions that she had a sexual relationship with Defendant, and D.L. repeatedly stated that she truthfully told the agents that there was no sexual relationship. The Court finds that the Defendant has not demonstrated that he was prejudiced.

However, the Court finds that the Government did mislead the jury by suggesting that the Defendant wrote prescriptions after September 24, 2019 in violation of his bond conditions. In eliciting this testimony, AUSA Barras asked Crane to characterize BOP records that the Government relied upon in its release revocation petition. On its face, the BOP records indicate that the Defendant wrote 20 prescriptions between September 25 and November 26, 2019. However, by the Government's own admission, at least 16 of the 20 prescriptions in question were actually written before September 24, 2019. Crane's investigation revealed that 12 were proven to be refills of prescriptions written before September 24, 2019, three physical prescriptions were

dated September 23, 2019, and one was dated August 5, 2019. *See* Omnibus Resp. 69-70, ECF No. 202. Crane notified the Government of his findings before the revocation hearing, but the Government proceeded anyway.

The Government's Omnibus Response attempts to parse out the prescriptions in the BOP records and asserts that three prescriptions to P.H. were written after September 24, 2019. However, this assertion is disingenuous for two reasons. First, AUSA Barras recognized at the hearing that Defendant's employee testified that those dates were incorrect, and that P.H. visited the office and received the prescription on September 23, 2019. Hr'g Tr. 75:6-10, ECF No. 163; *see also* Hr'g Tr. 9:15-20 (Defendant's former employee testifying that P.H. visited the office on September 23, 2019). Second, the Government's continued reliance on the BOP records is misguided. At the close of the hearing, the magistrate judge expressly found that these records did not accurately reflect the date that Defendant wrote the prescriptions and did not "come close to clear and convincing evidence" that Defendant violated his bond. *Id.* at 76:5-8. And yet, Barras characterized the records as proof that Defendant violated his bond condition for several months:

> Q. Regarding your review of that document, was there anything of note that you reviewed in terms of prescribing of the defendant potentially?
> A. Yes. Within the document, it had prescriptions after September 24th, 2018 -- or '19.
> . . . .
> Q. Was it your understanding that the defendant had a pretrial condition that he was not permitted to prescribe controlled substances after September 24th, 2019?
> A. Yes.
> Q. Was there a time frame in general that these prescriptions covered?
> A. Yes, I believe so.
> . . . .
> Q. Did they occur after September 25th, 2019?
> A. Yes.
> Q. And were they as far in the future as November 26th, 2019?
> A. Yes.

Trial Tr. vol. 2, 182:1-184:16. Moreover, Barras crafted his questions to give the impression that Crane's investigation confirmed that Defendant violated his bond condition when he knew that the

opposite was true. He asked whether Crane had investigated the violations, but deliberately avoided eliciting information about Crane's findings:

> Q. And why exactly did you get the prescriptions themselves?
> A. To validate whether or not Dr. Houdersheldt wrote the prescriptions after September 25th, 2019.
> Q. Did you want to get it right?
> A. Yes.
> Q. And determine whether or not he actually did write those prescriptions or they were refills or something like that?
> A. Yes.
> Q. And regarding that petition, was it eventually denied?
> A. Yes.
> MR. BARRAS: Your Honor, I have nothing further at this time.

Trial Tr. vol. 2, 182:1-184:16. Therefore, although AUSA Barras' questioning appears to be technically truthful, it was nonetheless designed to be misleading.

Although the Court does not condone Barras' questioning, it cannot conclude that the questioning prejudiced Defendant such that a new trial is warranted. Defendant's counsel asked Crane on cross examination about his investigative findings, which revealed to the jury that Crane told the Government that the records did not prove that Defendant violated his bond, and that the Government nonetheless went ahead with the revocation hearing.[17] Given that Crane quickly

---

[17] Defendant's counsel asked:

> Q. So you say you found out the day of the hearing, before [] the hearing that there had been nothing unlawful occurring; is that right?
> A. Yes.
> Q. And you attended the hearing?
> A. Yes.
> Q. Watched the hearing?
> A. I didn't watch the hearing. I testified in the hearing.
> Q. Okay. Did you warn anybody, guys, it turns out this is wrong?
> A. Yes.
> Q. You told the United States Attorney Strike Force that it was wrong?
> A. Yes.
> Q. And they moved forward in the hearing?
> A. Yes.

admitted to these facts, Defendant was not deprived of a fair trial.

B.  Misleading Statements in Closing Argument

Defendant next argues that the Government deprived him of a fair trial because it made misleading or false statements during its closing argument. The issue of "[w]hether improper argument by government counsel has so prejudiced the trial process as to require reversal must be gauged from the facts of each trial." *United States v. Harrison,* 716 F.2d 1050, 1051 (4th Cir.1983), *cert. denied,* 466 U.S. 972 (1984). The Fourth Circuit has identified a number of factors that should be considered when evaluating whether a prosecutor's remarks prejudiced the Defendant, including: "(1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters." *United States v. Mitchell*, 1 F.3d 235, 241 (4th Cir. 1993) (citing *Harrison,* 716 F.2d at 1052). In closing, "a prosecutor may argue that the evidence gives rise to an inference, but the suggested inference must be reasonably drawn from the facts in evidence." *United States v. Wilson*, 135 F.3d 291, 298 (4th Cir. 1998).

On the facts of this case, the Court finds that the Defendant was not deprived of his right to a fair trial. Only one statement that the Defendant identifies is unsupported by the evidence. AUSA MacFadden stated in her closing that "[b]y [Dr. Whaley's] own admission, as he sat there today, he is in violation of DEA regulations that require him to have a valid state license to prescribe. Those were his words. It's incredibly troubling." Trial Tr. vol. 5, 1044:12-19. In fact, there was no evidence that Dr. Whaley wrote prescriptions after his license expired or otherwise

---

Trial Tr. vol. 2, 227:15 -228:16.

violated DEA regulations. In fact, Dr. Whaley is retired and expressly denied this claim. The Government's briefing attempts to side-step this error by emphasizing that his license was "no good." But MacFadden's closing did not simply state that Dr. Whaley's license was no good. She took it a step further, and without evidence, accused Dr. Whaley of illegal prescribing—conduct similar to that which the Defendant was on trial for. This makes her distortion especially troubling.

Nevertheless, although the above statement is troubling, it seems to be an isolated falsity. The four statements giving rise to Defendant's remaining claims represent a reasonable interpretation of the facts. First, the Government's argument that Defendant was "grooming" D.L. for sex was supported by the fact that Defendant had information that D.L. might have been addicted to opioids, that she met Defendant out of the office and after hours, that Defendant prescribed opioids to her during those out-of-office meetings without an exam, and that Defendant propositioned her for sex during one of these meetings. Based on this evidence, a reasonable jury could infer that Defendant sought to take advantage of D.L.'s addiction by meeting her outside of the office and continually prescribing her opioids.

Second, the Government's characterization of Defendant's call to Chief Mullins as Defendant "get[ting] his story straight" was a reasonable interpretation of the evidence. The evidence showed that shortly after Defendant met Duran in the park, he called Chief Mullins to complain. While a reasonable trier of fact could find that this call was innocuous, one could also find that defendant sought to gain favor with Chief Mullins before Duran reported the incident.

Third, the Government's statement regarding Dr. Whaley's testimony that opioids should not be prescribed for fibromyalgia is also a fair characterization of his testimony. *See* Trial Tr. 999: 18-22. ("Q. So turning your attention to Ronnie Wilson, you stated during your testimony yesterday that opioids are not okay treatment for fibromyalgia or inflammatory issues, correct? A.

I didn't say for inflammatory issues. I said for fibromyalgia."). More to the point, however, even if the Government's statement were false, it is unclear how this error would justify a new trial. The jury acquitted the Defendant of all prescriptions to R.W., who was the only patient in the Indictment with fibromyalgia.

And fourth, Defendant's claim that the Government lied when it said that D.L. had nothing to gain from her testimony also fails. D.L. testified that she had been promised nothing in exchange for her testimony and was told to simply tell the truth. The Government's closing argument was a reasonable interpretation of that testimony and not improper "vouching." *Cf. United States v. Hayes*, 322 F.3d 792, 800 (4th Cir.2003) (citing *United States v. Lewis*, 10 F.3d 1086, 1089 (4th Cir.1993)) ("It is impermissible for a prosecutor to indicate her personal belief in the credibility of Government witnesses or to elicit one witness' opinion that another witness has told the truth.").

In sum, the Defendant has identified one improper statement by the Government in its closing argument. However, because this statement was an isolated incident, it is not enough to require a new trial given the weight of the other evidence.

C.   Other Claims of Misconduct

Defendant's other claims of misconduct fail for similar reasons. As this Court previously held, even if the Court accepts that the Government lied to Defendant about Mullins testifying and D.L.'s ability to remain opioid-free, Defendant has given no indication that this prejudiced him at trial. ECF No. 233. Defendant also claims that he was denied due process because of the Department of Justice's press release regarding his case. But even if the Court accepts Defendant's characterization of the press release, he has not explained how it prejudiced him. The Court asked all potential jurors whether they had "read something or heard anything about this particular case." Hr'g Tr. 21:23-25, ECF No. 173. Only one juror notified the Court that they had read a newspaper

article about the case, and that juror was later excused for other reasons.

In sum, the Court finds that although the Government committed two inexcusable errors, those errors were isolated events that did not unfairly prejudice Defendant such that his due process rights were violated. Accordingly, Defendant has failed to identify grounds to justify a new trial.

## IV. CONCLUSION

For the foregoing reasons, the Motion is **GRANTED** as to Counts 1-2 and **DENIED** as to Counts 3-17.

The Clerk is **DIRECTED** to send a copy of this Order to counsel and the defendant, the United States Attorney's Office, the United States Probation Office, and the United States Marshals Service.

ENTER:        December 23, 2020

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE