IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

UNITED STATES OF AMERICA

v.  CRIMINAL ACTION NO.  3:19-00239

RICKY L. HOUDERSHELDT, D.O.

**MEMORANDUM OPINION AND ORDER**

Defendant Ricky L. Houdersheldt, D.O., was convicted by jury on August 10, 2020, of seventeen counts of Distribution of a Quantity of a Controlled Substance, Not for Legitimate Medical Purposes in the Usual Course of Professional Medical Practice and Beyond the Bounds of Medical Practice, in violation of 21 U.S.C. § 841(a)(1). Sentencing is scheduled for January 6, 2021. On December 9 and 10, 2020, the Court held an evidentiary sentencing hearing on the United States' objection to paragraphs 54 and 76 of the Presentence Report (PSR) for failing to apply an obstruction of justice enhancement pursuant to U.S.S.G. § 3C1.1. *See Addendum to PSR*, United States' Obj. #1, at 45; *Sent. Memo. of the U.S.*, at 1-10, ECF No. 224. The Court also heard evidence on Defendant's objection to the inclusion of relevant conduct to the offenses of conviction. *See PSR*, Def.'s Obj. #12; *Sent. Mem. of Def.*, 2-40 ECF No. 225. Upon review of the evidence and the arguments of the parties, the Court **HOLDS IN ABEYANCE** a final decision on the United States' obstruction of justice objection and **GRANTS, in part,** and **DENIES, in part**, Defendant's objection to relevant conduct.

**I.
Obstruction of Justice Enhancement**

Section 3C1.1 of the United States Sentencing Guidelines provides for a two-level increase when a defendant:

> willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense[.]

U.S.S.G. § 3C1.1. In relevant part, Application Note 1 of the Commentary to this section explains that this adjustment will apply if a "defendant's obstructive conduct . . . occurred with respect to the investigation [and] prosecution . . . of the defendant's instant offense of conviction, and . . . [it] related to . . . the defendant's offense of conviction . . . ." U.S.S.G. § 3C1.1, cmt. n.1, in part. Recognizing there can be wide variations in obstructive conduct, the Sentencing Commission set forth non-exclusive examples of conduct to illustrate types of conduct for which the enhancement is intended and not intended to apply. U.S.S.G. § 3C1.1, cmt. n.3. Included amongst the examples warranting an enhancement is when a defendant "conceal[s] . . . evidence that is material to . . . [a] judicial proceeding" or provides "materially false information to a judge." U.S.S.G. § 3C1.1, cmt. n.4(D) & (F), in part. Application Note 6 defines "material" as "evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1, cmt. n.6. "The threshold for materiality . . . is conspicuously low." *United States v. Gormley*, 201 F.3d 290, 294 (4th Cir. 2000) (internal quotation marks and citations omitted). However, if a defendant "provid[es] incomplete or misleading information, not amounting to a material falsehood, in respect to a presentence investigation," for instance, the conduct does not ordinarily warrant the enhancement, but it may justify "a greater sentence within the otherwise applicable guideline range[.]" U.S.S.G. § 3C1.1, cmt. n.5, in part.

"In order to apply the obstruction of justice enhancement, the district court must find that a defendant consciously acted with the purpose of obstructing justice." *Gormley*, 201 F.3d at 294 (internal quotation marks and citations omitted). Additionally, even if a false statement had no

actual effect on a proceeding, an obstruction of justice enhancement applies if the false statement, if believed, could "influence or affect the issue under determination." U.S.S.G. § 3C1.1, cmt. n.6; *Gormley*, 201 F.3d at 294-95 (holding the district court did not error in applying the enhancement where the defendant made a materially false statement that "could have affected the sentence ultimately imposed within the guideline range"). Application Note 9 also provides that the enhancement can apply based upon a defendant's own conduct and if "the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused" another's conduct. U.S.S.G. § 3C1.1, cmt. n.9. It is the government's burden to prove "facts supporting the enhancement by a preponderance of the evidence." *United States v. Andrews*, 808 F.3d 964, 968 (4th Cir. 2015) (citing *United States v. O'Brien*, 560 U.S. 218, 224 (2010)).

In this case, Defendant stated that the parties engaged in a reverse proffer in June 2020, in which the United States represented that one of Defendant's patients, D.L., was going to be a star witness and that she had turned her life around after he stopped prescribing opioids to her. Thereafter, Defendant actively sought to obtain Board of Pharmacy (BOP) records on D.L. from the United States to determine if D.L. was still obtaining opioid prescriptions from other providers. The United States provided him those records on July 17, 2020, and they revealed D.L. had received eleven opioid prescriptions from two dentists who were her employers.[1] Defendant contended the United States ran periodic BOP record checks on D.L. so it should have disclosed that information earlier than it did. Defendant insisted this evidence was critical to his case and the United States' untimely disclosure of impeachment and exculpatory evidence just two weeks

---

[1]The two dentists are in the same practice. The United States also disclosed that D.L. was arrested on a charge of obtaining property in return for a worthless check in violation of West Virginia Code § 61-3-39. In its Response to Defendant's motion, the Government stated that D.L. plead no contest in February 2020 to a misdemeanor. *Opp. to Def.'s Motion to Dismiss Counts One through Six of the Second Superseding Indictment,* at 3, ECF No. 103.

.

before trial impeded his ability to have a fair trial in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972).

In its Response, the United States asserted the additional prescriptions D.L. received were valid and for legitimate dental treatment. The United States also argued the disclosure did not violate Defendant's due process rights because he received the information in sufficient time prior to trial.

The Court heard arguments on the motion at the Pretrial Conference held on Wednesday, July 29, 2020. At the hearing, counsel for the United States represented that they had just received the BOP records when they turned them over to Defendant. However, immediately following the hearing, the United States informed the Court and Defendant that the records actually were provided to them much earlier than July 17 and before the parties had engaged in the reverse proffer. Thereafter, the United States filed a "Notice of Record Production" (ECF No. 111), and the Court scheduled a hearing on the matter for Friday, July 31, 2020. ECF No. 112. At the hearing, Defendant challenged whether D.L.'s prescriptions were legitimate and renewed his motion to dismiss the counts related to D.L. for late disclosure of impeachment evidence. To give Defendant the opportunity to investigate the prescriptions, the Court entered an Order directing subpoenas be issued for a deposition of one of the dentists and for the production of records. The parties conducted the deposition of one of the dentists on Saturday morning, and the Court was satisfied that any issues created by the late disclosure were remedied. The case then proceeded to trial on Monday, August 3.

Now, the United States has produced evidence that Defendant had a copy of D.L.'s BOP records long before it produced them and prior to the reverse proffer. At the sentencing hearing held on December 9, 2020, the United States offered the testimony of Chere Robertson, who

worked for Defendant as a medical assistant. As part of her duties, Ms. Robertson ran BOP checks of Defendant's patients to review the prescriptions they were receiving to make sure they were following the prescription guidelines in their contracts with Defendant. Ms. Robertson testified that Defendant personally asked her to pull D.L.'s BOP records in May 2020, and she gave copies of the records to the office manager and Defendant. Defendant did not provide any reason for his request. She recalled pulling the records again in either June or July of 2020 and giving the records to the office manager.[2] These records were obtained after Defendant was prohibited from writing prescriptions and was no longer treating D.L.

The United States also presented the testimony of Michael Goff, the Executive Director of the Controlled Substance Monitoring Program Administrator for the West Virginia BOP. Mr. Goff testified that to get an account with the BOP an individual must have a DEA and medical license. Once an account is created, a physician can create delegate accounts so office staff can access records. Regardless of who in an office accesses records, they only may be obtained for legal purposes. Mr. Goff testified that accessing an individual's prescribing history to prepare for litigation is not a proper use of the system. Mr. Goff further testified and produced a record showing Ms. Richardson username and password were used several times prior to July 17, 2020, to access D.L.'s prescription history. *See* Gov't Ex. 1b, *User Tracker Report for Robertson* (Oct. 27, 2020). Mr. Goff also produced a record showing that Defendant's username and password were used to access D.L's prescription history several times between July 22 and August 26, 2020. *See* Gov't Ex. 1a, *User Tracker Report for Houdersheldt* (Oct. 27, 2020).

---

[2] Ms. Robertson stated that the officer manager also asked her to pull D.L.'s record in February 2020.

The United States argues this evidence proves Defendant already had D.L.'s records before it disclosed them to him in July. Thus, the United States contends Defendant deliberately misrepresented to the Court that he needed those records to adequately prepare his defense and that the timing of the United States disclosure warranted dismissal of all the charges related to D.L. Therefore, the United States insists Defendant should receive a two-point enhancement under U.S.S.G. § 3C1.1.

Upon consideration of the evidence, the Court finds the evidence clearly establishes that Defendant had obtained copies of D.L.'s records prior to July 17, when they were first disclosed by the United States. The Court also finds there was no legitimate reason for Defendant to obtain D.L.'s records on one occasion because he was no longer authorized to write prescriptions[3] and he was no longer treating D.L. Although there is no evidence that defense counsel knew Defendant had accessed the records before it was recently discovered by the United States, the Court is troubled by the fact Defendant silently sat back and watched a flurry of events unfold based upon his counsels' insistence they did not have the records in time to investigate and potentially impeach D.L.'s testimony. Defense counsel went so far as to ask that all the charges related to D.L. be dismissed prior to trial, and they raised the issue as an error in Defendant's post-trial motion. *See Def.'s Motion to Dismiss Counts One through Six of the Second Superseding Indictment*, ECF No. 97; *Mem. in Supp. of Def.'s Renewed Mot. for J. of Acquittal or Dis. or, in the alternative, a New Trial*, at 72-82, ECF No. 186. Certainly, as argued by Defendant, the United States was obliged to give him the records. However, the United States' missteps in providing him those records does not change the fact Defendant already had them. In light of the evidence, the Court finds

---

[3]As a condition of Defendant's bond, he agreed that he would not write any controlled substance prescriptions. *Order Setting Conditions of Release*, at 2 (Sept. 24, 2019), ECF No. 11.

Defendant's conduct warrants consideration under the Commentary to § 3C1.1. However, the Court reserves until Sentencing to decide whether the conduct rises to the level of a two-point enhancement or whether a sentence near the top of the Guideline range is appropriate.

## II.
## Relevant Conduct

Turning next to relevant conduct, Defendant objects to the inclusion of drug quantities for prescriptions Defendant wrote outside the counts of conviction. These additional prescriptions were written for D.L., B.W., and R.W., all of whom were mentioned in the second superseding indictment, and a fourth patient, K.S., who was never mentioned in the second superseding indictment or at trial. Counting these prescriptions together with the counts of conviction results in a significant increase to Defendant's base offense level under the Sentencing Guidelines—from a level 18 to a level 30. Nevertheless, the United States argues these prescriptions are properly included as relevant conduct because they constitute "acts . . . that were part of the same source of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2).

In considering the parties' arguments, the Court is mindful that "the overarching design of the Sentencing Guidelines is aimed at sentencing defendants in substantial part for 'the actual conduct in which the defendant engaged regardless of the charges for which he was indicted or convicted.'" *United States v. Agyekum*, 846 F.3d 744, 751 (4th Cir. 2017) (quoting U.S.S.G. § 1A1.4(a)). Thus, a defendant may be sentenced more broadly than the offense of conviction based on relevant conduct. *Id*. (citations omitted). Additionally, the United States is not required to present at trial everything it intends to argue is relevant conduct. Similarly, this Court is not bound by the trial evidence in calculating drug quantities for relevant conduct purposes. *U.S. v. Young*, 609 F.3d 348, 358 (4th Cir. 2010) (citations omitted). However, not all conduct is relevant conduct, and the Court must determine whether the United States has met its burden to establish

relevant conduct by a preponderance of the evidence. *See United States v. Perry*, 560 F.3d 246, 258 (4th Cir. 2009), as corrected (Mar. 31, 2009) (holding "[i]t has long been established that sentencing courts may consider acquitted conduct in establishing drug amounts for the purpose of sentencing, so long as the amounts are established by a preponderance of the evidence[,]" but declining to address whether extreme circumstances warrant application of the clear and convincing standard (citation omitted)). In considering whether these other prescriptions should be included as relevant conduct, the Court finds instructive the Fourth Circuit's recent decision in *United States v. Brizuela*, 962 F.3d 784 (4th Cir. 2020).

In *Brizuela*¸ the defendant was a physician who was convicted by jury of fifteen counts of unlawfully distributing controlled substances outside the bounds of professional medical practice, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C). 962 F.3d at 786, 789. Each of these counts was "related to specific prescriptions written for five of [the defendant's] patients[.]" *Id*. at 789. At trial, the government called six of the defendant's patients to testify about their treatment. Two of the patients were amongst the five whose prescriptions were subject to the indictment, and the other four patients had no charges associated with their treatment. *Id*.

Prior to trial, the government gave the defendant and the district court notice that it intended to introduce the additional patients' testimony under Federal Rule of Evidence 404(b) "because it was 'necessary to complete the story of the crime on trial.'" *Id*. at 791 (quoting *United States v. Kennedy*, 32 F.3d 876, 886 (4th Cir. 1994) (referred to as the "*Kennedy* doctrine")). In the alternative, the government argued the other patients' testimony was admissible under Rule 404(b)(2) to show the defendant did not write the prescriptions by mistake or accident. *Id.* (footnote omitted). On appeal, the defendant argued that the district court erred in permitting the testimony

of the four patients whose treatment did not serve the basis of a criminal charge. *Id*. at 791. Upon review, the Fourth Circuit agreed and reversed the defendant's conviction. *Id.* at 793.

In making its decision, the Fourth Circuit recognized that "not all prior 'bad act' evidence is" barred from admission under Rule 404(b) as "evidence of another 'crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.'" *Id*. (quoting Fed. R. Evid. 404(b)(1) (internal quotation marks and citation omitted)). Instead, only extrinsic evidence, that is, evidence "separate from or unrelated to the charged offense," is covered by the Rule. *Id*. "In contrast, acts that are a part of, or intrinsic to, the alleged crime do not fall under Rule 404(b)'s limitations on admissible evidence." *Id*. (internal quotation marks and citations omitted).

In deciding if evidence is "intrinsic" to a charged offense, and not prohibited under Rule 404(b), the Fourth Circuit requires a "case-by-case, fact-based analyses" to determine if the conduct "'arose out of the same . . . series of transactions as the charged offense, . . . or is necessary to complete the story of the crime on trial.'" *Id*. at 793-94 (quoting *Kennedy*, 32 F.3d at 886; other citations and footnotes omitted). Whether evidence of uncharged conduct "completes the story" requires a finding that the evidence is "probative of an integral component of the crime on trial or provide[s] information without which the factfinder would have an incomplete or inaccurate view of the other evidence or of the story of the crime itself." *Id*. at 795. The Fourth Circuit emphasized "that the evidence must be 'necessary' to 'complete the story' of the charged offense." *Id*. (citing *Kennedy*, 32 F.3d 885). In order to meet this requirement, courts must be careful "to ensure that there is a clear link or nexus between the evidence and the story of the charged offense, and that the purpose for which the evidence is offered is actually essential" to prevent propensity evidence from being admitted under the pretext of the "'complete the story' doctrine." *Id*.

Applying these criteria to the challenged evidence before it, the Fourth Circuit found the testimony of the four patients whose treatment did not serve as the basis of a criminal charge was not "necessary to 'complete the story' of the charged offenses and, therefore, described conduct that was extrinsic to the offenses for which [the defendant] was charged." *Id*. Importantly, the Fourth Circuit looked to the Controlled Substances Act and the regulations and found "[a]n unlawful distribution violation under § 841 is . . . charged by citing a *specific* prescription." *Id*. (italics added). In other words, "a doctor's violation of § 841 is prescription specific, and writing a prescription only violates § 841 if, in doing so, the doctor strays from bounds of professional medical practices *in treating that specific patient*." *Id*. at 797 (emphasis original; citations omitted). For purposes of a § 841 offense under these circumstances, the "story" "is whether in writing the cited prescription, the defendant doctor was treating *the patient receiving the prescription* within the bounds of professional medical practices." *Id*. (emphasis original).

However, the Fourth Circuit found that none of the testimony challenged in *Brizuela* "reference[d] or encompass[ed] any of the 21 prescriptions listed in the indictment," nor did these patients describe acts arising "from the same transaction, series of transactions or single criminal episode as the charged offenses." *Id*. at 796. Moreover, the Fourth Circuit found these patients did not offer any testimony "necessary to prove a specific element of a charged offense or provide information that was essential to understanding how the offense was committed." *Id*. On the contrary, their testimony was completely unnecessary to proving the actual charges and merely invited jurors to find the defendant guilty by association and pattern. *Id*. It simply is not enough to use uncharged conduct to show the extensiveness or severity of the defendant's acts to be admissible under the "complete the story" doctrine. Instead, the evidence must be clearly linked to the charged offenses and "'complete the story *of the crime[s] on trial*.'" *Id*. at 797 (quoting

-10-

*Kennedy*, 32 F.3d at 885; emphasis added in *Brizuela*). Based upon the facts before it, the Fourth Circuit held the government failed to sufficiently connect the treatment of the four additional patients to the charges in the indictment to be admitted under the "complete the story" doctrine. *Id*.

Having found the testimony was not admissible under either of the government's theories, the Fourth Circuit then considered whether the introduction of that evidence was harmless error. Faced with a close question on that issue, the Fourth Circuit ultimately found the government failed to meet its burden of showing the introduction of the testimony was harmless. Therefore, the Fourth Circuit vacated the defendant's burden and reversed and remanded the case for a new trial. *Id*. at 799-80.

Although *Brizuela* involves the admissibility of testimony regarding uncharged conduct to prove a defendant's guilt, rather than evidence of uncharged conduct being attributed as relevant conduct, the Court finds the principles underscored in *Brizuela* are significant here. Before uncharged conduct can be considered relevant conduct, the United States must establish by a preponderance of the evidence that the uncharged conduct constitutes a crime. In other words, the specific prescriptions listed in the PSR must exceed the "bounds of professional medical practices *in treating that specific patient*." *Id*. at 797 (emphasis original). To determine whether this standard is met, the Court must look at each specific prescription and compare it to the evidence presented at trial and at the sentencing hearing. Following a thorough and painstaking review of the prescriptions and evidence,[4] the Court finds as follows.

---

[4] Included within the PSR's calculation of relevant conduct are Gabapentin, Dexmethylphenidate, and Suboxone. The United States stated it agrees that neither the Gabapentin nor Dexmethylphenidate prescriptions should be used in calculating relevant conduct, and it took no position on whether the Suboxone should be used. Given these representations, the Court shall not include these prescriptions as relevant conduct.

In determining offense and relevant conduct, the PSR adopted the expert report of Timothy Munzing, M.D., a physician board certified in Family Medicine and expert in pain management, who testified on behalf of the United States at trial and at the sentencing hearing. With respect to D.L., the PSR identified 106 total controlled substance prescriptions between 2014 and 2019,[5] and 147 prescriptions for B.W. between a similar period. The chart in the PSR breaks out prescriptions by separating the substances, identifying them by brand name, listing the date of issuance, and detailing the number of pills or patches ordered. In D.L.'s case, it results in separate calculations of drug weights for Norco, Adderall, Dexedrine, Percocet, Tylenol #4, Suboxone, and small amounts of three other substances. A similar chart is included for prescriptions written for B.W., but it consists of Fentanyl patches, Morphine Sulfate, Xanax, and Valium. The PSR also accepts Dr. Munzing's report as to numerous prescriptions for R.W. and K.S., using similar charts to support finding these prescriptions are relevant conduct. Considering the trial testimony and exhibits, and the testimony and exhibits submitted at the sentencing hearing, the Court accepts, in part, and rejects, in part, the list of prescriptions added to the PSR as relevant conduct.

As to the prescriptions for D.L., the Court rejects the prescriptions listed in the chart, other than the four resulting in the counts of conviction, finding the United States has not demonstrated by a preponderance of the evidence that these prescriptions were illegal. In reaching this conclusion, the Court finds the evidence does not establish that each prescription was a knowing and intentional distribution of a controlled substance, not for legitimate medical purposes in the usual course of professional medical practice and beyond the bounds of professional medical practice. Though likely not in compliance with the standard of care for treating chronic pain

---

[5] This figure includes eleven prescriptions for Suboxone and two prescriptions for Gabapentin.

through the use of opioids, Defendant may have had a reasonable, good-faith belief that his use of opioids and benzodiazepines was for a legitimate medical purpose. Despite lax, or worse, documentation and/or examinations, Defendant was very familiar with D.L. and, in fact, was seeing her in his office weekly during the period of time covering the charged conduct and on at least a monthly or so basis throughout the 2014-19 period. As she testified at trial, Defendant well knew that she was engaged in challenging physical labor—running a farm—and often had to deal with pain. The incompleteness of his records and the absence of exam findings, for a patient he knew well and monitored regularly, carries less significance than the United States urges. At trial, that Defendant seemingly ignored suspicious drug screen results, where "no more meds" or such was written, certainly supported Dr. Munzing's and the United States' theory. However, at the sentencing hearing, the medical assistant explained that such notations meant merely that any future prescriptions had to be discussed with and approved by the doctor. More importantly, the facts are that D.L. tried Suboxone alternatives under Defendant's care on two occasions, and the reasons she did not continue were unrelated to Defendant. D.L. also testified, and the prescription records confirm, that on more than one occasion she sought less pain medication so Defendant switched her to Tylenol #4 and, over time, tapered the morphine milligram equivalents (referred to as MMEs) dosage.

      The bottom line is this: for any prescription to be included in the offense and relevant conduct, it must constitute a crime. To do so, each must be considered and supported by evidence to meet the elements of the offense. The Court cannot rely on sweeping generalizations of impropriety or assume a pattern of conduct, suspecting that some relevant facts exist but not having evidence that it is so. When reviewing a physician's decisions in prescribing a controlled substance, the Court must focus on the facts at that time, considering that over time the course of

treatment of the patient's condition may change, the options available to the doctor may be different, and other factors may come into play that alter the assessment. Further, this case presents none of the circumstances often cited as indicia of criminality in physician prescribing cases, such as patients traveling long distances to see the doctor, paying in cash, utilizing multiple pharmacies, or instructing patients how to seek prescriptions.

In the case of D.L.'s prescriptions, other than the offenses of conviction, the Court is not persuaded that all the other prescriptions were illegal; thus, they cannot be included as relevant conduct. There was not evidence the MME doses, even if medically unreasonable, were so extreme that they exceed the bounds of medical judgment. Further, the length of time she received opioids does not surpass some sort of duration limit, beyond which it is per se illegal. As James Murphy, M.D., a pain and addiction medicine specialist, testified at the sentencing hearing on behalf of Defendant, concomitant use of opioids and benzodiazepines is disfavored but not precluded. There clearly are serious risks, but no evidence those risks were born out. The United States has not established this "polypharmacy" makes these dual prescriptions criminal in the context of these patients, and the patients did report anxiety, depression, and similar concerns for which benzodiazepines are appropriate.

Turning to B.W., key facts are unlike those in D.L.'s case and compel a different result. Dr. Munzing testified at trial that during the period covering the counts of conviction for this patient, Defendant persisted with extremely high MME doses with little, if any, consideration of alternatives, despite signs the patient was addicted. This high level went on for years as both Fentanyl and Morphine were prescribed together regularly from 2014-19. However, the Court cannot base the finding of an illegal prescription on the MME dose amount standing alone. Rather, the surrounding circumstances relative to each particular prescription must support the finding.

This analysis requires consideration of the progress notes, drug screens, and other facts to conclude that a "red flag" is more than suspicious. The evidence before the Court does not meet this test for prescriptions outside the time period covered by the indictment—March 2018 through March 2019—about which Dr. Munzing testified and identified pertinent records.

Dr. Munzing pointed to particular office notes for March 2, 2018, demonstrating Defendant continued writing high dose prescriptions on that date without evidence that B.W.'s condition supported them. His records reflected no real physical examination, but also "no acute distress" or any support for the Fentanyl patch or Morphine he prescribed. Then, a few months later on June 14, 2018, he noted B.W.'s complaints of constipation and tooth decay due to chronic opioid use, two "red flags," but reissued the same high dose opioids. At an office visit on September 4, 2018, the patient's dependency on the pain medication was again noted, but no change in treatment was considered. Dr. Munzing concluded that for a three-year period, Defendant had simply prescribed very high levels of opioids with no supporting findings or documentation, little or no information on B.W.'s mental health or possible addiction, and no effort to taper or alter opioids. The final specific medical record cited by Dr. Munzing at trial was the drug screen of March 25, 2019, which repeated suspicious findings. The Court refuses to go outside this time period to assess relevant conduct against Defendant. The Court will instruct the Probation Office to recalculate the drug quantity to conform to this ruling and provide it to counsel.

As to K.S., the evidence shows she was a patient of Defendant's for several years. At the sentencing hearing, the United States focused Dr. Munzing's testimony on the period between March 2017 to June 2019. During that period, numerous prescriptions for controlled substances were written for her by Defendant. Her addiction was frequently noted, and she had been on Suboxone periodically before this time period. Dr. Munzing criticized Defendant's poor

documentation, inadequate explanation for continuing opioid and other controlled substances, and suspicious notations of the office forms. Though the MME of Defendant's prescriptions to K.S. reached as high as 180, it was often lower than 180 and not nearly as high as that for patient B.W. It also is apparent that K.S. had several serious medical problems besides her opiate use, for which Defendant provided follow-up care.

K.S. died in September 2020, so without the benefit of her testimony, the Court is reluctant to hold Defendant criminally liable for what may have been just poor medical judgment. Unlike B.W., Defendant's opioid prescriptions for K.S. were not extraordinarily high over a period of years, and K.S.'s attempts to address her addiction by turning to Suboxone were reasonable steps by Defendant to treat her. The variety and nature of her other medical problems made treating her pain more complex. Given all these considerations, the Court cannot conclude that the prescriptions Defendant wrote for K.S. were "not for legitimate medical purposes in the usual course of professional medical practice and beyond the bounds of medical practice." Thus, the Court rejects the prescriptions written for K.S. as relevant conduct.

Turning last to R.W., the Court reaches the same conclusion as the jury with respect to the prescriptions written by Defendant. R.W. has a complicated medical history, and he turned to Defendant as his primary care physician. However, R.W. also went to specialists, and he was actively engaged with his doctors. Though the same general criticisms expressed by Dr. Munzing apply to Defendant's treatment of R.W., poor documentation and questionable physical exams are not strong evidence of criminality. Additionally, the MME levels were much lower than B.W.'s. Therefore, the Court finds the United States has failed to meet its burden of showing that the prescriptions Defendant gave R.W. should be counted as relevant conduct.

## III.
## CONCLUSION

Accordingly, for the foregoing reasons, the Court the **HOLDS IN ABEYANCE** a final decision on the United States' obstruction of justice objection and **GRANTS, in part,** and **DENIES, in part**, Defendant's objection to relevant conduct. The Court further **DIRECTS** the Probation Office to submit an Addendum to the Presentence Report **on or before Monday, December 28, 2020,** with revised calculations that only count as relevant conduct the prescriptions written for B.W. between March 2018 through March 2019 and that disregard as relevant conduct the prescriptions written for D.L., K.S., and R.W.

The Court **DIRECTS** the Clerk to send a copy of this Order to the defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER: December 23, 2020

_____
ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE